James E. Cecchi
CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | |
| NEWELL BRANDS INC., MICHAEL B. POLK, RALPH J. NICOLETTI, and JAMES L. CUNNINGHAM, III, | **COMPLAINT and** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Bucks County Employees Retirement Fund ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Newell Brands Inc. ("Newell Brands" or the "Company"), as well as reports by securities analysts, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of purchasers of Newell Brands common shares (hereinafter the "common stock" or "common shares") between February 6, 2017 and January 24, 2018, inclusive (the "Class Period"), seeking to pursue remedies under Sections10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78aa].

3.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

4.      Venue is proper pursuant to Section 27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District, and the Company is headquartered in this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

**PARTIES**

6.      Plaintiff Bucks County Employees Retirement Fund, as set forth in the accompanying certification incorporated by reference herein, purchased Newell Brands common stock during the Class Period and has been damaged thereby.

7.      Defendant Newell Brands is a global manufacturer and marketer of name brand consumer products.  The Company maintains its headquarters in Hoboken, New Jersey and its common stock trades on the NYSE under the symbol NWL.

8.      Defendant Michael B. Polk ("Polk") served, at all relevant times, as Chief Executive Officer and a Director of Newell Brands.

9.      Defendant Ralph J. Nicoletti ("Nicoletti") served, at all relevant times, as Executive Vice President and Chief Financial Officer of Newell Brands.  On June 1, 2018, Newell Brands issued a press release announcing the retirement of Defendant Nicoletti effective December 31, 2018.

10.     Defendant James L. Cunningham, III ("Cunningham") served, at all relevant times, as Senior Vice President and Chief Accounting Officer of Newell Brands.

11.     Defendants Polk, Nicoletti and Cunningham are referred to collectively herein as the "Individual Defendants."   Unless otherwise noted herein, Defendant Newell Brands and the Individual Defendants are collectively referred to herein as "Defendants."

12.     Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects.  This adverse undisclosed information was acquired by the Individual Defendants via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations

compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors (the "Board") meetings and committees thereof, and via reports and other information provided to them in connection therewith.

13.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of Newell Brands, was directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial affairs and financial reporting, as alleged herein.  The Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being publicly disseminated, and approved or ratified such false and misleading statements in violation of the federal securities laws.

14.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the data alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants were responsible for the accuracy of the public reports and statements detailed herein and is therefore primarily liable for the representations contained therein.

15.     The Individual Defendants each had a duty, as officers and controlling persons of a publicly held company whose shares are registered with the SEC pursuant to the Exchange Act and are traded on the NYSE, to promptly disseminate accurate and truthful information with respect to

the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects during the Class Period. In addition, the Individual Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue so that the market price of Newell Brands publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Newell Brands common stock (the "Class") by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Newell Brands' business, prospects and operations, as well as the intrinsic value of Newell Brands common stock; (b) enabled corporate insiders to sell approximately $21 million of their Newell Brands common stock to the unsuspecting public at artificially inflated prices; and (c) caused Plaintiff and the Class to purchase Newell Brands common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

17.     Defendant Newell Brands is a global manufacturer and marketer of name brand consumer and commercial products that are sold in nearly 200 countries around the globe.

18.     The history of Newell Brands dates back more than 100 years, with its growth primarily emanating from a long list of acquisitions, the most recent of which occurred in April 2016 when the Company, then named Newell Rubbermaid, acquired Jarden Corporation ("Jarden"). Following the acquisition of Jarden, the Company was renamed Newell Brands.

19.     The acquisition of Jarden, a global consumer products company whose brands included Yankee Candle®, Crock-Pot®, FoodSaver®, Mr. Coffee®, Oster®, Coleman®, First Alert®, Rawlings®, Jostens®, K2®, Marker®, Marmot®, and Völkl®, more than doubled the size of the Company.  In addition to the above noted brands acquired from Jarden, the Company's legacy portfolio of brands include Paper Mate®, Sharpie®, Dymo®, Expo®, Parker®, Elmer's®, Rawlings®, Irwin®, Lenox®, Sunbeam®, Rubbermaid Commercial Products®, Graco®, Baby Jogger®, NUK®, Calphalon®, Rubbermaid®, Contigo®, and Waddington.

20.     After the Jarden acquisition, the Company began consolidating its business units into global divisions and extending its design, innovation and brand development capabilities across a broader set of categories.  These organization changes resulted in formation of global divisions that generally fall into four areas of strategic focus, which Newell Brands refers to as "Live," "Learn," "Work," and "Play."

21.     During the Class Period, the Company operated its business via nine business segments.  These segments, and the key brands within each segment, are as follows:

| Segment | Key Brands | Description of Primary Products |
|---|---|---|
| Writing | Sharpie®, Paper Mate®, Expo®, Prismacolor®, Mr. Sketch®, Elmer's®, X-Acto®, Parker®, Waterman®, Dymo® Office | Writing instruments, including markers and highlighters, pens and pencils; art products; activity-based adhesive and cutting products; fine writing instruments; labeling solutions |
| Home Solutions | Rubbermaid®, Contigo®, bubba®, Calphalon®, Goody® | Indoor/outdoor organization, food storage and home storage products; durable beverage containers; gourmet cookware, bakeware and cutlery; hair care accessories |
| Tools | Irwin®, Lenox®, hilmor™, Dymo® Industrial | Hand tools and power tool accessories; industrial bandsaw blades; tools for HVAC systems; label makers and printers for industrial use |
| Commercial Products | Rubbermaid Commercial Products® | Cleaning and refuse products; hygiene systems; material handling solutions |
| Baby & Parenting | Graco®, Baby Jogger®, Aprica®, Teutonia® | Infant and juvenile products such as car seats, strollers, highchairs and playards |
| Branded Consumables | Yankee Candle®, Waddington, Ball®, Diamond®, First Alert®, NUK®, Quickie®, Pine Mountain® | Branded consumer products; consumable and fundamental household staples |
| Consumer Solutions | Crock-Pot®, FoodSaver®, Holmes®, Mr. Coffee®, Oster®, Rainbow®, Sunbeam® | Household products, including kitchen appliances and home environment products |
| Outdoor Solutions | Coleman®, Jostens®, Berkley® Shakespeare®, Rawlings®, Völkl®, K2®, Marmot® | Products for outdoor and outdoor-related activities |
| Process Solutions | Jarden Plastic Solutions, Jarden Applied Materials, Jarden Zinc Products | Plastic products including container closures, contact lens packaging, medical disposables, plastic cutlery and rigid packaging |

22.     The Company's principal customers are large mass merchandisers, such as discount stores, home centers, warehouse clubs, office superstores, craft stores, direct-to-consumer channels,

specialty retailers and wholesalers, commercial distributors, and e-commerce companies.  During 2016, approximately 72% of the Company's revenues were derived from sales to U.S. customers, with approximately half of its U.S. revenue concentrated among 20 retailers.

23.     Throughout the Class Period, Defendants used the term "core sales," a non-GAAP financial measure, to explain Newell Brands results to stockholders and the investment community, as well as to internally evaluate and manage the Company's business.  According to the Company's earnings press releases during the Class Period, Defendants believe that the term "core sales" provided investors with a more complete understanding of Company sales trends by "providing sales on a consistent basis as it excludes the impacts of acquisitions [other than the Jarden acquisition, which it included in the core sales measure on a pro-forma basis starting in the second quarter of 2016], planned or completed divestitures, the deconsolidation of the Company's Venezuelan operations and changes in foreign currency from year-over-year comparisons."

24.     In addition, the Company's SEC filings note that Newell Brands generally records a sale upon shipment or delivery of merchandise to its customers, at which time Defendants consider the merchandise to be "channel inventory" because, while the merchandise has been purchased from Newell Brands by a retailer or distributor, it has not yet been purchased by a consumer. Accordingly, during the Class Period, Defendants used the term "sell-in" to describe a sale by Newell Brands to a distributor or retailer and "sell-though" or "sell-out" to describe a sale by a distributor or retailer of the Newell Brands merchandise to the ultimate consumer.  Thus, when sell-in is higher than sell-through or sell-out, channel inventory levels generally increase.

25.     Prior to and during the Class Period, the U.S. retail environment had been experiencing an on-going transformation from the traditional "brick-and-mortar" store fronts to an e-

commerce business model.  According to Defendants, this transition caused retailers to, among other things, endeavor to reduce physical store counts and inventory levels.

26.     Despite the challenges ensuing from this transformation in the retail environment, and numerous other challenges, including rising manufacturing costs, retail bankruptcies, mall traffic weakness and a high level of Company debt, Defendants falsely and misleadingly reassured investors early in the Class Period that Newell Brands' positive financial results provided the market with strong evidence of its ability to execute on Defendants' commitment to drive growth at Jarden by having it implement the Company's legacy business model and that the adverse financial ramifications associated with retail channel inventory reductions were "behind us now."

27.     Unbeknownst to investors, however, the favorable financial performance reported by Newell Brands during the early part of the Class Period resulted from steep promotional discounts granted by the Company to its customers, which caused the retail channel to be loaded up with excess Newell Brands product in advance of the 2017 back-to-school and holiday selling seasons. Defendants knowingly, or recklessly, failed to disclose that the Company's future sales growth would be adversely impacted given that retailers, which generally had been aiming to maintain lower levels of inventory, needed to materially slash future purchases in an attempt to clear the known, but undisclosed, massive build-up of Newell Brands inventory in the retail channel.

28.     Indeed, later in the Class Period, Defendant Polk acknowledged that Defendants were aware of the build-up of inventory in the retail channel during the Class Period when he represented that Defendants actively monitor inventory in the retail channel, stating that Defendants "model our inventory position at by [sic] retail, or by product family, every month."  Defendant Polk further represented that Newell Brands also monitored its channel inventory by comparing the Company's invoicing to retail sales statistics, including customer point-of sale ("POS") data.

29.     Defendants also knew, but failed to disclose, that material reductions in retailer purchasing patterns would have a particularly pronounced impact on Newell Brands operations given that 50% of its products are manufactured around the globe and its long supply chain does not provide it with the flexibility to timely cancel ordered merchandise, which further amplifies the build-up of unsold Newell Brands inventory.

30.     When Defendants announced the Company's 2017 third quarter results on November 2, 2017, they disclosed, during their earnings call, that Newell Brands' "disappointing outcome" and materially lower core sales growth (0.4% versus Wall Street estimates of 2.9%) were due to "retailers pull[ing] back on order rates and rebalanced inventories" to help clear the known, but previously undisclosed, bloated build-up of Newell Brands inventory in its retail channel.  Indeed, retailers dramatically reduced product re-order rates even though Defendants stated that retailers experienced 3.5% sellout growth, thereby demonstrating the extent to which Defendants had loaded up the retail channel with Newell Brands products.

31.     On November 2, 2017, in response to this news, the price of Newell Brands stock fell approximately *27%*, or $10.99 per share, on heavy trading volume to close at $30.01 per share.

32.     Defendants, however, continued to mislead the market by downplaying the amount of Newell Brands inventory in the retail channel and the effects of such inventory on the Company's future sales growth.

33.     In addition, Defendants misled investors about the synergies associated with newly acquired Jarden.  Although the legacy Newell Brands and Jarden businesses looked similar on paper, unbeknownst to investors, they were operated in completely different fashions, with legacy Newell Brands employing a highly centralized model, while Jarden utilized a highly decentralized, more entrepreneurial model.  This undisclosed difference in managerial style and culture caused

significant internal discord that had a material adverse effect on the Company's operating performance during the Class Period.

34.     On January 25, 2018, Newell Brands issued a press release pre-announcing its 2017 results.  The Company stated that now it anticipated 2017 core sales growth of approximately 0.8% versus previous guidance 1.5% - 2.0% (implying *negative* 2.0% organic sales growth during the 2017 fourth quarter).  The press release further noted that "the[C]ompany's core sales results were impacted by an acceleration of the gap between sell-in and sell-through results due to a continuation of retailer inventory rebalancing in the U.S. and the bankruptcy of a leading baby retailer [Toys"R"Us]."

35.     Although Defendants deceptively tried to attribute the Company's poor financial performance to general market conditions and the bankruptcy of Toys"R"Us, in truth, the reasons for Newell Brands' worse than expected 2017 year-end financial results were Company specific and largely due to the lingering amount of excess inventory in the retail channel, as well as the cultural discord and management rancor ensuing from the Jarden acquisition.  Indeed, since May of 2017, Newell Brands has reduced its estimated 2018 earnings before interest, tax, depreciation and amortization by *22%* compared to a decline of only *3%* by its peer group, demonstrating that Newell Brands' expected 2018 financial performance is inconsistent with that of its peers and not due to general market conditions.

36.     The January 25, 2018 Newell Brands press release also announced that the Company was exploring "strategic options" to significantly restructure its business by divesting industrial and commercial assets.  Newell Brands stated that this action was expected to result in a 50% reduction in both the Company's customer base and its global factory and warehouse footprint.  That same day, Newell Brands issued a press release announcing that three members of its Board had resigned.

37.     In response to these revelations, the price of Newell Brands stock fell approximately *21%*, or $6.42 per share, on heavy trading volume to close at $24.81 per share on January 25, 2018.

38.     Thereafter securities analysts slashed their ratings on Newell Brands stock citing the core growth shortfalls relating to an acceleration in the gap between inventory sell-in and sell-through, as well as concerns over integration synergies associated with Jarden.

39.     On February 9, 2018, *The Wall Street Journal* reported that investor activist Starboard Value and Opportunity Master Fund Ltd ("Starboard") had teamed up with three former Jarden executives, including its former chairman, Martin Franklin ("Franklin"), to oust the existing Newell Brands management in a proxy battle.  According to *The Wall Street Journal*, the former members of Jarden management were "unhappy about how the sprawling collection of consumer brands ha[d] been run since the 2016 deal."

40.     Later that day, Newell Brands issued a press release confirming Starboard's intention to nominate 10 candidates for election to the Newell Brands Board at the Company's 2018 Annual Meeting of Shareholders.

41.     Thereafter, Franklin appeared on CNBC and claimed that the Company's poor financial performance was not due to macro-economic conditions, as represented by Defendants, but, rather, the result of "failed" execution by Defendants.

42.     Wall Street securities firm Jefferies Group LLC concurred and issued a report stating that "communication to the Street has been unreliable" and called the Company's financial reporting "at times opaque."

43.     On April 23, 2018, Newell Brands issued a press release announcing that it had entered into an agreement with Starboard to end the proxy contest.  As part of the agreement, Newell

Brands agreed to a reconstituted Board that it said will bring a "refreshed sense of urgency, oversight, and accountability to Newell."

44.     Thereafter, in May 2018, Starboard announced that was in the process of "transforming" Newell Brands and issued a detailed presentation demonstrating, among other things, that:

- "While Newell Has Blamed Poor Performance on the Macro Environment, We Believe it Is Self-Inflicted";

- "While Newell's Revenue Is Declining, Its Peers Are Growing Consistently";

- "While Newell's Gross Margins Are Deteriorating, Its Peers' Are Continuing to Expand";

- "Many of Newell's issues are self-inflicted due to communication problems within the Company";

- "The Structure of the Organization Has Resulted in High Costs, Massive Inefficiencies, and Declining Revenue";

- "These issues frustrate customers and lead to Newell giving large promotional concessions, which drastically lowers margins"; and

- "Communication issues between corporate and the divisions / brands have resulted in negative financial consequences for the Company."

**Newell Brands' Class Period SEC Filings Did Not Comply
with SEC Disclosure Regulations**

45.     Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among other things, Item 303 of Regulation S-K required that Newell Brands' Class Period Forms 10-K and 10-Q disclose known events or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

46.     The SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events or uncertainties.  The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *          *          *
>
> **Events that have already occurred** or are anticipated **often give rise to known uncertainties**.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required**.[1]

47.     The MD&A disclosures in Newell Brands' Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and events associated with the excessive build-up of its inventory in the retail channel and acquisition of Jarden, as alleged herein.  These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.

48.     In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk Factors*.  Item 503 of Regulation S-K required that Newell Brands' Class Period Forms 10-K and 10-Q disclose the most significant matters making an investment in Newell Brands risky.

---

[1]     Unless otherwise noted, all emphasis herein is added and internal citations are omitted.

49.     As detailed herein, during the Class Period, Newell Brands' Forms 10-K and 10-Q made materially false and misleading representations about *potential* competitive and integration related risks when, in fact, such risks were *existing* during the Class Period.  In addition, Defendants failed to disclose a major risk associated with its long global supply chain including, in particular, the risk associated with a change in product demand.

50.     Further, Item 9A of Form 10-K and Item 4 of Form 10-Q requires SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures*.  Item 307 of Regulation S-K required Newell Brands' Class Period Forms 10-K and 10-Q to disclose Defendant Polk's and Defendant Nicoletti's conclusions about the effectiveness of Newell Brands' disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

51.     During the Class Period, Newell Brands falsely and misleadingly represented in the Forms 10-K and 10-Q it filed with SEC that its disclosure controls were operating effectively when they were not, as detailed herein.  These false and misleading representations were then fraudulently certified by Defendants Polk and Nicoletti, as set forth herein.

### Materially False and Misleading
### Statements Issued During the Class Period

52.     The Class Period begins on February 6, 2017.  Before the market opened, Newell Brands issued a press release announcing its financial results for the 2016 fourth quarter and fiscal year end, the periods ended December 31, 2016.  For the fourth quarter, Newell Brands reported that net sales increased 165%, to $4.14 billion, and core sales grew 2.5%.  For the year ended 2016, Newell Brands reported that net sales increased 124%, to $13.26 billion, and core sales grew 3.7%.  Defendant Polk, commenting on the results, stated, in pertinent part, as follows:

**Our fourth quarter results reflect continued strong progress in the company's transformation**. We delivered over 40 percent earnings per share growth and nearly $1 billion of operating cash flow, driven by accelerating cost savings from synergies and Project Renewal. **Despite significant portfolio and organization change in the quarter, core sales growth was competitive led by very good growth on Writing, Baby, Beverages, Waddington, Fishing, Team Sports and Technical Apparel. We delivered this outcome in the context of challenging mall-based retail conditions driven by accelerating bricks-to-clicks shopper migration during the holidays**.

This has been one of the most transformative years in our history. In the context of unprecedented change, **we have delivered very strong full year results with core sales growth of 3.7 percent** and normalized earnings per share growth of nearly 33 percent. We have made tremendous progress on our strategic initiative to strengthen our portfolio, acquiring businesses with over $10 billion in revenue and divesting or holding for sale businesses with about $1.6 billion in revenue. **Our progress on costs has enabled us to improve normalized operating margin by over 100 basis points while simultaneously investing for future growth by strengthening our capabilities in insights, design, innovation and ecommerce**. And we have rapidly deleveraged our balance sheet, reducing gross debt by nearly $2.1 billion since the creation of Newell Brands on April 15, 2016. As we head into 2017, we are confident that we will continue to rapidly deleverage while simultaneously putting the building blocks in place to drive the growth acceleration and transformative value creation promised in the Growth Game Plan.

53.     Later that day, Newell Brands held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the conference call, Defendant Polk highlighted that the existing challenges within the retail environment were incorporated within the Company's financial plans and projections, stating, in pertinent part, as follows:

As you all know, **the macro environment has not been the most favorable over the last few years** with slow GDP growth compounded by foreign exchange headwinds. **While we may soon** reach an inflection point where we **begin to see more favorable GDP growth, our plans do not count on that happening this year**. We take confidence in the fact that we've always handled macro and other challenges in stride and you can count on us to do our best to do the same this year.

Defendant Polk then discussed the Company's 2017 guidance, noting, in particular, that the Company's financial outlook incorporated the effects of the on-going "bricks-to-clicks" shopper migration, as well as retailer inventory reductions, ordering pattern reconfigurations and store count changes, stating, in pertinent part, as follows:

This morning we updated our 2017 full-year guidance for core sales growth and normalized EPS [earnings-per-share] and provided guidance for the first time on full-year net sales.  We've added net sales guidance range in 2017 given the scope of mergers and acquisitions activity and the continued volatility of foreign exchange. Our outlook for 2017 net sales is $14.52 billion to $14.72 billion, which represents 9.5% to 11% net sales growth compared to prior year.  The guidance reflects our current expectations for the timing of acquisitions and divestitures, the latest view of foreign exchange which has worsened from our prior guidance and our latest view of core sales growth.

The Company has adjusted its 2017 full-year guidance range for core sales growth to 2.5% to 4%, lowering the bottom of the range from the original guidance of 3%. **This revised outlook reflects our expectation of continued bricks-to-clicks shopper migration, causing some retailers to rebalance store count, reduce inventories, and reconfigure ordering patterns**, as some retailers did after Black Friday this past quarter.  **The 25 basis point reduction** in the midpoint of the core sales growth range **is necessary to accommodate** recently announced store count reductions and **our new expectations for inventory rebalancing**.  **We expect this rebalancing to be more pronounced in the first half of 2017 and to lessen in the second half of 2017**, as we lapped this past year's changes.

In this context, **we believe core sales growth will sequentially accelerate with the core growth in the first half of the year in the lower half of the full-year guidance range**.  We expect the first-quarter growth rate to be roughly in line with the fourth quarter of 2016, as we start up our new organization.

54.    On February 24, 2017, Defendant Polk spoke at the Consumer Analyst Group of New York Conference.  During the conference, Defendant Polk made materially false and misleading statements about Newell Brands' growth and channel inventory.

55.    On March 1, 2017, Newell Brands filed with the SEC its Form 10-K for the year ended December 31, 2016 (the "Form 10-K"), signed by the Individual Defendants.  The Form 10-K contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as the certifications thereon by Defendants Polk and Nicoletti.

56.    The MD&A disclosure included in the Form 10-K was materially false and misleading in that it failed to disclose the effects of known events and uncertainties that were then having, and were reasonably likely to continue to have, a material effect on the Company's operating

results, including those events and uncertainties associated with Newell Brands' growth, channel inventory and acquisition of Jarden.

57.    The risk factor disclosure included in the Form 10-K deceptively referred to *potential risks* associated with the integration of Jarden and changes in purchase quantities by existing customers, when, in fact, such risks were *then existing*, stating, in pertinent part, as follows:

> **The Company's plans to continue to improve productivity and reduce complexity and costs may not be successful, which would materially adversely affect its ability to compete**.
>
> The Company's success depends on its ability to continuously improve its manufacturing operations to gain efficiencies, reduce supply chain costs and streamline or redeploy nonstrategic selling, general and administrative expenses in order to produce products at a best-cost position and allow the Company to invest in innovation and brand building, including advertising and promotion.  The Company is currently in the process of implementing Project Renewal and delivering the cost synergies related to the acquisition of Jarden.  Both efforts are global initiatives designed to reduce the complexity of the organization and increase investment in the Company's most significant growth platforms.  Project Renewal and the Company's cost saving plans associated with the Jarden integration may not be completed substantially as planned, may be more costly to implement than expected, or may not result in, in full or in part, the positive effects anticipated.  In addition, such initiatives require the Company to implement a significant amount of organizational change, which could have a negative impact on employee engagement, divert management's attention from other concerns, and if not properly managed, impact the Company's ability to retain key employees, cause disruptions in the Company's day-to-day operations and have a negative impact on the Company's financial results.  It is also possible that other major productivity and streamlining programs may be required in the future.
>
> \*          \*          \*
>
> **The Company's sales are dependent on purchases from several large customers and any significant decline in these purchases or pressure from these customers to reduce prices could have a negative effect on the Company's future financial performance**.
>
> The Company's customer base is relatively fragmented.  Although we have long-established relationships with many customers, the Company generally does not have any long-term supply or binding contracts or guarantees of minimum purchases with its largest customers.  Purchases by these customers are generally made using individual purchase orders.  As a result, these customers may cancel their orders, change purchase quantities from forecast volumes, delay purchases for a number of

reasons beyond the Company's control or change other terms of the business relationship. Significant or numerous cancellations, reductions, delays in purchases or changes in business practices or by customers could have a material adverse effect on the Company's business, results of operations and financial condition. In addition, because many of the Company's costs are fixed, a reduction in customer demand could have an adverse effect on the Company's gross profit margins and operating income. [First and second emphasis in the original.]

58. The Form 10-K also contained false and misleading representations about Newell Brands' disclosure controls, stating, in pertinent part, as follows:

**ITEM 9A. CONTROLS AND PROCEDURES**

(a) Evaluation of Disclosure Controls and Procedures: as of December 31, 2016, an evaluation was performed by the Company's management, under the supervision and with the participation of the Company's chief executive officer and chief financial officer, of the effectiveness of the Company's disclosure controls and procedures. Based on that evaluation, the chief executive officer and the chief financial officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2016.

59. The representations in the Form 10-K about Newell Brands' disclosure controls were then falsely and misleadingly certified by Defendants Polk and Nicoletti:

I, [Defendant Polk and Nicoletti], certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2016 of Newell Brands Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.     The above noted material misstatements and omissions in the Form 10-K failed to disclose material facts required by SEC rules and regulations associated with Newell Brands' growth, channel inventory and its integration of Jarden.  These material misrepresentations and omissions in the Form 10-K, including the certifications by Defendants Polk and Nicoletti, were

repeated, in all material respects, in the Forms 10-Q that Newell Brands filed with the SEC throughout the remainder of the Class Period.

61.     On May 8, 2017, Newell Brands issued a press release announcing its financial results for the 2017 first quarter, the period ended March 31, 2017.  For the quarter, Newell Brands reported that net sales increased 148%, to $3.30 billion, and core sales grew 2.5%.  The Company also reaffirmed its 2017 core sales growth guidance of 2.5% to 4.0%.  Defendant Polk, commenting on the results, stated, in pertinent part, as follows:

> **Our first quarter results provide strong evidence of our team's capacity to perform while we transform**.  We delivered competitive core sales growth of 2.5 percent despite significant organization and portfolio change.  **Our core sales results were broad based** with growth in all four regions and across four of five segments.  Our international growth coupled with very strong e-commerce results **more than offset the continuing impact of inventory de-stocking in U.S. mass channels**.  Our operating margin was well ahead of plan driven by strong cost synergies and stringent discretionary cost management, and we further deleveraged, paying down over $725 million of debt in the quarter, bringing our cumulative debt repayment since the Jarden transaction on April 15, 2016 to $2.8 billion.
>
> We have had a good start to 2017 and are on our way to unlock the transformative value creation associated with our long term guidance.  **We are confident that simultaneous growth and margin development** fueled by savings and synergies will generate strong cash flow, leading to rapid deleveraging and then more aggressive value-creating uses of capital.  We believe this transformative value creation story is unique to Newell Brands given our leading brand positions in large global categories, the inherent opportunities presented through the new scale of the company, the investments we are making in new capabilities and the strong cash generative nature of our businesses.  This confidence is shared by our Board of Directors which has approved a 21 percent increase of the quarterly dividend to $0.23 per share.

62.     Later that day, Newell Brands held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the conference call, Defendant Polk commented that "[w]hile inventory reduction by U.S. retailers was a meaningful headwind in the first quarter, I'm encouraged by how well our business has delivered through this turbulence."

Defendant Polk also reaffirmed the Company's 2017 full year guidance, stating, in pertinent part, as follows:

> **We're also making good progress and expect to deliver competitive levels of core growth towards the middle of our full year guidance range.** Our core growth delivery will be dependent on excellent execution of our growth priorities, continued strong e-commerce growth and continued market share gains in an environment of modest category growth.
>
> **Despite withstanding substantial inventory pressure over the last six months, we're beginning to realize many of the revenue opportunities of the combination.** We also see the benefits of our investments in e-commerce, design, innovation and brand building yielding strengthened new product, new distribution and new marketing plans in many of the businesses.
>
> \*       \*       \*
>
> **So while we're mindful of the challenging retailer environment and the potential for more retailer turbulence through the second quarter**, **our confidence in our delivery is grounded in the knowledge that we have a leading portfolio of brands**, we have advantaged capabilities in innovation and design, a peer-group-leading e-commerce organization, a long list of opportunities for international deployment and core distribution, the scale to outspend and out-execute our competition and a world-class team working on realizing the savings and cash benefits of the Jarden combination**, and a track record of integrating new acquisitions with cost and revenue benefits quickly captured. This is a proven model and playbook that we've executed before, and we're confident we can again**.

63.     During the conference call, when asked about the channel inventory destocking, Defendant Polk falsely and misleadingly stated the effects of channel inventory reductions are "behind us now" and that inventory pressure in the channel was due to the transition by retailers to a more e-commerce based model, stating, in pertinent part, as follows:

> So the inventory reduction impacts were broad based. **Some of those are masked in our numbers because we had really strong performance in certain other aspects of the business**. So even in Writing, we saw the distributor pressure on pencils and pens, but we had great momentum on markers behind Sharpie fine art, behind the Expo ink indicator, geographic expansion of Sharpie to Mexico and France. We've got a lot of things going on in these businesses. But pressure, even within Writing now, because of the momentum on markers, because of the momentum – continued momentum on glue connected to slime, we were able to overcome that. **The good news is that these things are now behind us**. And eventually, we lap these

scenarios as we come into '18, which will serve us well.  In the distributive trade, we saw pressure across the distributive trade for a couple of reasons.  **One is just basic inventory pressure in that channel, but you have to ask the question why.  And what's going on there is similar to what's going on in retail, which is the B2B e-platforms are impacting those channels**.

*        *        *

We expect more headwinds in the second quarter connected to the retailer transitions that are occurring.  **We were successful in overcoming that headwind in Q1 as a result of the diversity of our portfolio and channels, as a result of the share gains in the modest-growing categories, as a result of the broad-based growth** in the international contribution and as a result of the tremendous surge in momentum we have in e-commerce.  So those four variables contributed to our ability to deal with the **acute issue that's happening -- was happening on the inventories in the U.S.** . . .

As I said, **we expect that to continue into Q2**.  We don't know for how long, but we expect it to continue, **and we're assuming it does in our planning**.  These things are not as -- these types of issues are not as smooth and predictable as you'd like them to be, but **we've got that built into our thinking**.

64.     On May 10 2017, Newell Brands filed with the SEC its Form 10-Q for the quarter ended March 31, 2017 (the "Q1 Form 10-Q"), which was signed by Defendants Nicoletti and Cunningham.  The Q1 Form 10-Q contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendant Polk's and Nicoletti's certifications thereon, as detailed herein.

65.     On August 4, 2017, Newell Brands issued a press release announcing its financial results for the 2017 second quarter, the period ended June 30, 2017.  For the 2017 second quarter, Newell Brands reported that net sales increased 5.1%, to $4.10 billion, and core sales grew 2.5%.  The Company also reaffirmed its full year 2017 guidance for core sales growth of 2.5% to 4.0%.  Defendant Polk, commenting on the results, stated, in pertinent part, as follows:

**We achieved a solid set of results in the second quarter delivering competitive growth**, good margin development and strong earnings.  We increased market share by sixty basis points in our large U.S. business, drove continued double digit growth of our global e-commerce business and once again delivered broad-based geographic results with core sales growth in all four regions.  Normalized operating margin

increased by one hundred and thirty basis points, enabled by more than $80 million of incremental cost savings and synergies, which contributed to our delivery of double digit normalized earnings per share growth.

**We expect core sales growth to strengthen in the second half of the year as we benefit from new distribution gains, a stronger back half pipeline of innovations** and sustained double digit growth in e-commerce.  We remain confident in our unique long term value creation opportunity for simultaneous growth and margin development and expect strong cash flow generation to enable delivery of our leverage ratio targets well ahead of our committed timetable.

66.    Later that day, Newell Brands held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the conference call, Defendant Nicoletti commented that while "[c]ore sales growth was broad-based, with growth in all geographies," such growth would have been even greater had it not been for retailer inventory destocking in the Company's Learn and Play segments.  In addition, Defendant Polk reassured investors about Newell Brands' 2017 year core sales growth guidance stating that "with this strong back half, we expect to deliver core sales growth acceleration into the second half of the year in the upper half of our full year core sales growth guidance range, with sequential acceleration in our growth rate from Q3 to Q4."  Defendant Polk also falsely and misleading claimed that "fundamentals are good across the business and are improving" and that the adverse effects associated with bloated retail inventory levels were due to macroeconomic, rather than Company specific reasons, stating, in pertinent part, as follows:

**More broadly, the fundamentals are good across the business and are improving as we head into the second half of the year**.  That said, **like most others in our industry, we continue to face pressure from retailer inventory reductions and retailer consolidation in the U.S**.  And sometimes, the impact can be pretty sharp.

67.    During the Q&A session of the conference call, a securities analysts questioned Defendants about whether the expected core sales growth uptick during the second half of 2017 would come from the newly acquired Jarden or the legacy Newell Brands business.  In response, Defendant Polk noted that growth would occur "across a number of different business" with "a broad

section of activity coming." Defendant Polk further reassured investors noting that "[o]ur outlook
for the back half of the year hasn't really changed," and that "other than a surprise bankruptcy, I
think we are well aware of where the issues are." Defendant Polk stated, in pertinent part, as
follows:

> **It's a pretty good balance**, although I want to be clear. The things that we're
> launching are things that don't really tie to the big investments we've made in
> insights. Those -- that work to fill the innovation funnel really will yield in the
> middle of 2018. So that upside is still in front of us. But **we actually have some
> very strong and exciting things going on across a number of different
> businesses**. We've got a very big launch on Cookware. . . . We've got Baby Gear
> launches in Canada. In the U.S., we got a really cool new stroller launching that we
> call UNO2DUO, . . . . We've got some exciting new stuff coming on Writing
> connected to coloring and gifting in the fourth quarter.
>
> **So we've got -- you've got a broad section of activity coming**, plus we have a
> tremendous amount of marketing and merchandising activity set up around Back-to-
> School, of course, and around Black Friday. So **the back half was always going to
> be the more loaded half of the year for us for two reasons. It's natural** -- it
> matches the natural flow of our business, **but also in the first half of the year,
> we've been changing basically everything**. The entire organization, new people,
> new roles, consolidating structures. So this wasn't the period of time to be launching
> a lot of new items into the market. So it's the natural phasing in our business and the
> natural phasing of our -- in connection to the natural phasing of our change program.
>
> *       *       *
>
> **Our outlook for the back half of the year hasn't really changed. We're always
> calling acceleration and performance**. We never got quite as specific to say
> sequential improvement between Q3 and Q4, but that was always the profile, the
> plan, as you would expect because of the flow of activity, but in the time between the
> changes we've made in the first half. So I think that would be my answer on core
> sales growth. And we'll see. Maybe someday in the future, we'll have a 5%. But I
> think that doesn't happen until we get into the thick of our innovation activity on the
> legacy Jarden businesses. But more to come on '18 and beyond, when we get a little
> bit closer to that timeframe.
>
> The other thing that I said in the speech, in the script, was that **this presumed no
> major retail-driven disruptions in the back half of the year. And I think that's
> a good assumption to make**. We've experienced many of them. I think we -- **other
> than a surprise bankruptcy, I think we are well aware of where the issues are**.
> And I think we've contemplated -- particularly given the things we've been able to
> do in Q2 in Writing, **we contemplated the risk profile that could emerge from
> office superstores in the back half of the year**. So I think we have well in hand,

but again, **our guidance would be disrupted by a major bankruptcy. But, again, I don't see that. The profile of our retailer base is such that it doesn't look like there's anybody in our top 15 for sure that would ever be in that circumstance**.

68.     Then, in response to an analyst question about the expected impact of retailer inventory destocking on Newell Brands' 2017 second half results, Defendant Polk told investors that the retail environment would have to get "materially worse" than during 2016 for it to have an adverse impact on the Company's operations after the 2017 third quarter, stating, in pertinent part, as follows:

> We're in the middle of what has been a structural change in retailer attitudes that started in the fourth quarter of last year. As you'll recall, we missed a replenishment order on Appliances after Black Friday. There was a $24 million order at Walmart. And the good news is, as we come through Q3, we lapped the vast majority of [retailer inventory reductions], which means that all of these changes are now in the base. And so **the environment would have to get materially worse than last year's environment for us to face headwinds from Q4 onward**. So that's our view of the view forward. We may not be precise or right. There's certainly some structural things out there that we've been living with for years: office superstore contraction, the rebalancing of that retail landscape. We've done very, very well in our Writing business in the context of that. So I say what I say recognizing that **there is certainly more to come in this space, but I don't think it has as profound an impact on the business as the last three quarters, that 1Q through 3Q, the last year has had**. This will go down as one of those cycles that the industry goes through. **And once we get** through the fourth -- and **into the fourth quarter, I think the degree of impact lessens**.

69.     Concerning Defendants initial read on the back to school season, Defendant Polk, stated, in pertinent part, as follows:

> **This is actually the most favorable July 4th treatment we could have for a Q2 sell-in**. So I've read some of the commentary; I don't quite get that. I think what people are referring to, I think in some of their commentary is that it's just sort of a shortcut to an explanation. I think there's been a fair month of inventory rebalancing in the distributive trade in an office superstore channel that's gone on in the first half of the year in the stationary categories. I think that's the primary things. I don't think Back-to-School timing. This is about the most favorable structure you could have for a Q2 sell-in for Back-to-School, because of the fact that July 4th was a Tuesday and the merchandise for July 4th was on the floor. So there was room in our retailer warehouses for us to sell-in inventory at the end of the quarter. So we don't see any timing-related shift. That said, there's always different behaviors on the part of retailers with respect to their merchandising activity. So I was referring to sell-in

timing.  There's certain retailers that have gone early this year and one retailer, in particular, that's gone later than they went last year in the office superstore channel. And we'll see how that all plays out over time.  To your point, while schools open in many states in the Midwest now this week -- and think in some of the Southern states it starts to open next week, so Back-to-School has happened in the Northeast.  And then out West, it's still -- we're still ramping into that window.

**But our early numbers look pretty good.  And based on the aggregate selling in Q2 on Writing, we would expect a really good sellout**.  And we'll look and watch order patterns in September, presuming that our share momentum continues and we get the sellout, which we should.  Then we'll watch that order pattern dynamic at the end of September into October, again, to see whether there's any rebalancing.  We think we've made a prudent assumption in our guidance for Q3, but you really don't know until the very, very end.

70.     On August 9, 2017, Newell Brands filed with the SEC its Form 10-Q for the quarter ended June 30, 2017 (the "Q2 Form 10-Q"), which was signed by Defendants Nicoletti and Cunningham.  The Q2 Form 10-Q contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendant Polk's and Nicoletti's certifications thereon, as detailed herein.

71.     On September 6, 2017, Newell Brands issued a press release announcing that it had revised its 2017 earnings guidance to account for the effects of Hurricane Harvey on its U.S. manufactured resin businesses.  Despite the disruptions associated with Hurricane Harvey, the press release reiterated the Company's expected 2017 core sales growth rate of 2.5% - 4.0%.

72.     On September 7, 2017, Defendant Polk spoke the Barclays Global Consumer Staples Conference.  During the conference, Defendant Polk made materially false and misleading statements about Newell Brands growth and the integration of Jarden.

73.     The statements referenced in ¶¶ 52-55 and 61-72 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them as follows:

(a)     that the Company's retail channel was loaded with extremely high levels of unsold Newell Brands product;

(b)     that the Company's business fundamentals were not "improving" as Defendants claimed and that adverse effects associated with bloated retail inventory levels were due to Company specific reasons rather than macroeconomic;

(c)     that as a result of the unusually high levels of unsold inventory in its retail channel, Newell Brands was exposed to a heightened risk that it would experience slower sales growth in future periods;

(d)     that undisclosed managerial and cultural differences in the legacy Newell Brands and Jarden businesses had created significant internal discord that were then having a material adverse effect on the Company's operating performance;

(e)     the representations in Newell Brands' SEC filings about its MD&A, risk factors and disclosure controls, as well as Defendant Polk's and Nicoletti's certifications thereon, were materially false and misleading; and

(f)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about Newell Brands then-current business and future financial prospects.

74.     On November 2, 2017, Newell Brands issued a press release announcing its financial results for the 2017 third quarter, the period ending September 30, 2017.  For the quarter, Newell Brands reported that net sales *declined* 7%, to $3.70 billion, and core sales grew 0.4%.  The Company also revised 2017 full year net sales outlook to $14.7 billion - $14.8 billion and core sales growth to 1.5% - 2.0%.

75.     Defendant Polk deceptively commented that the 2017 third quarter results were below expectations due to weak "late-quarter sales" related to retailer inventory rebalancing, stating, in pertinent part, as follows:

> **Newell Brands third quarter results were below expectations as our transformation progress was overshadowed by weak late-quarter sales related to retailer inventory rebalancing, primarily in response to decelerating U.S. market growth through the Back-to-School period.** While markets across a number of categories were weaker than expected, we delivered solid point-of-sale growth of +3.5 percent and share improvement of +65 basis points in the U.S., driven by good results in the mass channel and strong double-digit growth in e-commerce. We continued to realize cost synergies as planned, with an incremental $86 million in the quarter. While those benefits, coupled with a lower than normal tax rate, were partially offset by weaker than expected sales, cost inflation and the absence of about $50 million of pre-tax earnings associated with divestitures, we still delivered double-digit earnings per share growth for the quarter.
>
> **Despite challenging marketplace conditions, we are on a path to achieve our transformation objectives**. Our market share increases, point of sale growth, innovation and e-commerce development, and cost savings delivery have enabled competitive year-to-date results, strengthening our confidence in the transformative value creation opportunity inherent in Newell Brands. That confidence is shared by our Board, which has approved a $1 billion share repurchase authorization through 2020. This program will enable increased flexibility to allocate capital to our most attractive strategic options as part of our ongoing commitment to create value for our shareholders.

76.     In addition, Defendant Polk falsely and misleading stated that the adverse effects associated with bloated amount of Company inventory in the retail channel were due to macroeconomic, rather than Company specific reasons, stating during a call later that day with analysts, that "[w]e had unrelenting retailer inventory destocking, creating a headwind for revenue as our retail partners adjust to slowing market growth and changes in shopping patterns."

77.     Later that day, Defendants held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the conference call, Defendant Polk noted that the Company's reported revenues missed expectations by $100 million, primarily due to U.S. based shortfalls in the Writing and Appliance businesses. In particular, Defendant Polk stated

Newell Brands was significantly impacted by weak Back-To-School retail channel sell-through in its

U.S. Writing business and inventory destocking across both its Writing and Appliance businesses

78.     During the conference call Defendant Polk explained that while Newell Brands

experienced "solid growth" in during the first month of the 2017 fourth quarter, Defendants reduced

the Company's guidance for the balance of 2017 to account for two specific issues: (i) an "assumed

negative impact associated with the Toys"R"Us restructuring" and (ii) continued "headwinds" at

select customers within its Writing business.

79.     In addition, during the conference call, Defendant Polk announced a major risk

associated with its global supply chain including, in particular, the risk associated with a change in

product demand, stating, in pertinent part, as follows:

> For sure, **the reality of our business model is it's impossible to adjust in 30-day windows or 60-day windows or 45-day windows because of the fact that we're only 50% self-manufactured, and we have a long value chain of source finished goods that are on the water that's tied to kind of a forward-looking forecast**. It's really important for us to accept the retail landscape dynamics for what they are, such that we're not setting ambitions in the company that drive behaviors that carry too much risk. So for example, **if we put too big a number out there and chase for top line, the divisions will build inventories to support that outcome** because they -- we won't do that without them having given us some confidence in that. **And if you miss, then you're hung out with those inventories**. And so we have to make sure that we're doing a better job going forward with calibrating the upside in the business against the risk profile associated with the working capital position.

80.     When asked about inventory levels at the Company's bigger customers, Defendant

Polk, acknowledged that Newell Brands has the ability to monitor inventory in the retail channel,

stating, in pertinent part, as follows:

> **We have perfect visibility into our largest retailer's inventory position**. We know what our -- through retail link, you have that visibility. You see **exactly how many weeks on hand you've got at retail and how many weeks on hand you have in the warehouse**. So we know exactly what has gone on there, **and we can see that by SKU quite frankly, every day. So we have perfect visibility at that customer and they share that with us because it's in their interest for us to know and to work with them to manage those inventories down. It's not true with every retailer. We model our inventory position at by retail or by product**

**family every month.**  We're looking at this, **so there's a standard report that we're looking at, which is how I can tell you what I told you earlier on the retail landscape**.

81.     Later during the conference call, Defendant Polk noted that Newell Brands could also gauge channel inventory by comparing the Company's invoicing to POS data, stating, in pertinent part, as follows:

> [W]e tracked 4 things every week that the data becomes available, some of it becomes available daily, some of it becomes available in 4-week increments.  And we don't track Nielsen data in the traditional sense.  We're looking at panel diary data, Nielsen panel diary data, which includes the e-commerce effect across all of our businesses.  And in some cases that, that's not available, so we take what is available which is an IRI platform.  And then there are some specific databases in Team Sports that are neither IRI or panel diary.  And then we aggregate that into a scorecard that all of us  get that looks at the market growth data sellout in 4-week, 12-week, 52-week increments or market share, share change.  And then we get POS data weekly, which is transaction data from our retailers, including Amazon, and we get the ability to split both [e-] from bricks-and-mortar.  By product family we could go lower, but we've got all that data that comes in and gets aggregated.  So you're not going to see the POS data that we see, we see that every week and it's the equivalent of retail link from all of our retailers.  And then of course we have our invoicing that we compare all that to.  We look at it across 75 product families, and we do this in the U.S.  And so we have a very, very granular view of our business, and it's a unique combination of these different data sources that gives us the perspective . . . .

82.     On November 2, 2017, in response to this news, the price of Newell Brands stock fell approximately **27%**, or $10.99 per share, on heavy trading volume to close at $30.01 per share.

83.     Defendants, however, continued to mislead the market about the synergies associated with newly acquired Jarden and downplayed the magnitude of existing channel inventory and its likely impact on the Company's future sales growth.

84.     On January 25, 2018, Newell Brands issued a press release pre-announcing its 2017 results.  The Company stated it anticipated 2017 core sales growth of approximately 0.8% versus previous guidance 1.5% - 2.0% (implying negative 2.0% organic sales growth during the 2017 fourth quarter).  The press release further noted that "the company's core sales results were impacted by an

acceleration of the gap between sell-in and sell-through results due to a continuation of retailer inventory rebalancing in the U.S. and the bankruptcy of a leading baby retailer [Toys"R"Us]."

85.     The January 25, 2018 Newell Brands press release also announced that the Company was exploring "strategic options" to divest industrial and commercial assets and that such divestiture would result in a 50% reduction in both Newell Brands customer base and its global factory and warehouse footprint.

86.     In response to these revelations, the price of Newell Brands stock fell approximately *21%*, or $6.42 per share, on heavy trading volume to close at $24.81 per share on January 25, 2018.

87.     Thereafter securities analysts slashed their ratings on Newell Brands stock citing the core growth shortfalls relating to an acceleration in the gap between inventory sell-in and sell-through, as well as concerns over integration synergies associated with Jarden.

88.     On February 9, 2018, *The Wall Street Journal* reported Starboard had teamed up with three former Jarden executives, including its former chairman Franklin, to oust the existing Newell Brands management in a proxy battle.  According to *The Wall Street Journal*, the former members of Jarden management were "unhappy about how the sprawling collection of consumer brands ha[d] been run since the 2016 deal."

89.     Later that day, Newell Brands issued a press release confirming Starboard's intention to nominate 10 candidates for election to the Newell Brands' Board at the Company's 2018 Annual Meeting of Shareholders.

90.     Thereafter, Franklin appeared on CNBC and claimed that the Company's poor financial performance was not due to macro-economic conditions, as represented by Defendants, but, rather, the result of "failed" execution by Defendants.

91.    Wall Street securities firm Jefferies Group LLC concurred and issued a report stating that "communication to the Street has been unreliable" and called the Company's financial reporting "at times opaque."

92.    On April 23, 2018, Newell Brands issued a press release announcing that it had entered into an agreement with Starboard to end the proxy contest.  Thereafter, in May 2018, Starboard announced that was in the process of "transforming" Newell Brands and issued a detailed presentation that demonstrated, among other things, that:

- "While Newell Has Blamed Poor Performance on the Macro Environment, We Believe it Is Self-Inflicted";

- "While Newell's Revenue Is Declining, Its Peers Are Growing Consistently";

- "While Newell's Gross Margins Are Deteriorating, Its Peers' Are Continuing to Expand";

- "Many of Newell's issues are self-inflicted due to communication problems within the Company";

- "The Structure of the Organization Has Resulted in High Costs, Massive Inefficiencies, and Declining Revenue";

- "These issues frustrate customers and lead to Newell giving large promotional concessions, which drastically lowers margins"; and

- "Communication issues between corporate and the divisions / brands have resulted in negative financial consequences for the Company."

93.    The market for Newell Brands common stock was open, well developed and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions during the Class Period, Newell Brands common stock traded at artificially inflated prices.  Plaintiff and other members of the Class purchased Newell Brands common stock relying upon the integrity of the market prices of Newell Brands common stock and market information relating to Newell Brands and have been damaged thereby.

94.     During the Class Period, Defendants inflated the price of Newell Brands common stock and materially misled the investing public by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements not misleading, as set forth herein.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, its growth and its operations, as alleged herein.

95.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Newell Brands common stock, inventory, operations and outlook.  These material misstatements and omissions had the cause and effect of creating an unrealistically positive market assessment of Newell Brands, its business, its expected growth, its operations and its outlook, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

96.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

Defendants, by virtue of their receipt of information reflecting the true facts regarding Newell Brands, their control over, and/or receipt and/or modification of Newell Brands allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Newell Brands, participated in the fraudulent scheme alleged herein.

97.     The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  Given their executive-level positions with Newell Brands, the Individual Defendants controlled the content of Newell Brands public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants was responsible for the accuracy of Newell Brands' corporate statements and is, therefore, responsible and liable for the representations contained therein.

98.     The scienter of the Defendants is underscored by the Sarbanes-Oxley Act mandated certifications of Defendants Polk and Nicoletti, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Newell Brands was made known to them and that the Company's disclosure-related controls were operating effectively.

99.     Defendants were also motivated to engage in this course of conduct in order to allow certain Company insiders to collectively sell shares of their personally held Newell Brands common stock for gross proceeds of approximately $21.0 million during the Class Period.

## LOSS CAUSATION

100.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Newell Brands common stock and operated as a fraud or deceit on Class Period purchasers of Newell Brands common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Newell Brands common stock declined significantly as the prior artificial inflation came out of the price of the Company's common stock.

101.     As a result of their purchases of Newell Brands common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had their intended effect and caused Newell Brands common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $55.08 per share on June 19, 2017.

102.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Newell Brands, its business, its expected growth and its operations.  When the truth about the Company was revealed to the market, the price of Newell Brands common stock fell significantly.  The price declines removed the inflation from the price of Newell Brands common stock, causing real economic loss to investors who had purchased Newell Brands common stock during the Class Period.

103.    The declines in the price of Newell Brands common stock after the corrective disclosures came to light were the direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Newell Brands common stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to Defendants' fraudulent conduct.

104.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Newell Brands common stock and the subsequent significant decline in the value of Newell Brands common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

105.    At all relevant times, the market for Newell Brands common stock was an efficient market for the following reasons, among others:

(a)    Newell Brands common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient stock market;

(b)    as a regulated issuer, Newell Brands filed periodic public reports with the SEC and the NYSE;

(c)    Newell Brands regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Newell Brands was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

106.    As a result of the foregoing, the market for Newell Brands common stock promptly digested current information about the Company from all publicly available sources and reflected such information in Newell Brands common stock price.  Under these circumstances, all purchasers of Newell Brands common stock at artificially inflated prices during the Class Period suffered similar injury and a presumption of reliance applies.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

107.    This Count is asserted against the Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of Newell Brands common stock during the Class Period.

110.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Newell Brands common stock.  Plaintiff and the

Class would not have purchased Newell Brands common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

111. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Newell Brands common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

112. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

113. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  June 21, 2018                    CARELLA, BYRNE, CECCHI
                                          OLSTEIN, BRODY & ANGELLO, P.C.


                                          /s/ James E. Cecchi
                                          JAMES E. CECCHI
                                          5 Becker Farm Road
                                          Roseland, NJ 07068
                                          (973) 944-1700


                                          Samuel H. Rudman
                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          (631) 367-7100


                                          Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

BUCKS COUNTY EMPLOYEES RETIREMENT FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Hoey v. Insmed Incorporated, et al.*, No. 3:16-cv-04323 (D.N.J.)
*In re Under Armour Sec. Litig.*, No. 1:17-cv-00388 (D. Md.)

(b) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*In re Amicus Therapeutics, Inc. Sec. Litig.*, No. 3:15-7350 (D.N.J.)
*Friedman v. Endo International plc, et al.*, No. 1:16-cv-3912 (S.D.N.Y.)

NEWELL

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed this 29th day of May. 2018.

> BUCKS COUNTY EMPLOYEES
> RETIREMENT FUND
>
> By: _____
>      Robert G. Loughery, Chairman

- 2 -

NEWELL.

SCHEDULE A

SECURITIES TRANSACTIONS

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 09/14/2017 | 12,789 | $43.58 |
| 11/02/2017 | 6,144 | $30.05 |