**BARRACK, RODOS & BACINE**
Robert A. Hoffman, Esquire
Jeffrey B. Gittleman, Esquire
Chad A. Carder, Esquire
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 297-1484

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan, Esquire
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

***Lead Counsel and Attorneys for Lead Plaintiff***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE NEWELL BRANDS, INC. SECURITIES LITIGATION | : | Civil Action No. 18-cv-10878 (JMV) (JBC) |

**CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 12

III. PARTIES .......... 12

A. Lead Plaintiff .......... 12

B. Newell Defendants .......... 13

IV. CLASS ACTION ALLEGATIONS .......... 15

V. BACKGROUND FACTS AND NATURE OF THE FRAUD AT NEWELL .......... 17

A. Background and Pre-Class Period Events .......... 17

1. The Jarden Acquisition and a Renewed "Transformation" of Newell .......... 18

2. Newell Reports Strong Momentum with Significant Progress Integrating Jarden Heading into the Class Period .......... 23

B. Defendants' Fraudulent Conduct During the Class Period .......... 29

1. Newell's Excess Inventory Problem .......... 29

2. Pricing Conflicts Arise with Growth of Newell's Global E-commerce Division, Straining Customer Relationships .......... 35

3. Significant Operational Issues as a Result of the Jarden Acquisition Hamper Newell's Ability to Recognize Its Potential Benefits .......... 41

4. Defendants Issue False and Misleading Guidance to Investors .......... 55

VI. DEFENDANTS' VIOLATIONS OF SEC RULES .......... 63

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......... 65

VIII. THE TRUTH ABOUT NEWELL EMERGES .......... 82

IX. ADDITIONAL FACTS RELEVANT TO SCIENTER .......... 85

X. LOSS CAUSATION ........ 89

XI. APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND MATERIAL OMISSIONS ........ 95

XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ........ 97

XIII. CAUSES OF ACTION ........ 98

FIRST CLAIM FOR RELIEF ........ 98

SECOND CLAIM FOR RELIEF ........ 103

PRAYER FOR RELIEF ........ 104

JURY DEMAND ........ 105

Lead Plaintiff Hampshire County Council as Administering Authority of the Hampshire County Council Pension Fund ("Lead Plaintiff" or "Hampshire") alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes but is not limited to review and analysis of: (a) regulatory filings made by Newell Brands Inc. ("Newell" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases issued and disseminated by the Company; (c) analyst and media reports concerning Newell; (d) analysis of securities movements and pricing data; (e) other public information regarding the Company, including but not limited to a 172-page Presentation entitled "Transforming Newell Brands," that was issued in May 2018 by Starboard Value LP; and (f) pertinent provisions within certain federal and state laws, pronouncements and regulations.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors, other than certain excluded persons per paragraph 41 below, who purchased Newell's publicly traded common stock between February 6, 2017 and January 24, 2018, inclusive (the "Class Period").

2.      Newell is a global manufacturer and marketer of name brand consumer and commercial products that are sold in nearly 200 countries around the globe. Its portfolio of name brands includes Paper Mate®, Sharpie®, Dymo®, EXPO®, Parker®, Elmer's®, Coleman®, Jostens®, Marmot®, Oster®, Sunbeam®, FoodSaver®, Mr. Coffee®, Rubbermaid® and Rubbermaid

Commercial Products®, Graco®, Baby Jogger®, NUK®, Calphalon®, Contigo®, First Alert®, and Yankee Candle®.

3. In April 2016, Newell acquired Jarden Corporation ("Jarden"), itself a consumer products company that owned a vast portfolio of brand names, for approximately $15.3 billion, including $5.4 billion of cash and $9.9 billion of stock. The Jarden acquisition more than doubled the size of the Company, and Defendant Michael B. Polk ("Polk") was tapped to serve as chief executive officer of the combined entity.

4. Defendant Polk had built his professional reputation on his ability to transform companies while at the same time reporting strong growth, which he referred to as "performing while transforming." Defendants told investors that the acquisition of Jarden was yet another chance to transform Newell using management's "proven" track record. Heightening the market's already lofty expectations for success of the combined entity, Defendant Polk spoke glowingly of the potential growth of the combined entity, stating that "[t]he combination of these two great companies creates a $16 billion consumer goods company with incredible potential to grow and create value." And throughout Newell's communications touting the deal, Defendant Polk repeatedly downplayed any execution risk that came with the massive increase in Newell's size, instead painting the Company's increased size and scale as a positive that would generate new sales growth while at the same time unlocking significant cost efficiencies.

5. After the acquisition of Jarden and throughout the remainder of 2016, Newell was in the process of consolidating its 32 business units so that it could "transform" from a holding company to an operating company. As such, by January 1, 2017, just prior to the Class Period, Newell stated that it had created 16 global divisions that generally aligned to five segments, which Newell calls "Live," "Learn," "Work," "Play," and "Other."

6.      During this time, Newell also created a new Global E-commerce division, which was responsible for all e-commerce activity across the enterprise. According to Defendants, this division was created because, prior to and during the Class Period, the United States retail environment had been experiencing an ongoing shift from traditional "brick-and-mortar" store fronts to an e-commerce business model. Defendants touted Newell's new Global E-commerce division as a way to combat what they referred to as a migration from "bricks to clicks," and stated that the Company's intention was for its new E-commerce division to grow rapidly.

7.      Newell markets the name brands in its segments to large mass merchandisers that serve as the Company's principal customers. These merchandisers include discount stores, home centers, warehouse clubs, office superstores, craft stores, direct-to-consumer channels, specialty retailers and wholesalers, commercial distributors, and e-commerce companies. During 2016, approximately 72% of the Company revenues came from sales to customers in the United States.

8.      In reporting Newell's financial results throughout the Class Period, Defendants used the term "core sales," a non-GAAP financial measure, to explain the Company's financial results to stockholders and the investment community. In fact, Newell prominently featured the Company's core sales growth figure in the Company's earnings press releases and in investor conferences. In Newell's Class Period filings with the SEC, Defendants stated their belief that this metric provided investors with a more complete understanding of the Company's sales trends because it provided sales on a consistent basis by excluding the impact of acquisitions (other than the Jarden acquisition), planned or completed divestitures, the deconsolidation of the company's Venezuelan operations, retail store openings and closings, and changes in foreign currency from year-over-year comparisons.

9. Additionally, Defendants represented in Newell's Class Period filings with the SEC that the Company generally recognizes a sale upon shipment or delivery of merchandise based upon contractual terms, at which time Defendants consider the merchandise to be "channel inventory" because, while the merchandise has been purchased from Newell by a retailer or distributor, it has not yet been purchased by a consumer. Accordingly, during the Class Period, Defendants used the term "sell-in" to describe a sale by Newell to a distributor or retailer and "sell-through" or "sell-out" to describe a sale by a distributor or retailer of the merchandise to the ultimate consumer. Thus, when sell-in is higher than sell-through or sell-out, channel inventory levels generally increase.

10. Given the nature of the Company's business as a global retailer of consumer products and the importance and magnitude of the Jarden acquisition, throughout the Class Period analysts and investors were especially attuned to the Company's reported sales growth and Newell's ability to effectively integrate and unlock what Defendants said were the significant benefits of the Jarden acquisition. Analysts and investors were also focused on the success of Newell's new Global E-commerce division, and whether it would be effective in allowing Newell to defend against, and capitalize on, the bricks-to-clicks migration that was occurring in the retail industry.

11. This case has been brought because during the Class Period, Defendants deceived investors by, among other things, misrepresenting or failing to disclose that (1) Newell's retail channel was loaded with extremely high levels of Newell product, and increasing inventory "destocking," or reductions, by the Company's retailer customers was having, and increasingly would continue to have, a material adverse effect on Newell's sales growth and margins; (2) undisclosed pricing conflicts between Newell's new Global E-commerce division and its brick-

and-mortar sales teams were straining the Company's relationships with its retailer customers and were also having a material adverse effect on the Company's sales growth and margins; and (3) undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses were causing significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition. Defendants' representations in Newell's SEC filings about its MD&A, risk factors and disclosure controls, as well as Defendants' certifications thereon, were also materially false and misleading. As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about Newell's then-current business and future financial prospects, and Defendants' deceptive conduct had the cumulative effect of making Newell's business appear more appealing and less risky than it actually was.

12.     Early in the Class Period and in the face of what Defendants asserted was a challenging retail environment experiencing a shift from bricks to clicks and numerous other challenges, Defendants falsely and misleadingly reassured Newell investors that the Company's positive financial results provided the market with strong evidence of Newell's ability to "perform while it transformed." Not only did Defendants conceal from investors the effect that inventory destocking by the Company's retailer customers was having on the Company's bloated retail channel inventory, and the increasing material adverse effect this inventory destocking would have on Newell's sales growth and margins in future periods, Defendants continually misled investors by asserting the opposite: ***that Newell would report accelerating growth and stronger financial results in the second half of 2017.***

13.     Indeed, during the first half of the Class Period, Defendant Polk was happy to trumpet Newell's ability to generate strong financial results in the face of what Defendants asserted

were macroeconomic headwinds while downplaying any effect these headwinds would have on Newell's business moving forward. For example, while announcing Newell's financial results for the fourth quarter and full-year ended December 31, 2016 in February 2017, Defendant Polk stated that the Company's strong "fourth quarter results reflect[ed] continued strong progress in the company's transformation" and that these results were delivered "in the context of challenging mall-based retail conditions driven by accelerating bricks-to-clicks shopper migration during the holidays." In what would be a recurring theme in Defendants' representations to investors throughout most of 2017, Defendant Polk also emphasized that Newell's core sales growth would accelerate in the second half of 2017, enabling Newell to meet its 2017 core sales growth guidance of 2.5% to 4.0%.

14. Similarly, in reporting Newell's financial results for the first quarter of 2017 in May 2017 and reaffirming the Company's previously-issued core sales growth guidance for 2017, Defendant Polk stated that Newell's "first quarter results provide ***strong evidence*** of our team's capacity to ***perform while we transform***."[1] Strikingly, not only did Defendant Polk dismiss the effect that inventory destocking by United States retailers and supposed macroeconomic headwinds were having on the Company's business, Defendant Polk unequivocally asserted that the effects of this inventory destocking, a particular area of focus for both the Company and the investment community, were ***"now behind us."***

15. And while reaffirming Newell's 2017 core sales growth guidance in announcing Newell's results for the second quarter of 2017 in August 2017, Defendant Polk touted the Company's "solid set of results in the second quarter delivering competitive growth" and stated that "***[w]e expect core sales growth to strengthen in the second half of the year*** as we benefit

[1] Unless otherwise noted, all emphasis herein is added.

from new distribution gains, a stronger back half pipeline of innovations and sustained double digit growth in e-commerce." Defendant Polk stated that ***"fundamentals are good across the business and are improving as we head into the second half of the year."***

16. Even in September 2017, ***just a few weeks from the close of Newell's fiscal third quarter***, Defendants were reaffirming the Company's previously-issued core sales growth guidance and downplaying any effect that external factors would have on the Company's performance. Specifically, in a September 6, 2017 press release discussing disruptions associated with Hurricane Harvey on Newell's United States manufactured resin businesses, the Company reiterated its expected 2017 core sales growth rate of 2.5%-4.0%. And the next day, while speaking at the Barclays Global Consumer Staples Conference, Defendant Polk touted Newell's growth and the integration of Jarden while once again reaffirming the Company's 2017 core sales growth guidance.

17. However, less than two months later, while discussing the Company's results for the quarter ended September 30, 2017, Newell investors would begin to find out that these prior Company statements and representations were untrue. On November 2, 2017, Newell issued a press release announcing incredibly disappointing financial results for the third quarter of 2017, with net sales ***declining*** 7% compared to the prior year period and core sales growth measuring a paltry 0.4%. Moreover, ***less than two months after Defendants had reaffirmed Newell's 2017 core sales growth guidance of 2.5%-4.0%, they essentially slashed it in half in setting a new range of 1.5%-2.0%.***

18. Rather than come clean and admit that bloated inventory levels in its retail channel had caused Newell's retailer customers to cut back on purchasing and/or forced Newell to offer promotional discounts to these retailer customers, thus causing Newell to experience slower sales

growth and decreased margins, Defendants blamed the Company's poor third quarter financial results on "weak late-quarter sales" due to vague macroeconomic factors that were supposedly causing retailer inventory rebalancing. Specifically, Defendant Polk represented that this retailer inventory rebalancing occurred "primarily in response to decelerating U.S. market growth through the Back-to-School period."

19.    As for the supposed macroeconomic factors that Defendants cited in their statements and in public filings throughout the Class Period, the truth was that it was actually undisclosed internal operational issues at Newell that were causing a drag on the Company's financial results, sales growth and margins. Specifically, undisclosed problems within Newell's new Global E-commerce division were straining the Company's relationships with its retailer customers, further eroding the Company's sales growth and margins. Whereas Defendants had promised to keep close tabs on the E-commerce division because of the potential for conflicts in pricing to arise between its E-commerce and brick-and-mortar sales teams, Defendants were aware of yet failed to disclose that poor communication between the E-commerce and brick-and-mortar teams allowed conflicts in pricing strategy to develop during the Class Period and these pricing conflicts significantly impaired Newell's relationships with its retailer customers.

20.    Undisclosed differences in managerial style and culture between the legacy Newell and Jarden businesses were also causing significant internal problems within Newell, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition. With Newell unable to unlock the full benefits of the acquisition, the truth about Newell's deteriorating business fundamentals was exposed.

21. The market was stunned by Defendants' belated disclosures. On November 2, 2017, in response to the Company's disclosures, Newell stock fell by $10.99 per share, approximately 27%, on heavy trading volume to close at $30.01 per share.

22. It was not until January 25, 2018, however, when Newell issued a press release pre-announcing the Company's full-year 2017 financial results, that investors became aware of the internal operational problems at Newell and the significant impacts those problems were having on Newell's sales growth, margins, and ability to effectively integrate the Jarden acquisition. Rather than the revised 1.5%-2.0% 2017 core sales growth guidance Defendants had issued only two months earlier, Newell stated that it now anticipated 2017 core sales growth of only approximately 0.8%.

23. Further, far from touting the positive impact of its integration of Jarden, Newell announced that the Company was exploring "strategic options" to divest industrial and commercial assets and smaller consumer businesses with such divestitures resulting in a staggering 50% reduction in both Newell's customer base and its global factory and warehouse footprint. Newell also announced that three members of its Board had resigned, including Ian G.H. Ashken, the former president of Jarden, and Martin E. Franklin, the former chairman of Jarden.

24. Once again, the market reacted sharply to Newell's disclosure. Newell stock fell $6.42 per share, or approximately 21%, on heavy trading volume to close at $24.81 per share on January 25, 2018.

25. During the Class Period, Defendants knew, or were reckless in not knowing, that the statements they were making concerning Newell's business were materially false and misleading. For example, with respect to inventory destocking and Newell's inventory in its retail channel, Defendant Polk has admitted that Defendants had "perfect visibility" into Newell

inventory in the retail channel during the Class Period, stating that "[w]e have ***perfect visibility*** into our largest retailers' inventory position" and that Defendants could "see exactly how many weeks on hand you've got at retail and how many weeks on hand you have in the warehouse." This "perfect visibility" was granular in nature and ongoing in real-time, as Defendant Polk further explained that Defendants could ***"see [inventory] by SKU quite frankly, every day."*** Complimenting this granular view of inventory in the retail channel, Defendants also admitted that they also had a detailed view of sell-through or sell-out on a real-time basis.

26. Further, with respect to the pricing conflicts that arose during the Class Period between Newell's Global E-commerce division and its brick-and-mortar retail sales teams, Defendants reassured investors before the Class Period that Newell management would keep close tabs on this precise issue, going so far as to place the new E-commerce division on the floor below Company executives in Newell's corporate offices in Hoboken given the importance of this issue to Newell's operating results and growth.

27. And given that Newell management consistently reassured investors that their past track record of generating strong financial results while transforming companies was a "proven" model for once again transforming Newell after the Jarden acquisition, their Class Period representations as to the seamless nature of the integration flies in the face of what they knew were a plethora of operational problems that plagued the integration of Jarden during the Class Period.

28. Events since the end of the Class Period have only served to confirm the false and misleading nature of Defendants' prior representations. On February 9, 2018, *The Wall Street Journal* reported that investor activist Starboard Value LP ("Starboard") had teamed up with three former Jarden executives, including Franklin and Ashken, to oust existing Newell management in a proxy battle. ***Franklin, a member of the Newell Board for the entirety of the Class Period,***

***publicly stated that Newell's poor financial performance was in fact not due to any macroeconomic headwinds, as had been repeatedly asserted by Defendants, but instead was the result of "failed" execution on their part***. On April 23, 2018, Newell issued a press release announcing that it had entered into an agreement to end the proxy contest, agreeing to a reconstituted Board that it said would bring a "refreshed sense of urgency, oversight, and accountability to Newell."

29. Thereafter, in May 2018, Starboard issued a detailed 172-page presentation based, in part, on dozens of interviews it had conducted with former Newell employees, customers, and suppliers (the "Starboard Presentation"). Not only did the presentation find that Defendants had falsely blamed external factors for Newell's poor performance, it also noted the substantial harm Newell shareholders had suffered as the direct result of Defendants' deception. Specifically, the Starboard Presentation demonstrated, among other things, that:

- "While Newell Has Blamed Poor Performance on the Macro Environment, We Believe it Is Self-Inflicted…";
- "While Newell's Revenue Is Declining, Its Peers Are Growing Consistently";
- "While Newell's Gross Margins Are Deteriorating, Its Peers' Are Continuing to Expand";
- "Many of Newell's issues are self-inflicted due to communication problems within the Company";
- "The Structure of the Organization Has Resulted in High Costs, Massive Inefficiencies, and Declining Revenue";
- "These issues frustrate customers and lead to Newell giving large promotional concessions, which drastically lowers margins"; and
- "Newell Has Consistently Overpromised and Under-delivered…And Shareholders Have Suffered…As Significant Shareholder Value Has Been Destroyed."

30.     As a consequence of Defendants' materially false and misleading statements and omissions that deceived the market, Lead Plaintiff and the other members of the Class suffered massive damages, having purchased Newell stock at artificially inflated prices that were tainted and distorted by Defendants' fraudulent scheme.

## II.     JURISDICTION AND VENUE

31.     The claims asserted herein on behalf of Lead Plaintiff and the Class (defined in ¶ 41 below) arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

32.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1331.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Newell maintains its principal executive offices in this District and many of the acts and transactions giving rise to the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

34.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, and the facilities of a national securities market.

## III.     PARTIES

### A.     Lead Plaintiff

35.     Lead Plaintiff Hampshire is a pension fund based in the United Kingdom that has over 167,000 total members and approximately £6.6 billion under management.  As set forth more

fully in its motion to be appointed lead plaintiff and the exhibits thereto (ECF No. 5), Hampshire purchased or acquired 545,275 shares of Newell common stock during the Class Period, paying over $27 million for those shares, and suffered millions of dollars in damages as the result of the violations of the federal securities laws alleged herein.

**B. Newell Defendants**

36. At all times relevant hereto, Newell was a Delaware corporation with its principal executive offices located in Hoboken, New Jersey, that operated as a global manufacturer and marketer of name brand consumer products. Shares of Newell trade on the New York Stock Exchange ("NYSE") under the ticker symbol "NWL." As of January 31, 2018, Newell had 485.2 million shares of common stock outstanding (net of treasury shares).

37. Defendant Polk served as President and Chief Executive Officer of Newell at all times relevant hereto, and has held those positions with the Company since joining Newell Rubbermaid in July 2011. During the Class Period, Defendant Polk was in large measure the public face for Newell, appearing not only in the Company's press releases and taking the lead role in speaking with analysts on the Company's conference calls, but also appearing at various industry and analyst conferences to discuss Newell's business and prospects. Defendant Polk signed and attested to the accuracy of the Company's annual report on Form 10-K for 2016, and attested to the accuracy of the Company's quarterly reports on Forms 10-Q for all of 2017.

38. Defendant Ralph J. Nicoletti ("Nicoletti") was appointed as Executive Vice President and Chief Financial Officer of Newell on June 8, 2016, and has served in those positions at all times relevant hereto. In the Newell press release announcing the hiring of Defendant Nicoletti, Newell touted the fact that he had served as the Chief Financial Officer of global, publicly-traded corporations for almost ten years prior to joining Newell, and Defendant Polk

noted that Nicoletti would serve as a "key partner to me in helping Newell Brands scale our operating model, deliver our growth and financial objectives, and tell the Newell Brands story to our investors." As a key partner for Defendant Polk, one of Defendant Nicoletti's initial tasks after being hired at Newell was to lead "the development of a high-performing finance function to fully capture the value creation associated with the company's recent combination with Jarden." Defendant Nicoletti signed and attested to the accuracy of the Company's annual report on Form 10-K for 2016 and the Company's quarterly reports on Forms 10-Q for all of 2017. On June 1, 2018, less than two years after Nicoletti's hiring, Newell issued a press release announcing his retirement effective December 31, 2018.

39.     Defendant James L. Cunningham, III ("Cunningham") was appointed Senior Vice President and Chief Accounting Officer of Newell on May 11, 2016, and has served in those positions at all times relevant hereto. Prior to his appointment at Newell, Defendant Cunningham had served as the Senior Vice President and Chief Accounting Officer of Jarden since May 2012. Defendant Cunningham signed the Company's annual report on Form 10-K for 2016 and its quarterly reports on Forms 10-Q for all of 2017. On October 4, 2018, Newell filed a Form 8-K with the SEC announcing Defendant Cunningham's intention to leave the Company in 2019.

40.     Defendants Polk, Nicoletti and Cunningham are collectively referred to herein as the "Executive Defendants." The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Newell's reports to the SEC, the Company's press releases, and presentations to securities analysts, institutional investors and other members of the market. Each Executive Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected. Because of their positions and access to material non-public information, each of the Executive Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. CLASS ACTION ALLEGATIONS

41. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of Newell during the period from February 6, 2017 through January 24, 2018 (as noted above, the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, their officers, directors and partners, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have a controlling interest.

42. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Newell's common stock was actively traded on the NYSE, an efficient market, and responded promptly to the disclosure of new, material information as it was made known to the market. As of January 31, 2018, Newell had 485.2 million shares of common stock outstanding (net of treasury shares). While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that Class members number in the thousands.

43. There is a well-defined community of interest in the questions of law and fact involved in the case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

(a)     whether Defendants violated the federal securities laws;

(b)     whether Defendants misrepresented material facts concerning Newell;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether Defendants engaged in perpetuating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

(f)     whether Newell's SEC filings issued during the Class Period that contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K) contained untrue or materially misleading statements;

(g)     whether the price of Newell's common stock was artificially inflated; and

(h)     the extent of damages sustained by Class members and the appropriate measure of damages.

44.     The claims of Lead Plaintiff are typical of the Class and Lead Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

45.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Lead Plaintiff seeks to represent.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

47.     Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## V.     BACKGROUND FACTS AND NATURE OF THE FRAUD AT NEWELL

48.     As more fully described below, during the Class Period, Defendants knowingly misrepresented and/or failed to disclose, among other things, that (1) Newell's retail channel was loaded with extremely high levels of Newell product, and increasing inventory "destocking," or reductions, by the Company's retailer customers was having, and increasingly would continue to have, a material adverse effect on Newell's sales growth and margins; (2) undisclosed pricing conflicts between Newell's new Global E-commerce division and its brick-and-mortar sales teams were straining the Company's relationships with its retailer customers and were also having a material adverse effect on the Company's sales growth and margins; and (3) undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses were causing significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition.  All of this misconduct was orchestrated in an effort to make Newell's business appear more appealing and less risky than it actually was.

### A.     Background and Pre-Class Period Events

49.     Newell manufactures and markets name brand consumer and commercial products that are sold in nearly 200 countries around the globe.  The history of the Company dates back

well over 100 years to 1903, when the Newell Manufacturing Company was founded by Edgar Newell in Ogdensburg, New York. The Company went public in 1972, and since that time has grown primarily by acquisition, seeking out and acquiring various consumer and commercial branded products.

**1. The Jarden Acquisition and a Renewed "Transformation" of Newell**

50. In 1999, Newell acquired the Rubbermaid and Graco brand names in a $5.8 billion megamerger deal, thereafter changing its name to Newell Rubbermaid. That name remained until 2016, when the Company completed its acquisition of Jarden, itself a consumer products company that owned a vast portfolio of brand names and that throughout its history had also grown through acquisition. Newell acquired Jarden in April 2016 for approximately $15.3 billion, including $5.4 billion of cash and $9.9 billion of stock, and changed its name to Newell Brands.

51. The Jarden acquisition more than doubled the size of the Company, creating a consumer goods company with over $14 billion in annual sales and a portfolio of over 80 product brands, including the following brands that had been within Newell Rubbermaid (Sharpie®, Paper Mate®, Elmer's®, Irwin®, Lenox®, Rubbermaid Commercial Products®, Contigo®, Rubbermaid®, Calphalon®, Goody®, Graco®, Aprica®, Baby Jogger®, Dymo®, Parker® and Waterman®), and the following brands that had been within Jarden (Ball®, Bee®, Bernardin®, Bicycle®, Billy Boy®, Crawford®, Diamond®, Envirocooler®, Fiona®, First Alert®, First Essentials®, Hoyle®, Kerr®, Lehigh®, Lifoam®, Lillo®, Loew-Cornell®, Mapa®, Millefiori®, NUK®, Pine Mountain®, Quickie®, Spontex®, Tigex®, Waddington, Yankee Candle®, YOU®, Abu Garcia®, AeroBed®, Berkley®, Campingaz® and Coleman®, Dalbello®, ExOfficio®, Fenwick®, Greys®, Gulp!®, Hardy®, Invicta®, Jostens®, K2®, Marker®, Marmot®, Mitchell®, Neff®, PENN®, Rawlings®, Shakespeare®, Squadra®, Stearns®, Stren®, Trilene®, Volkl®,

Zoot®, Bionaire®, Breville®, Cadence®, Crock-Pot®, FoodSaver®, Health o meter®, Holmes®, Mr. Coffee®, Oster®, Patton®, Rainbow®, Rival®, Seal-a-Meal®, Sunbeam®, VillaWare® and White Mountain®). In the year ended December 31, 2015, Newell Rubbermaid had reported net sales of over $5.9 billion and net income of $350 million, while Jarden had reported net sales of over $8.6 billion and net income of $146.5 million.

52. Defendant Polk, who was serving as chief executive officer of Newell Rubbermaid, was tapped to serve in the same role with the new combined company. Further, three Jarden directors joined the Newell board of directors, including Martin Franklin, founder and executive chairman of Jarden, and Ian G. H. Ashken, co-founder, vice-chairman and president of Jarden.

53. As CEO of the post-acquisition Newell, Defendant Polk felt immense pressure to ensure that the integration of Newell was a complete success, and not just because it would benefit Newell's shareholders. Defendant Polk had a vested personal interest in making sure the Jarden acquisition was viewed as a complete success because, by that time, he had invested a great amount of effort in creating a reputation for himself as an executive who was successful at ***"transforming"*** companies.

54. Indeed, Defendant Polk's biography on the Newell website boasts that "[d]uring eight years at Unilever, [Polk] is credited with ***transforming*** the company's business in the Americas, sharpening Unilever's global portfolio strategy, and creating a more competitive, faster-growing, innovation-driven organization."[2] And once hired as president and chief executive officer of Newell Rubbermaid in 2011, the biography praises Defendant Polk for "***transform[ing]*** [Newell] into a bigger, faster growing, more global and more profitable enterprise." The biography

[2] https://www.newellbrands.com/michael-polk (last visited Nov. 27, 2018).

goes on to call Defendant Polk a "global marketer, innovator and leader with a ***proven record of growing brands, driving change and delivering superior financial performance***…."

55. Leveraging Defendant Polk's reputation as an executive who could successfully transform companies to both bolster support for the deal and to provide investors with assurance of the strong growth that Newell would experience in future periods, Defendants made "transformation" a central theme of the Jarden acquisition. In announcing the deal, Defendants repeatedly emphasized the theme that management was looking to once again "transform" Newell, this time from a holding company into an operating company, using the same "proven" transformation model implemented at Newell in 2011. Defendant Polk described that model on the December 14, 2015 analyst conference call announcing the deal as follows:

> By look[ing] back at what we've done at Newell over the last four years, I think we've got ***a proven track record as the management team as being able to unlock a tremendous amount of value*** by tackling what was arguably an even heavier cost structure at Newell than this combination provides, and releasing that money and putting it back into our brands and its capabilities, and having some of it flow through the margin for accelerated performance. ***That track record and that experience over the last four years positions us well for the type of work ahead in this combination.***

Other speakers on the call also repeatedly referred to the "transformative value creation" that would result from the combination of Newell and Jarden.

56. Similarly, on Newell's January 29, 2016 analyst conference call discussing the Company's financial results for the fourth quarter of 2015, Defendant Polk continued to reference the theme of transformation, stating:

> The strategic choice to reposition the company from a holding company to an operating company, releasing costs through Project Renewal such that we increase spending behind our brands and invest in an advanced set of capabilities, is clearly working. Our track record of delivery, and the value-creation story derived from our accelerating growth and margin development sets the stage for ***the next very exciting period of transformation, as we combine our company with Jarden to create Newell Brands***.

Later in the same call, Defendant Polk explained that management was

> ***…on a path to completely transform Newell Rubbermaid***, delivering highly competitive and differentiated results. Our operating model is extendible to more categories, more brands, and more geographies. ***This is the core logic that underpins the Jarden combination***.

By this time, Newell had also created the "Newell Transformation Office," which was responsible for delivering synergies to the total enterprise and for integrating the businesses of Newell and Jarden.

57. Speaking at the UBS Global Consumer Conference on March 9, 2016, Defendant Polk stated that "…Newell has been on a journey since 2011. ***We've really … transformed the architecture of the company***, the way we work, how we focus our human capital." And in response to a question about the timing of making such a large deal, Defendant Polk stated that the Newell Board had agreed with Newell management's assertion that it was time to "take ***a more transformative path*** on the company."

58. Defendants kicked off their most recent transformation of Newell by touting the benefits and incredible growth potential of the combination with Jarden. In Newell's December 14, 2015 press release announcing the deal, Defendant Polk stated that "[t]he combination of [Newell and Jarden] creates a $16 billion consumer goods company with incredible potential to grow and create value." And in the months leading up to the consummation of the deal in April 2016, Defendant Polk repeatedly stressed that both Newell and Jarden "enter into this partnership from positions of strength, very strong performance…" and that "[b]oth companies have strong value creation track records." In fact, appearing in a CNBC interview with David Faber on December 14, 2015, Defendant Polk flatly stated that "because the core businesses [of Newell and

Jarden] have momentum, ***you do not have to worry about any underlying issues in the business getting in the way of playing for the upside in those combinations***."

59. Defendants also repeatedly downplayed any execution risk that came with the massive increase in Newell's size, instead painting the Company's increased size and scale as a positive that would generate new sales growth while at the same time unlocking significant cost efficiencies. On Newell's December 14, 2015 analyst conference call announcing the deal with Jarden, Defendant Polk stated:

> Beyond all the benefits of portfolio and scale to grow, we know there are also substantial cost synergies. We have a clear line of sight to $500 million in anticipated cost synergies from the combination within four years. ***With greater scale will come greater efficiency.*** Joining this one company will allow us to eliminate duplication in corporate costs, scale procurement benefits, capture substantial savings from consolidating shared services and given the nearly $10 billion in revenue in the U.S. lower our cost to serve, with significant savings in distribution and transportation.

On the same call, Defendant Polk reassured investors that management would work "across both [the Newell and Jarden] organizations ***to ensure a seamless integration of the new organization***." And speaking at the Consumer Analyst Group of New York Conference on February 19, 2016, Defendant Polk addressed the question of whether the combination of Newell and Jarden was too complex, a question Polk said he got "often," by unequivocally declaring that "[i]t's not too complex."

60. On April 15, 2016, Defendants completed Newell's acquisition of Jarden, issuing approximately 223.8 million shares of Newell common stock directly to former shareholders of Jarden, with each former Jarden share converted to 0.862 shares of Newell common stock. Former Jarden shareholders also received $21 per share for their former Jarden shares. Newell's press release announcing completion of the deal once again referenced a "seamless transition" of the two organizations, and Defendant Polk stated, in part:

> [t]he combination of our two great organizations creates a powerhouse consumer goods company and sets up a very exciting long-term growth and value creation story…. Our immediate focus will be to deliver our 2016 financial objectives, start the work of integrating the two companies and develop the long term corporate and portfolio strategy that will guide the choices we make and the realization of the company's full potential.

### 2. Newell Reports Strong Momentum with Significant Progress Integrating Jarden Heading into the Class Period

61. In Newell's first three quarters of 2016, Defendants reported increasingly "strong" and "solid" financial results, telling investors that Newell was gaining significant momentum throughout 2016. According to Defendants, the integration of Newell's business was rapidly accelerating with no speed bumps in sight, thus proving that Newell could "perform while it transformed."

62. As more time elapsed following the Jarden deal, Defendants increasingly ratcheted up their rhetoric about how seamless the integration of Jarden's business had turned out to be. Defendants also made it a point to emphasize the benefits Newell would recognize from the new Global E-commerce division that it created in the wake of the Jarden deal. And, consistent with these representations, Defendants dismissed any notion that inventory destocking at the Company's retailer customers would have any effect on Newell's ability to unlock the full potential of the Jarden acquisition.

63. In reporting what he characterized as "a very strong set of first quarter results" for Newell on April 29, 2016, Defendant Polk stated that Newell had "an outstanding start to the year," with core sales growing 5.6% with growth in all of Newell's segments and regions. On Newell's April 29, 2016 analyst conference call, Defendant Polk stated that "we have clear momentum in our business as we come together to create Newell Brands," and emphasizing the theme of

performing while transforming Defendant Polk stated that "[w]e delivered these strong results, while simultaneously completing the most transformative transaction in our respective histories."

64.     On the same call, Defendant Polk sought to reassure investors that the integration of Jarden's business was turning out to be truly seamless, in part because Jarden and Newell had turned out to be very similar.  With respect to the integration of Jarden, Defendant Polk made the following statements on the April 29, 2016 analyst call:

- "Our two organizations are coming together quite well";

- "So we feel terrific.  We're right where we expected to be in the combination.  And we're excited by the possibilities";

- "I would say … that our cultures are more similar than you might think"; and

- "… based on what I've seen, I think that's going to be a really easy thing for us to land as an integrated company.  The values, the operational intensity that underpins things that we've done over the last few years are clearly in place on the Jarden businesses.  So I'm quite optimistic about there not being any cultural or social issues with us getting aligned on how we intend to operate."

65.     Newell's second quarter 2016 financial results, which it reported on July 29, 2016, were equally positive.  For the second quarter, Newell reported core sales growth of 5.0%, and in Newell's press release announcing its results Defendant Polk stated that Newell's "very good" financial results "benefited from the combination with Jarden" as the Company was "making good progress on the integration of the legacy Newell Rubbermaid and Jarden businesses."

66.     Defendant Polk gave additional insights to investors on Newell's July 29, 2016 analyst conference call, saying he was "very pleased to report a strong set of second quarter results with positive momentum on a number of fronts."  Emphasizing Newell's success in integrating the Jarden business, Defendant Polk declared:

> We successfully completed the most transformative deal in the history of either Newell Rubbermaid or Jarden. Despite the potential for distraction that a transaction of this size could create, we grew core sales 5% and delivered normalized EPS growth of nearly 22% in the second quarter.

And again, Defendant Polk emphasized the similarities between Jarden and Newell, remarking that "I've made this point before that the DNA of both organizations are really similar."

67. Even though Newell had reported two strong quarters, including one in which Jarden's results were consolidated with legacy Newell's results for the combined Company, analysts began inquiring about retailer inventory tightening in the retail channels during the July 29, 2016 conference call. The following exchange occurred, in which Defendant Polk summarily dismissed that any concerns about such inventory tightening would have any effect on the Company's guidance, as retailers were constantly tightening inventories and "discrete windows where events happen" are "so few and far between":

> Analyst: Okay. Thanks. Thanks for squeezing me in and I guess kind of dovetailing a little bit on Joe's last question, if you think about the benefits of scale at this point, ***we have been hearing just about some retailer inventory tightening in some kind of specialty retail channels.*** So I was just wondering if you could talk about having that incremental scale, how that's helped you in some key categories? Or do you feel that maybe some of the areas you've been a little bit susceptible to? So I was just wondering if you can put some color around that?
>
> Polk: You know I'm not a big fan of using retail inventory as a conversation point. ***There's always pressure on retailer inventories.*** If I were a retailer, I'd squeeze inventories as hard as I possibly can because they're rewarded on return on invested capital. So as a manufacturer, as a supplier, you have to accept that as part of their business model and you have to deliver your business plans in the context of ever increasing pressure on inventory positions.
>
> There always can be, sort of, discrete windows where events happen. We saw one of those in Q1 of 1996, or 2006, with Walmart and where they really created an event in a short period of time for everybody. And — but they're so few and far between. ***So there's always pressure on inventories. There's always a dynamic that***

> ***occurs when retailers consolidate or exit, but we ought to be able to anticipate those things and work our way through them and not have them really come up as guidance discussion points with you guys*.**

68. Newell reported its third quarter 2016 financial results on October 28, 2016, and by all accounts the momentum at the Company appeared to be strengthening as the transformation of Newell accelerated rapidly and was already driving tremendous growth. In the Company's third quarter of 2016, Newell reported that core sales grew 3.0%, and Newell raised its outlook for both 2016 core sales growth and normalized earnings per share. Defendant Polk touted the key theme of Newell's ability to perform while it transformed in the press release, stating that "[w]e delivered very good performance in the third quarter while simultaneously driving substantial organization and portfolio changes." He further said that

> ***[o]ur strong savings and cost synergies programs are now in full flight, which when coupled with growth in the underlying business are driving exceptional normalized earnings per share and operating cash flow growth.*** With very strong year to date results, we have raised our 2016 guidance for both core sales growth and normalized earnings per share into the top half of our previous 2016 guidance ranges.

69. On Newell's October 28, 2016 analyst conference call, Defendant Polk further stated that "[w]e've chosen to move decisively and with speed because we have the benefit of lessons learned from the Newell Rubbermaid transformation and confidence in our team's ability to perform while we simultaneously transform." Defendant Polk also reiterated that Newell's "cost synergy teams are now in full flight…."

70. Defendant Polk also used Newell's second and third quarter 2016 analyst conference calls to emphasize Newell's dedication to building its e-commerce business, which was a strategic focus of the Jarden acquisition because Jarden had a more robust e-commerce business than Newell. Specifically, Defendant Polk, recognizing the need to ensure that brick-and-mortar

retailer relationships are not adversely impacted by Newell's emphasis in growing its e-commerce business, stated on Newell's July 29, 2016 analyst conference call that:

> …we've made the determination that we need to invest in specialized skills and we've built out a whole team of e-commerce resources from the outside that are really driving our activity plans in these areas. And so we intend to continue to step up investment in this area this year, next year, the year beyond.
>
> * * *
>
> That does not mean we're taking resource away from our bricks and mortar partners. Walmart is our biggest partner. A big 95% of their business with us is brick and mortar still. So, obviously, for all of those folks that are in that phase of striking the right balance within their business model, we need to resource our relationship with that customer and our programming with that customer in a way that fits their strategic roadmap.

71. And on Newell's October 28, 2016 analyst conference call Defendant Polk made it clear that, in implementing Newell's E-commerce division, management was keenly aware of potential conflicts that could arise between Newell's e-commerce operations and its brick-and-mortar operations, especially around pricing. In fact, given the importance of the E-commerce division to Newell's growth agenda, Defendant Polk stated that its E-commerce division would operate on the floor below the executive team at the Company's Hoboken headquarters. Specifically, Defendant Polk said:

> This is a group of people that will be focused, and it will be a sizable group of people that will be focused on taking the demand created by the brand teams and converting it to purchase in these channels. And their focus is going to be largely brick-and-mortar dotcom and pure-play dotcom.
>
> * * *
>
> It's going to be really, really exciting. The billions of dollars of growth I think is conservative in terms of what's possible by 2020, but we're ramping that capability now. ***And the hub of that organization will be one floor below the executive team***

> ***in Hoboken, so we're going to keep that team right next to us because of the importance of its delivery against our growth agenda.***[3]
>
> * * *
>
> ***The point of connection to the operating divisions will come through pricing strategy and pricing execution. So obviously, you have channel conflict dynamics that can arise with this model. So that's where the point of connectedness needs to happen, it's in what we would call trade marketing or business development, where those conversations really need to be very, very clear such that we don't get into pricing dislocating dynamics between the bricks-and-mortar dotcom and the bricks-and-mortar or the pure-play dotcom in the bricks-and-mortar.***

72. Thus, by all accounts, the momentum behind Newell and its integration of Jarden was building entering the Class Period, with Defendants insisting that the Company could "perform while it transformed." Defendants dismissed the notion that inventory destocking at the Company's retailer customers would have any effect on Newell's ability to unlock the full potential of the Jarden acquisition while simultaneously touting the significant progress Newell had made in integrating Jarden's business. Defendants also emphasized the benefits Newell would recognize from its new Global E-commerce division, and reassured investors that they would keep close watch on any potential pricing conflicts that could arise between its e-commerce sales team and Newell's brick-and-mortar sales teams through the continued growth of that division.

---

[3] Speaking at the Morgan Stanley Global Consumer & Retail Conference on November 15, 2016, Defendant Polk similarly stated that Newell was "creating a global eCommerce division that cuts across the total enterprise" and that "[t]hose people will be housed in one location, be right across the river in Hoboken, right below our corporate headquarters where there's a floor—a 40,000 square foot area where all of our global eCommerce capabilities will be housed." Defendant Polk continued, ***"[w]e're keeping them close to senior executives because we expect to deliver $1 billion of gross growth, not net of cannibalization, but of gross growth between now and 2020 out of this team."***

**B. Defendants' Fraudulent Conduct During the Class Period**

73. Defendants continued touting the same positive themes about Newell's business during the first two quarters of the Class Period. Unbeknownst to investors, however, Newell was increasingly besieged by internal operational problems on a number of fronts, including inventory pressures from its retailer customers and a plethora of operational issues relating to the growth of its Global E-commerce division and integration of Jarden, all of which Defendants knew were having, and would increasingly continue to have, a material adverse effect on the Company's financial results.

74. Rather than disclosing the significant issues facing Newell and alerting investors to the real problems that the Company was facing, Defendants embarked on a scheme to conceal these issues from investors, and later chose to actively mislead investors about the true reasons behind the downturn in Newell's business. Defendants orchestrated this scheme because they knew that any sign of weakness from the Company or indication that Newell was incapable of performing while transforming, which Defendants promised investors given management's prior "proven" track record, would severely impact Newell's stock price and would threaten to end their tenures at Newell. This was especially true for Defendant Polk, the face of Newell throughout the Class Period, who had staked his entire professional reputation on his ability to once again transform Newell by seamlessly integrating the Jarden business and unlocking the full growth potential of that acquisition.

**1. Newell's Excess Inventory Problem**

75. Throughout the Class Period, Newell was confronted with an excess inventory problem. Specifically, Newell's retail channel was loaded with extremely high levels of Newell product. And because many of Newell's retailer customers had begun a process of tightening their

inventories, or what is commonly referred to as "inventory destocking," in late 2016, Newell was forced to maintain increasingly higher levels of inventory in-house that it had not yet sold to its retailer customers.  In fact, in the Starboard Presentation issued shortly after the end of the Class Period, Starboard compared Newell's inventory levels—expressed as a percentage of revenue—to six of its peers.  It found that Newell's inventory levels were around 42% higher than industry averages, and substantially higher than any of the inventory levels for the companies in Newell's peer group, as shown on the following slide from the Presentation:



76.     Newell's own bloated inventory levels posed a significant problem for the Company during the Class Period, as this trend of inventory destocking by Newell's customers during the Class Period was having and would increasingly have a significant negative impact on sales of Newell products as well as Newell's margins moving forward.  Specifically, because of the buildup of inventory in the Company's retail channel, Newell's retailer customers were

purchasing less of the Company's products to reduce these bloated inventory levels, and even in the sales Newell could make, the Company was forced to make significant promotional concessions.

77. Throughout the Class Period, Defendants were well aware of the problems that Newell's bloated inventory levels and continued retailer destocking were having on the Company's sales growth and margins. Indeed, by Defendants' own admission, during the Class Period they had "perfect visibility" into Newell's inventory levels at a granular level on a real-time basis. Not only did Defendants monitor Newell inventory levels on a granular basis in real-time, they were also monitoring similarly granular point of sale data from their retailers. In other words, during the entirety of the Class Period, Defendants were able to, and did, monitor both "sell-in" and "sell-through" or "sell-out" on a real-time basis. As Defendant Polk admitted on the Company's November 2, 2017, analyst conference call:

> We have ***perfect visibility*** into our largest retailers' inventory position. We know what our—through Retail Link, you have that visibility. ***You see exactly how many weeks on hand you've got at retail and how many weeks on hand you have in the warehouse.*** So we know exactly what has gone on there and ***we can see that by SKU,[4] quite frankly, every day.*** So we have ***perfect visibility*** at that customers and they share that with us because it's in their interest for us to know and to work with them to manage those inventories down.

* * *

[4] SKU stands for a stock keeping unit, which is a product and service identification code for a store or product, often displayed as a machine-readable bar code that helps track the item for inventory. According to tradegecko, a company that develops online inventory and order management software, managing inventory with SKUs allows a business to keep better track of its inventory levels, reorder when further inventory is needed, and cut down on inventory holding costs. "By tracking product variants with SKUs you can report not just on the main product line, but right down to the individual variation of the product, i.e. color, size, material. These reports can help determine which product variants are your best sellers and which are underperforming. Not only does this give you a clearer picture of your major profit streams, but also helps you make strategic product decisions to grow your business."

> …***we get [Point of Sale] data weekly, which is transaction data from our retailers, including Amazon and we get the ability to split both [E-commerce] from bricks-and-mortar by product family***. We could go lower, but we've got all that data that comes in and gets aggregated. So you're not going to see the [Point of Sale] data that we see. We see that every week and it's the equivalent of retail link from all of our retailers and then of course, we have our invoicing that we compare all that to. We look at it across 75 product families and we do this in the U.S. And so we have a very, very granular view of our business and it's a unique combination of these different data sources that gives us the perspective and that's the number we quote.

78. Despite this knowledge, Defendants not only omitted to tell investors of the problems facing the Company related to Newell's bloated inventory levels and the effect retail inventory destocking would increasingly have on the Company's growth and margins in future periods, but affirmatively misled the market about the effects of inventory destocking on Newell's business throughout the Class Period.

79. Specifically, Defendants advanced a false narrative concerning the effect of Newell's bloated inventory levels in the midst of retail customer destocking by initially reassuring analysts and investors that any inventory destocking would not have an effect on the Company's core sales guidance for 2017 and would lessen as the year progressed, and thus that core sales growth would actually accelerate in the second half of 2017. This false narrative included a materially false and misleading declaration by Defendant Polk that pressures from inventory destocking were "behind us."

80. For example, at the start of the Class Period on Newell's February 6, 2017 analyst conference call discussing the Company's fourth quarter 2016 financial results, Defendant Polk referred to "inventory rebalancing" by "some retailers," but stated that

> [w]e expect this rebalancing ***to be more pronounced in the first half of 2017 and to lessen in the second half of 2017 as we lap this past year's changes. In this context, we believe core sales growth will sequentially accelerate***, with the core growth in the first half of the year in the lower half of the full-year guidance range.

Later in the call, Defendant Polk reiterated that on "… the inventory thing, we'll continue to feel some of those dynamics ***through the first half of the year***, but I think that ***once we get through that window, this reset of the inventory algorithms that retailers have will be behind us."***

81. Through the second quarter of 2017, Defendants continued to downplay the impact of any inventory destocking and called for significant sales growth acceleration in the second half of 2017. On Newell's May 8, 2017 analyst conference call discussing the Company's first quarter 2017 financial results, while Defendant Polk characterized inventory pressures as a "meaningful headwind," he stated that these pressures were already "built into our thinking" and that "***[t]he good news is that [inventory reduction impacts] are now behind us*** and eventually we lap these scenarios as we come into 2018…."

82. And on Newell's August 4, 2017 analyst conference call discussing the Company's second quarter 2017 financial results, when it was apparent that inventory destocking had continued to pressure the Company, Defendant Polk said that Newell would lap the "vast majority" of the inventory destocking coming through the third quarter and that "…once we get…into the fourth quarter, I think the degree of impact lessens." Recognizing that some amount of inventory destocking may continue, Defendant Polk further stated "I don't think it has as profound an impact on the business as the last three quarters and a month or two through Q4 of the last year…."

83. As shown in the following chart, as Newell continued to report escalating amounts of inventory, Defendants' statements were designed and timed to falsely reassure investors that any concerns about inventory were overblown and that Newell would still be able to report accelerating sales growth in the second half of 2017[5]:

---

[5] The fact that Newell had an excess inventory issue in 2017 that it did not have throughout 2016 is further exhibited by the Company's statement of cash flows. Specifically, throughout 2016, Newell's cash flows related to inventory were increasingly positive, meaning Newell was selling

more products to its retailer customers than it was purchasing for inventory (thus resulting in the decreasing 2016 inventory levels shown in the chart below). In the first quarter of 2017, however, its cash flows related to inventory went sharply negative, meaning that Newell was purchasing more finished goods and/or incurring more costs of manufacturing finished products for inventory than what it was selling to its retailer customers. Its cash flows for inventory were increasingly negative for the first three quarters of 2017 (thus resulting in the increasing 2017 inventory levels shown in the chart below).

Unbeknownst to investors, Newell was unable to correct this issue throughout 2017 due to a major risk to its global supply chain. Specifically, as set forth in more detail herein, in announcing the Company's financial results for its third quarter of 2017 on November 2, 2017, Defendant Polk admitted that if Newell ordered too much inventory, it would be unable to adjust its inventory levels in a one or two-month window because Newell was only 50% self-manufactured. In such a scenario, which occurred in 2017, the Company would have "a long value chain of sourced finished goods" that it would be "hung out with." As Newell built inventory in 2017, Defendants concealed from investors the material risk presented by Newell's global supply chain and the Company's inability to take timely measures to reduce that inventory.



84. These materially false and misleading statements, when made, were directly contrary to non-public information Defendants later admitted that they possessed on a real-time basis concerning the Company's inventory levels and sell-through rates at its retailer customers and what they knew, but did not disclose to investors, would be the inevitable result of Newell's excess inventory on the Company's sales growth and margins.

**2. Pricing Conflicts Arise with Growth of Newell's Global E-commerce Division, Straining Customer Relationships**

85. During the Class Period, Newell's Global E-commerce division was determining online pricing for Newell's products without consulting with Newell's brick-and-mortar divisions,

which resulted in inconsistent pricing, strained customer relationships, and ultimately a negative impact on the Company's sales growth and margins.

86.     As Newell stated during the Class Period, the Company's divisions/brands were responsible for in-store pricing and Newell's E-commerce division was responsible for online pricing, ***even when both groups were selling to the same customer.***  For example, while Newell's divisions/brands were responsible for in-store pricing on its sales to Walmart brick-and-mortar stores, the Company's E-commerce division set the price for Newell's products sold on Walmart.com.  The result was that, during the Class Period, Newell's divisions/brands and its E-commerce division could go to the same customer with completely different plans and pricing for the same product.

87.     However, because there was a lack of communication between Newell's divisions/brands and its E-commerce division during the Class Period – in sharp contrast to Defendants' statements to the market that everything would be coordinated and closely overseen by the Company's senior management (see ¶¶ 70-71, above) – Newell was essentially competing with itself on the prices for its products, resulting in strained customer relationships and extensive promotional discounting that led to significantly impaired sales margins.   This lack of communication between Newell's divisions/brands in brick-and-mortar and its E-commerce division led to Newell actually violating its own Minimum Advertised Price ("MAP") policy for a number of products, triggering concessions to its retailer customers.

88.     For example, during the Class Period Newell's E-commerce division began to aggressively discount prices on fishing reels.  Shortly thereafter, a major sporting goods retailer and prominent Newell customer realized that they could purchase the same product sold in their stores online at a lower price than the wholesale price being offered to that retailer by Newell's

divisions/brands.  Thus, Newell's divisions/brands were forced to lower Newell's wholesale price for the reels sold to that retailer, thus hurting the Company's margins.  A similar scenario played out with Calphalon pots, where one of Newell's retailer customers discovered that Amazon was selling the same set of pots at a price below Newell's MAP, resulting in Newell offering that retailer substantial promotional funding, which also negatively impacted the Company's margins.

89.     The Starboard Presentation detailed these instances of pricing conflicts in the following slides, including quotes from a former executive at Newell indicating that not only did Newell violate its MAP with its sales to online customers, but Newell's own website was also violating the Company's MAP:



## The E-commerce Group Needs to Better Communicate with the Brands (cont'd)

**The lack of communication resulted in Newell violating its own Minimum Advertised Price (MAP) policy, forcing the Company to provide concessions to retailers.**

- On a number of different occasions, we understand that Newell's e-commerce group offered pricing to online customers that actually violated the Company's own Minimum Advertised Price (MAP) that the division / brand would provide to the brick-and-mortar retailer.
- This would result in frustrated retail customers that would then demand price adjustments or significant promotional funding, resulting in negative impacts to margins.
- Apparently, this is not only happening with sales to online customers, but also on Newell's own website.

> "In one such instance, after finding out that Newell's own website was selling a product online for substantially cheaper than the retailer, the retailer slid across a piece of paper and said '**your own website is violating your Minimum Advertised Price policy**.'"
>
> *- Former Newell executive*

**Why aren't e-commerce and the brands talking to each other?**

Source: Company filings, industry research and interviews.

73

## The E-commerce Group Needs to Better Communicate with the Brands (cont'd)

**The lack of communication resulted in Newell violating its own Minimum Advertised Price (MAP) policy, forcing the Company to provide concessions to retailers.**

**Example – Fishing Reels**

- Most likely in an effort to grow near-term sales, the e-commerce team began to aggressively discount prices on fishing reels.
- Shortly thereafter, a major sporting goods retailer (and prominent Newell customer) realized they were able to purchase this product online at a lower price than they were currently purchasing it wholesale from the brands.

**Result:**
**Newell lowered the price for the sporting goods retailer, hurting margins**

**Example – Calphalon**

- A major brick-and-mortar retailer was selling a set of Calphalon pots.
- Amazon was selling the same set at a materially lower price that was apparently below the brick-and-mortar retailers' minimum advertised price.

**Result:**
**In an effort to appease the frustrated retailer, Newell offered substantial promotional funding, hurting margins**

**The lack of communication between division / brands and e-commerce has resulted in frustrated customers and significant margin issues for the Company**

Source: Company filings, industry research and interviews.

74

90. Throughout the Class Period, Defendants were well aware of the pricing conflicts that were occurring as the result of the lack of communication between Newell's Global E-commerce division and the divisions/brands responsible for sales to brick-and-mortar retailers. As noted above, just before the Class Period, Defendant Polk assured investors that management was aware of the potential "channel conflict dynamics" that could arise, stating that he understood that "conversations really need to be very, very clear such that we don't get into pricing dislocating dynamics between the bricks-and-mortar dotcom and the bricks-and-mortar or the pure-play dotcom in the bricks-and-mortar." In doing so, Defendant Polk even specifically referenced Walmart, noting that Walmart was Newell's "biggest partner" and stressing the need to "strik[e] the right balance within their business model."

91. As a point of further reassurance to investors that management was actively monitoring the activities of Newell's Global E-commerce division, Defendant Polk stated that the E-commerce division would operate "one floor below the executive team in Hoboken…" so that Newell executives could "keep that team right next to us because of the importance of its delivery against our growth agenda." As Defendant Polk further explained, "[w]e're keeping them close to senior executives because we expect to deliver $1 billion of gross growth, not net of cannibalization, but of gross growth between now and 2020 out of this team."

92. Despite this knowledge, Defendants not only omitted to tell investors of the problems facing the Company as a result of pricing conflicts that had developed due to a lack of communication between Newell's brick-and-mortar divisions/brands and its E-commerce division, but affirmatively misled the market by prominently touting the growth of the Company's E-commerce division as a driver of sales growth in the second half of 2017 and by telling investors

that the pursuit of e-commerce opportunities was not having an adverse effect on its brick-and-mortar brands/divisions.

93.     For example, on Newell's February 6, 2017 analyst conference call discussing the Company's fourth quarter 2016 financial results, Defendant Polk stated that "[o]nce fully populated, our new global ecommerce division will be over 300 people strong," which Newell would use to more than double its $1 billion in e-commerce revenue by 2020.  And speaking at the CAGNY investor conference on February 24, 2017, Defendant Polk noted that "we expect e-commerce to drive 50% of our growth over the next five years."

94.     In reporting Newell's financial results for the first two quarters of 2017, Defendant Polk emphasized the tremendous benefits the Company's Global E-commerce division was already providing to Newell's growth.   On Newell's May 8, 2017 analyst conference call discussing the Company's first quarter 2017 financial results, Defendant Polk stated that Newell management was "pleased and particularly encouraged" by, among other things, the fact that "E-commerce…grew strong double digits" and called the E-commerce growth rate "extraordinary." Defendant Polk went even further, crediting the performance of the E-commerce division, in part, for Newell's ability to overcome inventory pressures the Company said it was experiencing from its retailer customers, and flatly stated that "just to be clear, our e-commerce business is margin accretive to the company, not necessarily at gross margin, but down through the balance of the P&L."

95.     Further, on Newell's August 4, 2017 analyst conference call discussing the Company's second quarter 2017 financial results, Defendant Polk stated that, with respect to Newell's Global E-commerce division, "[w]e're running as fast as we can possibly run."  In fact,

Defendant Polk revealed that Newell had decided to make a further investment in e-commerce and scale that division beyond what was originally contemplated, stating:

> ***With respect to sustaining our strong e-commerce momentum, our guidance assumes we deliver strong double-digit growth in both the third and fourth quarters.*** Today, e-commerce represents about 10% of our global business or about $1.5 billion of revenue. Through the first half of 2017, our global e-commerce business has grown strong double digits. We've increased our rate of investment in e-commerce beyond what we originally contemplated at the early stages in the combination and are well on our way to reach our near-term design of 500 dedicated e-commerce employees by the end of the year. We've opened e-commerce offices in Seattle and Hoboken in close proximity to our largest e-commerce retail partners and will open a third office in London later this year as we extend our capability to Europe. ***The velocity with which we've scaled this team has been extraordinary, and the team is doing a terrific job of transforming our capability while simultaneously delivering the strong growth we expect. These new resources and our strengthening capability positions us to deliver the strong double digit growth we've assumed in our 2017 guidance.***

96. While touting the performance of Newell's Global E-commerce division through the first half of 2017, Defendant Polk never gave any indication that its outsized growth relative to Newell's brick-and-mortar brands/divisions would act as anything other than a driver of strong growth in future periods for the Company or that there were any internal communications issues associated with this growth. In fact, he did just the opposite in speaking at the Deutsche Bank dbAccess Global Consumer Conference on June 15, 2017. There, Defendant Polk specifically dismissed any challenges associated with "activating" the "tremendous opportunity" in e-commerce, reassuring investors that Newell ***"created the design we have created from a division perspective in order to ensure that we keep focus on brick-and-mortar at the same time as we capture the opportunity in e-commerce."***

### 3. Significant Operational Issues as a Result of the Jarden Acquisition Hamper Newell's Ability to Recognize Its Potential Benefits

97. During the Class Period, undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses were causing

significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition.

98.    One of the biggest undisclosed internal issues related to the acquisition of Jarden was Newell's decision to fire the legacy Jarden sales force for many of the Company's products. Specifically, by the first quarter of 2017, hoping to effectuate cost savings from the acquisition of Jarden, Newell fired a large number of members of the legacy Jarden sales teams, leaving the legacy Newell sales force to be responsible for selling those products.

99.    The timing of Newell's decision to fire this portion of its sales force was disastrous, as it was just prior to a key selling season.  Specifically, sell-in for Newell's upcoming third and fourth financial quarters occurred primarily in the two prior quarters of 2017, at which points Newell was significantly understaffed to deal with buyers from its retailer customers.   For example, members of the Newell sales force that had been responsible for a small number of product lines were now responsible for dozens of product lines.

100.    In addition to being understaffed, the legacy Newell sales force that remained was severely unequipped to actually sell the products that Newell management expected them to sell. Many members of the remaining Newell sales force knew nothing about many of the Jarden products that they were now being tasked to sell.  Plus, the Newell sales force had no prior relationship with their counterpart buyers from Jarden's retailer customers.

101.    Newell management eventually realized these issues around the third quarter of 2017, and tried to hire back the legacy Jarden sales force that it fired.  At that point, however, the damage was done to Newell's sales prospects for the third and fourth quarters of 2017.  The following slide from the Starboard Presentation details the dynamic that occurred at Newell during this time period in relation to Newell's appliance business:



102.    The reason major issues like Newell's firing of the legacy Jarden sales teams existed was because, far from streamlining the organization after its acquisition, Newell's bureaucracy and the costs associated therewith actually exploded as a result of the Jarden transaction.  For example, as the following slide from the Starboard Presentation demonstrates, Newell actually increased the costs of its main corporate office locations in the wake of acquiring Jarden from the combined costs that each of the predecessor companies had incurred in their separate corporate office locations:



103.   Similarly, as shown in the following slide from the Starboard Presentation, Newell

accelerated the addition of many layers and executives within its senior management ranks, which

further elevated costs (rather than provided synergies from cost cutting) and fostered more internal

communication issues that served to reduce the Company's profitability:



104. Further, after the Jarden acquisition, Newell's siloed organizational structure caused massive communication issues within the Company, leading to an increase in costs rather than any cost savings. As the following slides from the Starboard Presentation show, this massive bureaucracy Defendants created allowed, among other things, (1) Newell's siloed Research and Development ("R&D") group to run up significant costs with a high kill rate,[6] as division leaders had little input on the group's activities, and (2) Newell to introduce products that retailers did not want because of a lack of communication between the Company's Brand Marketing group and its Division Trade Marketing and Sales, who had the customer relationships:

[6] A "kill rate" refers to the number of products that do not make it through the product development process in relation to the total number of products put into development.

Newell's Siloed Organizational Structure Causes Massive Communication Issues, Resulting in High Costs
Limited communication among the different functional groups not only results in duplicative costs, but also frustrates customers and causes poor employee morale.
Given revenue and operating plan from corporate with limited control over actual P&L levers
CORPORATE
Lack of communication
Division / Brand Level
Division CEO / Head of Brand
CFO | COO | Supply Chain | HR | Regional Presidents
E-commerce
Reports to e-commerce head
Determines online pricing regardless of whether retailer has brick-and-mortar store
Prices online products without the knowledge of division / brand, sometimes violating Company's own minimum pricing policy for some retailers, and in other cases, results in presenting different prices to the same retailer (i.e., Walmart vs. Walmart.com)
Can also reside in Corporate depending on the division / brand
Field Sales
Responsible for ultimately selling the product
If no Field Sales in Division, would have to speak with channel sales in corporate to know product sales trends; Very limited communication with Brand Marketing
Trade Marketing
Responsible for in-store promotions and in-store support
Very limited communication with R&D, resulting in new products having to be redesigned along with sourcing issues
Engineering (Plant and Supply Chain)
Responsible for manufacturing engineering products
Research and Development
Reports to Richard Davies
New product design operated out of Kalamazoo, MI
Works on new product development
Operates Design center in a silo away from Division; months or years of research with high kill rate because Division leaders have little to no input
Brand Marketing
Reports to Richard Davies
National marketing and website design
New product development and pricing
Limited communication with Division Trade Marketing and Sales (who have customer relationships) which results in bringing forward products that retailers don't want
STARBOARD VALUE
54

## The R&D Process Appears to Be a Key Reason for Inflated Costs and Slowing Revenue Growth

(1) The process is led by corporate, not by the division / brands.

- Corporate relies on test scores in determining new product design rather than conversations with retailers, pricing, competition, or manufacturability.
- Division leaders are not brought into the new product design process for sometimes up to a year after corporate determines new concept, despite the fact that they are the ones who speak with the retailers and are responsible for manufacturing.
- This results in high kill rates when corporate finally realizes that competition exists, pricing is too high, or a product cannot actually be manufactured.
- In some cases, the Company seems to wait until the product is already manufactured to bring it in front of retailers and then realizes that they don't want it, thereby killing the product after multiple years of development.

(2) The process is too lengthy and Newell misses opportunities to market.

- Speed to market is one of the most important factors in new product success and revenue growth, yet Newell's complex structure, which cuts off division leaders, can lead to multiple years from concept to new product production.

(3) Newell appears to measure success based on quantity of concepts (approximately 1,300 last year alone!) rather than actual new products to market or the revenue and return they generate.

**The brand leaders live and breathe their brands and their respective categories. These are the people that need to be empowered to drive innovation and revenue growth**

STARBOARD VALUE
62

46



105.    Escalating costs also occurred, ironically, in Newell's Transformation Office, which was tasked with capturing the cost savings and synergies from the Jarden acquisition. Instead, this office, which was supposed to be temporary but had been ongoing since before the Jarden acquisition, incurred costs of $247 million in 2017 employing a combination of consultants and Newell business unit employees, as shown in the following slides from the Starboard Presentation:

# …And an Overstaffed "Transformation Office"

**The Transformation Office was supposed to be a temporary business unit, but it continues to weigh on the P&L with no end in sight.**

- The understood purpose of the Transformation Office ("TO"), which operates as a separate team within corporate, is to execute on Newell's cost savings plans.
- We believe that the Transformation Office was supposed to be a temporary cost. However, in reality, it has become an **ongoing cash expense for over 3 years with seemingly no end in sight**.
- **We estimate that the TO – which, we believe, employs a combination of consultants and Newell business unit employees – had collective costs of ~$247 million in 2017, but those costs are excluded from adjusted operating metrics**.

**Transformation office**

- Disciplined program management, resourced for speed
- Commercial transformation that is driving growth

*– Consumer Analyst Group of New York, February 2016*

**Q4 2014 Earnings Call**

"We've formed a transformation office that is diving on a number of different work streams to see whether there's paths to pull forward 2016 savings into 2015. It's too early to know whether we'll be able to do that. But clearly, that's something that's top of mind for John [Stipancich], for myself, for the whole executive leadership team."

*- CEO Michael Polk, January 2015*

**Q4 2017 Earnings Call**

"**So, we've organized our synergy and savings delivery through what we call the Transformation Office. Those costs get normalized out of the P&L…They don't stop this year. The program was never designed that way**."

*- CEO Michael Polk, February 2018*

**Several years after its formation, the Transformation Office continues to operate and will continue to be a drag on both operating income and cash flow**

Source: Company filings, industry research and interviews.

STARBOARD VALUE 94

# Transformation and Integration Spend Appears Excessive

**Transformation and integration costs continue to significantly burden the P&L and cash flow.**

**Estimated Transformation Office Cost Structure**

($ in millions)
$120
$80
$16
$30
$247
Transformation Office Personnel Costs
3rd Party Expense
Travel & Entertainment
Other Expenses
Total
Opp: $120M $48M $16M $12M $196M
Est. % Savings 100% 60% 100% 40%

**Observations**

- We believe that the Transformation Office (TO) is made up of a large number of full-time employees (FTEs), significant 3rd party expenses (e.g. consultants), an enormous T&E budget, and other non-value added expenses.
  - Many of the employees allocated to the Transformation Office will eventually have to return to the business segments, creating a future drag on the P&L.
- We believe that the Transformation Office is unwarranted as the Company is unnecessarily relying on **excessive consultants**, which is a recurring cash cost, and operating with **bloated T&E budgets** (e.g., private air travel, company cars, etc.).
- Newell should **immediately review the P&L and policies (especially T&E) of the Transformation Office** and determine what amount, if any, is absolutely necessary and justified.

**A significant portion of Newell's Transformation Office expenditures are unnecessary and should be eliminated**

Source: Starboard's proprietary report by a leading consulting firm

STARBOARD VALUE 95

106. Other communication issues that arose due to Newell's siloed organizational structure were similar to what Newell experienced with the conflict between its Global E-commerce division and brick-and-mortar divisions/brands and similarly served to increase costs while decreasing the Company's sales growth and margins. These issues were similarly concealed by Defendants in making their statements to investors and analysts. One of the most glaring examples of this was Newell's treatment of its Yankee Candle franchise, which it had acquired as part of the Jarden deal.

107. Specifically, before it was acquired, and in order to expand the reach of Yankee Candle, Jarden created a value-priced candle line called "American Home" so that major retailers could carry the product without diluting its more high-end Yankee Candle franchise. Rather than continue this strategy, Newell instead chose to do away with American Home altogether and start selling the more high-end Yankee Candle products to its large retailer customers.

108. The end result was that these large retailers placed the high-end Yankee Candle products on shelving next to budget candles, and cut the price. With Newell allowing one retailer customer to discount Yankee Candle, the Company was forced to provide the same discount to its other retailer customers.

109. Newell's actions resulted in a massive negative impact on gross margins, ***especially given that Yankee Candle's own 600 retail locations in the United States were still selling candles at full price***. In other words, Newell was undercutting its own 600 stores through the discounts it was offering to its large retailer customers. The following slides from the Starboard Presentation illustrate what occurred:



## When Corporate Fails to Communicate with the Brands: Textbook Way to Harm a Brand – The Yankee Candle Story (cont'd)

**In 2017, in an effort to generate additional near-term sales, Newell did away with the American Home brand and began rolling out its higher-end, flagship Yankee Candle brand into large retailers.**

- **As a result of this action, Walmart a) cut the price of the product, and b) placed it right next to the lowest-end candles on the market.**

Yankee Candle
$19.87
Why would you put a high quality brand next to a cheap knockoff?
Low Quality Candles
priced at ~$3 - $5

- Now the high-end Yankee Candle brand is lost in a sea of low-end knockoff candles in Walmart. How does the opinion of its core customer base stay the same when Yankee Candle is now next to the $4 candles at Walmart?

**The first way to kill the value of a brand is to put it right next to the Walmart knockoff that is a quarter of the price**

STARBOARD VALUE
56

## In an Effort to Grow Sales, Newell Allowed Walmart to Discount Yankee Candle by Almost $10 per Candle

**Why would Newell push the Yankee Candle brand into Walmart at a 30% discount to the price at its own stores?**

**Yankee Candle Store - $27.99**

YANKEE CANDLE
Vanilla Cupcake

**Walmart - $19.87**

Rollbacks

**Not considering the long-term effects of a decision like this can be dangerous**

STARBOARD VALUE
57



So What Do You Think Happened Next?
Clearly, other large retailers would get upset if they realized Walmart was selling the same candle at a large price discount. So, Bed Bath & Beyond demanded a lower wholesale price from Newell, so it could offer a competitive retail price.
A more than 20% reduction at a major retailer not only severely impacts profitability, but also draws customers away from Company owned stores to capitalize on better prices!
Bed Bath & Beyond today - $21.99
Yankee Candle® Housewarmer® Vanilla Cupcake Large Classic Jar Candle
$21.99
We believe that this had a negative impact on gross margins
STARBOARD VALUE
58

## Many Major Retailers Ended Up Cutting Prices

**Newell's actions resulted in a number of large retailers significantly reducing their prices of Yankee Candle products. However, the same product is still sold in its own Yankee Candle stores for $27.99!**

**YankeeCandle.com - $27.99**

**Amazon - $21.99**

Yankee Candle Large Jar Candle, Vanilla Cupcake
$21.99

**Target - $19.99**

**Walmart - $19.87**

**Bed Bath & Beyond - $21.99**

**This decision resulted in retail partners cutting their prices by 20% - 30%; clearly a bad outcome for the business**

STARBOARD VALUE

59





110.     Rather than acknowledging that undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses were causing significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition, Defendants instead concealed these problems and falsely reassured investors that the Company was on track with the integration of Jarden and that any significant issues were behind it.

111.     On Newell's February 6, 2017 analyst conference call discussing the Company's fourth quarter 2016 financial results, Defendant Polk stated that the new organization would be up and running by the end of the first quarter, and that "***the change in the U.S. is largely behind us***. There's a few more things to do, ***but nothing material***.  We came through an intense period of change in the fourth quarter."  While Defendant Polk referenced the "consolidat[ion]" and "reorganiz[ation]" of Newell's sales force as well as the work of Newell's Transformation Office

(which he said was in "full stride"), he misleadingly did so in the context of cost savings and synergies while failing to disclose any of the problems the Company was facing, as detailed above.

112.    Defendant Polk continued to mislead investors when he spoke about Newell at the CAGNY Investor Conference on February 24, 2017.  Specifically, rather than acknowledging the complex and inefficient R&D and brand marketing apparatus that existed within Newell, Defendant Polk touted "differentiated product innovations" as something that set Newell apart from its peers, stating that innovation rates at Newell were "toe-to-toe with the best in consumer goods land."  Further, Defendant Polk continued to misleadingly reference the consolidation of Newell's sales force in terms of cost savings and synergies without disclosing any of the problems Newell was encountering as a result of that consolidation, saying that "…we have moved in the fourth quarter to integrated selling teams.  We went from four Walmart teams to one Walmart team, from four Target teams to one Target team, as part of the integration."  While this statement may have been literally true, Defendant Polk failed to disclose that cutting the teams was disastrous in terms of selling the Company's products successfully to these and other major retailers.

113.    Speaking on Newell's May 8, 2017 analyst conference call, Defendant Polk reiterated that the changes were behind Newell and he was looking forward to putting "more distance" from those changes:

> The organization change … was really quite profound, particularly in the U.S. in the fourth quarter of 2016 and in the first quarter of 2017, we ramped the organization and got into a … rhythm of operating.  ***So we're coming through that start-up curve in the first quarter and in that context we're quite pleased with the outcomes.  The more distance we put to those changes, the better that rhythm will be and the better the execution will be***.
>
> *            *            *
>
> We focused in the U.S. first because that's, obviously, where the biggest revenue stream is and we've made those changes largely now.  We've moved on and made

> changes in Canada and we will, over time, make changes in other parts of the business, ***but the vast majority of the change in our biggest market is behind us.***

On the same call, Defendant Polk misleadingly told analysts and investors that Newell's market share growth in the first quarter of 2017 was derived from, among other things, "new products, strong new products, [and] good sales execution…." And with respect to Newell's R&D process, while Defendant Polk conceded that many R&D projects do not make it into production, he misleadingly failed to disclose any of the inefficiency and communication issues embedded in Newell's R&D and brand marketing apparatus that would increasingly hinder Newell's ability to capitalize on any of its concepts.

114. Similarly, Defendant Polk spoke at the Deutsche Bank dbAccess Global Consumer Conference on June 15, 2017, and reassured investors that no material execution issues had occurred with Newell's acquisition and integration of Jarden, stating:

> So, we've come through Q4 2016, changed agenda, Q1; and ***if I were worried about, in an integration as big as the one we're driving, issues emerging in execution, it would have been in those two quarters because that's where the biggest change occurred and that's where the startup phase for the new organization was.*** So, ***I'm resting a lot easier than I was going through that six-month window, and we are now forward facing and forward leaning with respect to unlocking the opportunity.***

Defendant Polk continued to misleadingly tout Newell's R&D process, referencing the Company's products in development while simultaneously omitting to tell investors that problems with Newell's siloed organizational approach would prevent the Company from recognizing the full benefits of any of those projects.

115. Speaking on Newell's August 4, 2017 analyst conference call, Defendant Polk misled investors and analysts by discussing cost savings in the Company's synergy programs, telling them, in part, that "…we're right where we expected to be and the disciplined execution of the Transformation Office gives us full confidence in our 2017 delivery." As set forth above,

however, the Transformation Office was anything but "disciplined" when it came to cost savings as it was overstaffed and in the process of itself racking up approximately $247 million in costs for 2017 that were excluded from adjusted operating metrics. Defendant Polk also continued to mislead investors by referencing what he said were "advantaged capabilities in innovation and design with the best still yet to come…," and by stating that product innovation would begin to yield results in the third and fourth quarters of 2017.

116. Further, speaking at the Barclays Global Consumer Staples Conference on September 7, 2017, Defendant Polk continued to mislead investors by making positive statements about Newell's "innovation funnel" while omitting to disclose the escalating costs and inefficiencies within the Company's R&D and marketing apparatus due to Newell's siloed organizational structure.

**4. Defendants Issue False and Misleading Guidance to Investors**

117. In addition to, and to reinforce, the knowingly false material misrepresentations and omissions that Defendants were making concerning the Company's business fundamentals and the integration of Jarden, Defendants also issued and reaffirmed false and misleading 2017 financial guidance to investors without a reasonable basis. They prominently featured this guidance in their presentations to investors during the Class Period as proof that Newell could perform while it transformed. Further, even when Defendants were forced to lower that guidance late in the Class Period, they continued to mislead Newell investors by attributing the Company's financial downturn to macroeconomic factors rather than the internal issues discussed above. ***Far from performing while transforming, Defendants were instead misinforming while Newell was transforming***.

118. For example, while announcing Newell's financial results for the fourth quarter and full-year ended December 31, 2016 on February 6, 2017, the start of the Class Period, Defendant Polk stated that the Company's "fourth quarter results reflect[ed] continued strong progress in the company's transformation" and that these results were delivered "in the context of challenging mall-based retail conditions driven by accelerating bricks-to-clicks shopper migration during the holidays." Defendant Polk reassured investors that Newell's core sales growth would accelerate in the second half of 2017, enabling Newell to meet its 2017 core sales growth guidance of 2.5% to 4.0%.

119. Similarly, speaking at the CAGNY Investor Conference on February 24, 2017, Defendant Polk painted Newell's business as fundamentally sound across the entire enterprise, stating that "[t]his is a broad-based growth story and it's broad geographically as well, with good growth, very good growth in [a] slow GDP environment in North America despite unbelievable change in U.S...."

120. In reporting Newell's financial results for the first quarter of 2017 on May 8, 2017, not only did Newell reaffirm the Company's previously-issued core sales growth guidance for 2017, but it raised its normalized EPS guidance. Defendant Polk stated that Newell's "first quarter results provide ***strong evidence*** of our team's capacity to ***perform while we transform***." And a few weeks later, speaking at the Deutsche Bank dbAccess Global Consumer Conference, Defendant Polk told investors that "[t]hrough this period of time, ***we've done a great job of delivering superior returns through the transformation and we expect to be able to continue to do that going forward***."

121. While once again reaffirming Newell's 2017 financial guidance in announcing Newell's results for the second quarter of 2017 on August 4, 2017, and raising the Company's

2017 net sales guidance, Defendant Polk touted the Company's "solid set of results in the second quarter delivering competitive growth" and stated that "***[w]e expect core sales growth to strengthen in the second half of the year*** as we benefit from new distribution gains, a stronger back half pipeline of innovations and ***sustained double digit growth in e-commerce.***" On the Company's analyst conference call that day, Defendant Polk stated that ***"fundamentals are good across the business and are improving as we head into the second half of the year."*** And Defendant Polk went even further, stating that analysts and investors should expect Newell to "deliver core sales growth … ***in the upper half of our full year core sales growth guidance range [of 2.5% to 4.0%] with sequential acceleration in our growth rate from Q3 to Q4.***" As Defendant Polk made clear, ***"[o]ur outlook for the back half of the year hasn't really changed, so we're always calling acceleration and performance."***

122. Even in September 2017, ***just weeks from the close of Newell's financial third quarter***, Defendants were reaffirming the Company's previously-issued 2017 core sales growth and net sales guidance and downplaying any effect that external factors would have on the Company's performance. Specifically, in a September 6, 2017 press release discussing disruptions associated with Hurricane Harvey on Newell's United States manufactured resin businesses, the Company reaffirmed its 2017 core sales growth guidance of 2.5% to 4.0% and its 2017 net sales guidance. And the next day, while speaking at the Barclays Global Consumer Staples Conference, Defendant Polk touted Newell's "[b]road-based growth" and the integration of Jarden while once again reaffirming the Company's 2017 core sales growth and net sales guidance.

123. Only later would Newell investors begin to find out that Defendants' assertions were untrue when, on November 2, 2017, Newell issued a press release announcing financial results for the third quarter of 2017. While ***Defendant Polk had reaffirmed the Company's***

***guidance of 2.5% to 4.0% on September 6, 2017, which was over two-thirds of the way through the Company's 2017 third quarter that was to end on September 30, 2017, on the basis of the Company's third quarter results, it slashed Newell's 2017 core sales growth guidance essentially in half, setting a new range of 1.5% to 2.0%.***

124. But even while slashing its guidance and announcing poor quarterly results, Defendants continued to deceive the market concerning the true reasons for the downturn in Newell's business. Defendant Polk cited macroeconomic factors in stating that Newell was hurt "by weak late-quarter sales related to retailer inventory rebalancing, primarily in response to decelerating U.S. market growth through the Back-to-School period."

125. It was not until January 25, 2018, when Newell issued a press release pre-announcing the Company's 2017 financial results, that investors became aware of the internal operational problems at Newell and the significant impacts those problems were having on Newell's sales growth, margins, and ability to realize the promised benefits from the Jarden acquisition. Rather than the revised 1.5% to 2.0% 2017 core sales growth guidance Defendants had issued in November 2017, Newell stated that it now anticipated 2017 core sales growth of only approximately 0.8%, which implied that core sales growth had actually been negative during the fourth quarter.

126. The following chart shows Newell's reported quarterly core sales growth figures throughout the Class Period and the egregious nature of Defendants' materially false and misleading omissions, as set forth above:



127.   The following slides from the Starboard Presentation show that Defendants' claim that macroeconomic factors were the cause of Newell's declining sales and margin growth in the third and fourth quarters of 2017 was false and misleading, as Newell's peers fared much better in all areas in the same macroeconomic environment:

## While Newell Has Blamed Poor Performance on the Macro Environment, We Believe it Is Self-Inflicted and Can Be Improved (cont'd)

**Newell claims poor results and guidance reductions are due to the weak retail environment.**

| | |
|---|---|
| **Q2 2017 Earnings Call** *(August 4, 2017)* | "That said, like most others in our industry, **we continue to face pressure from retailer inventory reductions and retailer consolidation in the U.S.**" – CEO Michael Polk |
| **Barclays Conference** *(September 7, 2017)* | "We're making good progress despite a **tougher landscape** than we originally envisioned. **The landscape issue is really retail environment related** and also market growth related. We are existing now in sluggish markets, a little bit worse than where we were when this whole process started and where we envisioned the deal…" – CEO Michael Polk |
| **Q3 2017 Earnings Call** *(November 2, 2017)* | "We had a top customer bankruptcy, forcing a future re-plan on one of our best performing businesses. **We had unrelenting retailer inventory destocking, creating a headwind for revenue** as our retail partners adjust to slowing market growth and changes in shopping patterns. You name it, we experienced it this quarter."– CEO Michael Polk |
| **Q4 2017 Earnings Call** *(February 16, 2018)* | "What's changed is the retail environment, and what's unique about our portfolio and that does not change with the change in portfolio footprint is the **exposure to the stressed segment of the U.S. retail landscape**. And that will continue to be bit of an overhang on the business with probably episodic events like the ones we're dealing with right now."– CEO Michael Polk |
| **CAGNY Conference** *(February 22, 2018)* | "The **external environment is tougher than what we anticipated** when we did the deal and even at the beginning of this year, and it's not that the markets are really having troubles or consumer purchasing behaviors have slowed down in any way. In fact, it's the opposite, the consumer markets are quite robust. But the retail landscape given our category footprint and **our exposure to a group of stressed retailers is more troubling than what we anticipated**."– CEO Michael Polk |

**The Company has been vehement that its operational issues are macro related**

STARBOARD VALUE 48

## Facing the Same Retail Environment, Peers Have Fared Much Better

**Stock price performance between Newell and the Company's peers has differed significantly.**

**Despite experiencing similar retail trends, Newell's peers have outperformed**

Source: CapitalIQ

STARBOARD VALUE 49

## While Newell's Revenue Is Declining, Its Peers Are Growing Consistently

**While the macro environment may be more difficult, the Company's peers are demonstrating substantially better organic growth than Newell.**

**Peers have been able to weather the "difficult environment" without reporting a quarter of negative organic revenue growth. Unfortunately, Newell cannot say the same**

## While Newell's Gross Margins Are Deteriorating, Its Peers' Are Continuing to Expand

**While the macro environment may be more difficult, Newell Brands' peers are operating more effectively and performing significantly better.**

Change in Adjusted Gross Margin Year-over-Year

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | 2017 |
|---|---|---|---|---|---|
| newell BRANDS | (415bps) | (24bps) | (104bps) | (412bps) | (206bps) |
| Stanley Black & Decker | 163bps | (15bps) | 63bps | (17bps) | 44bps |
| FORTUNE BRANDS | 80bps | 115bps | 1bp | (46bps) | 35bps |
| COLGATE-PALMOLIVE | 72bps | 43bps | (2bps) | (36bps) | 19bps |
| Church & Dwight Co., Inc. | 103bps | (80bps) | (13bps) | 52bps | 16bps |

**While peers have been able to expand gross margins, Newell Brands' contracted significantly in 2017**

STARBOARD VALUE 51

Core Revenue Growth Is Declining and Management Consistently Blames the Macro Environment
Core revenue growth has significantly declined over the last 8 quarters!
Core Revenue Growth
7%
6%
5%
4%
3%
2%
1%
0%
-1%
-2%
6.2%
5.6%
5.0%
3.0%
2.5%
2.5%
2.5%
0.4%
-1.9%
4Q'15 1Q'16 2Q'16 3Q'16 4Q'16 1Q'17 2Q'17 3Q'17 4Q'17
Significant deceleration in revenue growth over the past 8 quarters!
Management Commentary
Q2 2017 Earnings Call (August 4, 2017)
"That said, like most others in our industry, we continue to face pressure from retailer inventory reductions and retailer consolidation in the U.S." – CEO Michael Polk
Barclays Conference (September 7, 2017)
"The landscape issue is really retail environment related and also market growth related." – CEO Michael Polk
Q3 2017 Earnings Call (November 2, 2017)
"We had unrelenting retailer inventory destocking, creating a headwind for revenue as our retail partners adjust to slowing market growth and changes in shopping patterns." – CEO Michael Polk
Q4 2017 Earnings Call (February 16, 2018)
"…exposure to the stressed segment of the U.S. retail landscape. And that will continue to be bit of an overhang…" – CEO Michael Polk
CAGNY Conference (February 22, 2018)
"The external environment is tougher than what we anticipated when we did the deal and even at the beginning of this year…." – CEO Michael Polk
Core revenue growth has massively decelerated and turned negative in 4Q'17
STARBOARD VALUE
164

But Peers Are Growing Consistently, Indicating that Newell's Decelerating Growth Is Not an Industry Issue
While the macro environment may be more difficult, Newell Brands' peers are demonstrating substantially better organic revenue growth than Newell.
Organic Revenue Growth
9%
7%
5%
3%
1%
-1%
-3%
Q1'16 Q2'16 Q3'16 Q4'16 Q1'17 Q2'17 Q3'17 Q4'17
NWL SWK CHD CL FBHS
Peers have been able to weather the difficult environment without reporting a quarter of negative organic revenue growth; unfortunately, Newell cannot say the same
STARBOARD VALUE
165

## VI.    DEFENDANTS' VIOLATIONS OF SEC RULES

128.    Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], *Management's discussion and analysis of financial condition and results of operations* ("MD&A").  Among other things, Item 303 of Regulation S-K required that Newell's Class Period Form 10-K and Forms 10-Q disclose known events, trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

129.    The SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events, trends or uncertainties.  The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *            *            *
>
> ***Events that have already occurred*** or are anticipated ***often give rise to known uncertainties***.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.   More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.***

130.    The MD&A disclosures in Newell's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties, trends and events associated with: (1) elevated inventory in Newell's retail channel and the effect of increasing retailer inventory destocking on Newell's sales growth and

margins; (2) undisclosed pricing conflicts between Newell's new Global E-commerce division and its brick-and-mortar sales teams that were straining the Company's relationships with its retailer customers and were also having a material adverse effect on the Company's sales growth and margins; and (3) undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses that were causing significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the acquisition.   These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.

131.    In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. § 229.503], risk factors.  Item 503 of Regulation S-K required that Newell's Class Period Forms 10-K and 10-Q disclose the most significant matters making an investment in Newell risky.

132.    As detailed herein, during the Class Period, Newell's 2016 Form 10-K and its 2017 Forms 10-Q made materially false and misleading representations about potential sales and integration-related risks when, in fact, such risks existed during the Class Period, as set forth above. In addition to concealing and misrepresenting the risks related to the Company's inventory levels, pricing conflicts emanating from its E-commerce division, and its integration of Jarden, Defendants failed to disclose a major risk associated with Newell's global supply chain including, in particular, the risk associated with a change in product demand.  Indeed, it was not until Newell was forced to announce weak third quarter 2017 results and lower its core sales growth guidance on November 2, 2017, that Defendant Polk disclosed a major risk involving Newell's global supply chain, as follows:

> ***The reality of our business model is it's impossible to adjust in 30-day windows or 60-day windows or 45-day windows because of the fact that we're only 50% self-manufactured, and we have a long value chain of sourced finished goods that are on the water that's tied to kind of a forward-looking forecast***. It's really important for us to accept the retail landscape dynamics for what they are such that we're not setting ambitions in the company that drive behaviors that carry too much risk. So, for example, ***if we put too big a number out there to chase for top line, the divisions will build inventories to support that outcome*** because we won't do that without them having given us some confidence in that. ***And if you miss, then you're hung out with those inventories.***

133. Further, Item 9A of Form 10-K and Item 4 of Form 10-Q require SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. § 229.307], Disclosure controls and procedures. Item 307 of Regulation S-K required Newell's Class Period Form 10-K and 2017 Forms 10-Q to disclose Defendant Polk's and Defendant Nicoletti's conclusions about the effectiveness of Newell's disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

134. During the Class Period, Newell falsely and misleadingly represented in the 2016 Form 10-K and 2017 Forms 10-Q it filed with SEC that its disclosure controls were operating effectively when they were not, as detailed herein. These false and misleading representations were then fraudulently certified by Defendants Polk and Nicoletti, as set forth herein.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

135. Entering the Class Period, Defendants portrayed Newell as a growing and thriving Company fresh off its acquisition of Jarden, the biggest transaction in its long history. According to Defendants, integration of the Jarden business was moving ahead at an increasingly rapid pace, and the Company was already seeing strong growth and benefits from the transaction that would continue, and even accelerate, over 2017.

136. The Class Period begins on February 6, 2017, when Newell filed a Form 8-K and attached press release with the SEC announcing the Company's financial results for the 2016 fourth quarter and full-year ended December 31, 2016. For the fourth quarter of 2016, Newell reported net sales growth of 165.0 percent to $4.14 billion and core sales growth of 2.5 percent. For 2016, Newell reported net sales growth of 124.2 percent to $13.26 billion, with core sales increasing 3.7 percent. The press release included the following comments from Defendant Polk:

> ***Our fourth quarter results reflect continued strong progress in the company's transformation….*** We delivered over 40 percent earnings per share growth and nearly $1 billion of operating cash flow, driven by accelerating cost savings from synergies and Project Renewal. Despite significant portfolio and organization change in the quarter, core sales growth was competitive led by very good growth on Writing, Baby, Beverages, Waddington, Fishing, Team Sports and Technical Apparel. ***We delivered this outcome in the context of challenging mall-based retail conditions driven by accelerating bricks-to-clicks shopper migration during the holidays***.
>
> This has been one of the most transformative years in our history…. ***In the context of unprecedented change, we have delivered very strong full year results with core sales growth of 3.7 percent and normalized earnings per share growth of nearly 33 percent.*** We have made tremendous progress on our strategic initiative to strengthen our portfolio, acquiring businesses with over $10 billion in revenue and divesting or holding for sale businesses with about $1.6 billion in revenue. Our progress on costs has enabled us to improve normalized operating margin by over 100 basis points while simultaneously investing for future growth by strengthening our capabilities in insights, design, innovation and ecommerce. And we have rapidly deleveraged our balance sheet, reducing gross debt by nearly $2.1 billion since the creation of Newell Brands on April 15, 2016. ***As we head into 2017, we are confident that we will continue to rapidly deleverage while simultaneously putting the building blocks in place to drive the growth acceleration and transformative value creation promised in the Growth Game Plan.***

137. In the press release, the Company also updated its financial guidance metrics for 2017, setting a range of $14.52 billion to $14.72 billion for net sales, 9.5% to 11.0% for net sales growth, 2.5% to 4.0% for core sales growth, and $2.95 to $3.15 for normalized earnings per share.

138. Later that day, Newell hosted a conference call with analysts and investors to discuss the Company's financial results. Discussing the Company's guidance and outlook for 2017, Defendant Polk stated:

> This morning, we updated our 2017 full-year guidance for core sales growth and normalized EPS and provided guidance for the first time on full-year net sales. We've added a net sales guidance range in 2017 given the scope of mergers and acquisitions activity and the continued volatility of foreign exchange.
>
> Our outlook for 2017 net sales is $14.52 billion to $14.72 billion, which represents 9.5% to 11% net sales growth compared to prior year. The guidance reflects our current expectations for the timing of acquisitions and divestitures, the latest view of foreign exchange which has worsened from our prior guidance, and our latest view of core sales growth.
>
> The company has adjusted its 2017 full-year guidance range for core sales growth to 2.5% to 4%, lowering the bottom of the range from the original guidance of 3%. This revised outlook reflects our expectation of continued bricks-to-clicks shopper migration, causing some retailers to rebalance store count, reduce inventories, and reconfigure ordering patterns as some retailers did after Black Friday this past quarter.
>
> The 25 basis point reduction in the midpoint of the core sales growth range is necessary to accommodate recently announced store count reductions and our new expectations for inventory rebalancing. We expect this rebalancing to be more pronounced in the first half of 2017 and to lessen in the second half of 2017 as we lap this past year's changes. In this context, we believe core sales growth will sequentially accelerate, with the core growth in the first half of the year in the lower half of the full-year guidance range. We expect first quarter growth rate to be roughly in line with the fourth quarter of 2016 as we start up our new organization.

139. Defendant Polk implied that the Company's guidance was conservative in the sense that it did not include any provision for improvement in what Defendant Polk referred to as an unfavorable "macro environment," stating:

> ***As you all know, the macro environment has not been the most favorable over the last few years*** with slow GDP growth compounded by foreign exchange headwinds. While we may soon reach an inflection point where we begin to see more favorable GDP growth, ***our plans do not count on that happening this year.*** We take confidence in the fact that we've always handled macro and other challenges in stride, and you can count on us to do our best to do the same this year.

140. On the call, Defendant Polk also dismissed concerns about inventory destocking by Newell's retailer customers, saying that while the Company would "continue to feel some of those dynamics through the first half of the year," once Newell got "through that window, ***this reset of the inventory algorithms that retailers have will be behind us***." With respect to the integration of Jarden, Defendant Polk stated that Newell management felt "great about the start-up of the new organization," noting that "***the change in the U.S. is largely behind us.*** There's a few more things to do, but nothing material." While Defendant Polk referenced the "consolidat[ion]" and "reorganiz[ation]" of Newell's sales force as well as the work of Newell's Transformation Office (which he said was in "full stride"), he misleadingly did so in the context of cost savings and synergies. Finally, Defendant Polk highlighted Newell's plans to "disproportionately" grow its e-commerce capabilities.

141. Defendants' representations in announcing Newell's financial results for the fourth quarter of 2016 were materially false and misleading because, unbeknownst to Newell investors, Newell had loaded its retail channel with large amounts of the Company's products. As such, far from being behind them, Defendants knew that inventory destocking by its retailer customers would have an increasingly negative effect on Newell's sales growth and margins. Further, while Defendants were touting the positive effects of the integration of Jarden, the truth was that escalating costs and internal communication problems related to the integration were mounting, which were also hurting Newell's financial prospects moving forward. As such, Defendants lacked a reasonable basis for the financial guidance Newell issued and for telling investors that the Company's sales growth would accelerate in the second half of 2017.

142. A few weeks later, on February 24, 2017, Defendants continued to mislead investors when Defendant Polk made a presentation at the CAGNY Investor Conference, where

he continued to highlight Newell's growth and financial prospects while simultaneously downplaying any threat from retailer inventory destocking. Specifically, Defendant Polk called Newell "a broad-based growth story" while also saying that retailer inventory destocking was not material "because of the savings momentum we've got, because of the strategic growth method we've got and the progress we're making on innovation…." With respect to the integration of Jarden, Defendant Polk misleadingly touted "differentiated product innovations" as something that set Newell apart from its peers, stating that innovation rates at Newell were "toe-to-toe with the best in consumer goods land." And Defendant Polk continued to misleadingly reference the consolidation of Newell's sales force in terms of cost savings and synergies by omitting disclosure of the problems Newell was encountering as a result of Defendants' actions in firing the legacy Jarden sales teams, saying that "…we have moved in the fourth quarter to integrated selling teams. We went from four Walmart teams to one Walmart team, from four Target teams to one Target team, as part of the integration." Finally, Defendant Polk again highlighted the Company's focus on e-commerce, stating that "we expect e-commerce to drive 50% of our growth over the next five years."

143. On March 1, 2017, Newell filed with the SEC its Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K"), which was signed by the Executive Defendants. The 2016 Form 10-K contained materially false and misleading disclosures and omissions concerning, among other things, known events, trends and uncertainties that were then having, and were reasonably likely to continue to have, a material effect on Newell's results.

144. For example, the risk factors disclosure in the 2016 Form 10-K referred to ***potential risks*** relating to the integration of Jarden and purchase pressures from Newell's large retailer

customers when, as alleged herein, those risks had materialized and were then existing. The 2016 Form 10-K stated:

> **The Company's sales are dependent on purchases from several large customers and any significant decline in these purchases or pressure from these customers to reduce prices could have a negative effect on the Company's future financial performance.**
>
> The Company's customer base is relatively fragmented. Although we have long-established relationships with many customers, the Company generally does not have any long-term supply or binding contracts or guarantees of minimum purchases with its largest customers. Purchases by these customers are generally made using individual purchase orders. As a result, these customers may cancel their orders, change purchase quantities from forecast volumes, delay purchases for a number of reasons beyond the Company's control or change other terms of the business relationship. Significant or numerous cancellations, reductions, delays in purchases or changes in business practices or by customers could have a material adverse effect on the Company's business, results of operations and financial condition. In addition, because many of the Company's costs are fixed, a reduction in customer demand could have an adverse effect on the Company's gross profit margins and operating income.
>
> The Company depends on a continuous flow of new orders from large, high-volume retail customers; however, the Company may be unable to continually meet the needs of these customers. Retailers are increasing their demands on suppliers to:
>
> - reduce lead times for product delivery, which may require the Company to increase inventories and could impact the timing of reported sales;
> - improve customer service, such as with direct import programs, whereby product is supplied directly to retailers from third-party suppliers; and
> - adopt new technologies related to inventory management such as Radio Frequency Identification, otherwise known as RFID technology, which may have substantial implementation costs.
>
> The Company cannot provide any assurance that it can continue to successfully meet the needs of its customers. A substantial decrease in sales to any of its major customers could have a material adverse effect on the Company's business, results of operations and financial condition.
>
> * * *

> **The Company's plans to continue to improve productivity and reduce complexity and costs may not be successful, which would materially adversely affect its ability to compete.**
>
> The Company's success depends on its ability to continuously improve its manufacturing operations to gain efficiencies, reduce supply chain costs and streamline or redeploy nonstrategic selling, general and administrative expenses in order to produce products at a best-cost position and allow the Company to invest in innovation and brand building, including advertising and promotion. The Company is currently in the process of implementing Project Renewal and delivering the cost synergies related to the acquisition of Jarden. Both efforts are global initiatives designed to reduce the complexity of the organization and increase investment in the Company's most significant growth platforms. Project Renewal and the Company's cost saving plans associated with the Jarden integration may not be completed substantially as planned, may be more costly to implement than expected, or may not result in, in full or in part, the positive effects anticipated. In addition, such initiatives require the Company to implement a significant amount of organizational change, which could have a negative impact on employee engagement, divert management's attention from other concerns, and if not properly managed, impact the Company's ability to retain key employees, cause disruptions in the Company's day-to-day operations and have a negative impact on the Company's financial results. It is also possible that other major productivity and streamlining programs may be required in the future.

145. The 2016 Form 10-K also contained false and misleading representations about Newell's disclosure controls, stating, in pertinent part:

> **ITEM 9A. CONTROLS AND PROCEDURES**
>
> (a) Evaluation of Disclosure Controls and Procedures: as of December 31, 2016, an evaluation was performed by the Company's management, under the supervision and with the participation of the Company's chief executive officer and chief financial officer, of the effectiveness of the Company's disclosure controls and procedures. Based on that evaluation, the chief executive officer and the chief financial officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2016.

146. The representations in the 2016 Form 10-K about Newell's disclosure controls were then falsely and misleadingly certified by Defendants Polk and Nicoletti, as they executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that, among other

things, (1) they had reviewed Newell's annual report on Form 10-K; (2) the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (3) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of Newell; and (4) each Defendant had designed and evaluated the effectiveness of the Company's disclosure controls and procedures, including disclosing any change in Newell's internal control over financial reporting.

147.    On May 8, 2017, Newell filed a Form 8-K and attached press release with the SEC announcing the Company's financial results for its first quarter of 2017.  For the first quarter of 2017, Newell reported net sales growth of 148.4 percent to $3.3 billion and core sales growth of 2.5 percent.  The press release included the following comments from Defendant Polk:

> Our first quarter results provide ***strong evidence of our team's capacity to perform while we transform***…. ***We delivered competitive core sales growth of 2.5 percent despite significant organization and portfolio change.*** Our core sales results were broad based with growth in all four regions and across four of five segments. ***Our international growth coupled with very strong e-commerce results more than offset the continuing impact of inventory de-stocking in U.S. mass channels***. ***Our operating margin was well ahead of plan driven by strong cost synergies and stringent discretionary cost management***. And we further deleveraged, paying down over $725 million of debt in the quarter, bringing our cumulative debt repayment since the Jarden transaction on April 15, 2016 to $2.8 billion.
>
> ***We have had a good start to 2017 and are on our way to unlock the transformative value creation associated with our long term guidance***. We are confident that simultaneous growth and margin development fueled by savings and synergies will generate strong cash flow, leading to rapid deleveraging and then more aggressive value-creating uses of capital. We believe this transformative value creation story is unique to Newell Brands given our leading brand positions in large global categories, the inherent opportunities presented through the new scale of the company, the investments we are making in new capabilities and the strong cash generative nature of our businesses. This confidence is shared by our Board of Directors which has approved a 21 percent increase of the quarterly dividend to $0.23 per share.

148. In the press release, the Company also reaffirmed its previously-issued financial guidance metrics for 2017, and actually increased its guidance for 2017 normalized earnings per share from a prior range of $2.95 to $3.15 to a new range of $3.00 to $3.20.

149. Later that day, Newell hosted a conference call with analysts and investors to discuss the Company's first quarter 2017 financial results. Discussing the Company's performance and outlook for 2017, including its integration of Jarden and the Company's claimed ability to innovate and successfully develop new products, Defendant Polk stated:

> ***We're also making good progress and expect to deliver competitive levels of core growth towards the middle of our full year guidance range***. Our core growth delivery will be dependent on excellent execution of our growth priorities, continued strong e-commerce growth, and continued market share gains in an environment of modest category growth. ***Despite withstanding substantial inventory pressure over the last six months, we're beginning to realize many of the revenue opportunities of the combination***. We also see the benefits of our investments in e-commerce, design, innovation and brand-building, yielding strengthened new product, new distribution and new marketing plans in many of the businesses.
>
> * * *
>
> ***So while we're mindful of the challenging retail environment and the potential for more retailer turbulence through the second quarter***, our confidence in our delivery is grounded in the knowledge that we have a leading portfolio at brands, we have advantaged capabilities in innovation and design, ***a peer group-leading e-commerce organization***, a long list of opportunities for international deployment and core distribution, the scale to out-spend and out-execute our competition, ***and a world-class team working on realizing the savings and cash benefits of the Jarden combination, and a track record of integrating new acquisitions with cost and revenue benefits quickly captured. This is a proven model and playbook that we've executed before and we're confident we can again***.

In response to an analyst's question on the status of the integration of Jarden, Defendant Polk stated, among other things, that "the vast majority of change in our biggest market [the United States] is behind us" and that the "more distance we put to those changes … the better the execution will be." On the same call, Defendant Polk told analysts and investors that Newell's market share

growth in the first quarter of 2017 was derived from, among other things, "new products, strong new products, [and] good sales execution…."

150.    Speaking on the call about channel inventory destocking, Defendant Polk continued to insist that it was not a concern, telling investors that the effects of retailer inventory destocking were "now behind us."  Specifically, Defendant Polk stated:

> ***So the inventory reduction impacts were broad-based.*** Some of those are masked in our numbers because we had really strong performance in certain other aspects of the business. So, even in writing, we saw in the distributive trade pressure on pencils and pens. But we had great momentum on markers behind Sharpie Fine Art, behind the EXPO Ink Indicator, geographic expansion of Sharpie to Mexico and France. We've got a lot of things going on in these businesses. But pressure, even within writing now because of the momentum on markers, because of the continued momentum on glue connected to slime, we were able to overcome that. ***The good news is that these things are now behind us*** and eventually we lap these scenarios as we come into 2018 which will serve us well.

151.    And with respect to the performance of Newell's new Global E-commerce division, Defendant Polk stated that Newell management was "pleased and particularly encouraged" by, among other things, the fact that "E-commerce … grew strong double digits," calling the e-commerce growth rate "extraordinary."  Defendant Polk credited the performance of the E-commerce division, in part, for Newell's ability to overcome inventory pressures the Company said it was experiencing from its retailer customers, stating that "just to be clear, our e-commerce business is margin accretive to the company, not necessarily at gross margin, but down through the balance of the P&L."

152.    Defendants' representations in announcing Newell's financial results for the first quarter of 2017 were materially false and misleading because, unbeknownst to Newell investors, Newell had loaded its retail channel with large amounts of the Company's products.  And because many of Newell's retailer customers had begun a process of inventory destocking in late 2016, Newell was forced to maintain increasingly higher levels of inventory in-house that it had not yet

sold to its retailer customers.  Indeed, as alleged herein, according to the Starboard Presentation Newell's inventory levels were around 42% higher than industry averages, and substantially higher than any of the inventory levels for the companies in Newell's peer group.  As such, far from being behind them, Defendants knew that its bloated inventory levels would have an increasingly negative effect on Newell's sales growth and margins.

153.    Further, while Defendants were touting the positive effects of the integration of Jarden and Defendant Polk was telling investors that organizational changes in the U.S. were behind them, the truth was that escalating costs and internal communication problems related to the integration were mounting, which were also hurting Newell's financial prospects moving forward.  Specifically, as alleged herein, by the time Defendants presented Newell's first quarter 2017 financial results on May 8, 2017, and unbeknownst to investors, Newell had already fired a large number of members of the legacy Jarden sales teams, leaving the legacy Newell salesforce to be responsible for selling products they were unfamiliar with just prior to selling season.  And with respect to Newell's R&D process, Defendant Polk failed to disclose any of the inefficiency and communication issues embedded in Newell's R&D and brand marketing apparatus that would increasingly hinder Newell's ability to capitalize on any of its concepts.

154.    Finally, Defendants' statements concerning Newell's new Global E-commerce division were materially false and misleading because, despite Defendants' pre-Class Period assurances that they would monitor the E-commerce division for any potential for pricing conflicts that could develop, these pricing conflicts had already developed between Newell's E-commerce division and the Company's brick-and-mortar divisions.  These conflicts were causing inconsistent pricing, strained customer relationships, and ultimately a negative impact on the Company's sales growth and margins.

155.    As such, Defendants knew or should have known that their actions in reaffirming the Company's previously-issued financial guidance for 2017 and raising its normalized EPS guidance when announcing the Company's first quarter 2017 financial results lacked a reasonable basis and were made without also disclosing known problems with the Company's operations that combined to make their statements false and materially misleading.

156.    On May 10, 2017, Newell filed with the SEC its Form 10-Q for the first quarter of 2017, the period ending March 31, 2017, which was signed by Defendants Nicoletti and Cunningham.  The First Quarter 10-Q substantially reiterated the false information contained in the announcement of Newell's first quarter 2017 financial results on May 8, 2017, as alleged herein, and contained similar false and misleading MD&A, risk factor and disclosure control disclosures to those present in the 2016 Form 10-K.  As with Newell's 2016 Form 10-K, the First Quarter 2017 10-Q was signed and certified under SOX by Defendants Polk and Nicoletti.

157.    Defendants continued to mislead investors on June 15, 2017, when Defendant Polk made a presentation at the Deutsche Bank dbAccess Global Consumer Conference, where he concealed from investors the truth about the pricing conflicts plaguing Newell from the growth of its Global E-commerce division and falsely told investors not to worry about integration issues from the Jarden acquisition.  Specifically, with respect to e-commerce, Defendant Polk dismissed any challenges associated with "activating" the "tremendous opportunity" in e-commerce, reassuring investors that Newell ***"created the design we have created from a division perspective in order to ensure that we keep focus on brick-and-mortar at the same time as we capture the opportunity in e-commerce."***  And with respect to the Jarden acquisition, Defendant Polk falsely reassured investors that no material execution issues had occurred with Newell's acquisition and integration of Jarden, stating:

> So, we've come through Q4 2016, changed agenda, Q1; and ***if I were worried about, in an integration as big as the one we're driving, issues emerging in execution, it would have been in those two quarters because that's where the biggest change occurred and that's where the startup phase for the new organization was.*** So, ***I'm resting a lot easier than I was going through that six-month window, and we are now forward facing and forward leaning with respect to unlocking the opportunity.***

Defendant Polk also continued to misleadingly tout Newell's R&D process, referencing the Company's products in development while simultaneously omitting to tell investors that problems with Newell's siloed organizational approach would prevent the Company from recognizing the full benefits of any of those projects.

158. On August 4, 2017, Newell filed a Form 8-K and attached press release with the SEC announcing the Company's financial results for its second quarter of 2017. For the second quarter of 2017, Newell reported net sales growth of 5.1 percent to $4.1 billion and core sales growth of 2.5 percent. The press release included the following comments from Defendant Polk:

> ***We achieved a solid set of results in the second quarter delivering competitive growth, good margin development and strong earnings***…. We increased market share by sixty basis points in our large U.S. business, drove continued double digit growth of our global e-commerce business and once again delivered broad-based geographic results with core sales growth in all four regions. Normalized operating margin increased by one hundred and thirty basis points, enabled by more than $80 million of incremental cost savings and synergies, which contributed to our delivery of double digit normalized earnings per share growth.
>
> ***We expect core sales growth to strengthen in the second half of the year*** as we benefit from new distribution gains, a stronger back half pipeline of innovations and sustained double digit growth in e-commerce. We remain confident in our unique long term value creation opportunity for simultaneous growth and margin development and expect strong cash flow generation to enable delivery of our leverage ratio targets well ahead of our committed timetable.

159. In the press release, the Company also reaffirmed its previously-issued financial guidance metrics for 2017, and actually increased its guidance for 2017 net sales from a prior range of $14.52 billion to $14.72 billion to a new range of $14.8 billion to $15 billion.

160. Later that day, Newell hosted a conference call with analysts and investors to discuss the Company's second quarter 2017 financial results, where Defendant Polk repeatedly stressed that the Company's growth and financial prospects were only going to strengthen in the second half of 2017 and that the Company would end up in the upper half of its core sales growth guidance range, stating that "[c]onsistent, competitive top line growth, coupled with strong double-digit earnings growth has enabled us to reaffirm our 2017 full year core sales growth and normalized EPS guidance and increased our 2017 net sales guidance…" and that "***we expect to deliver core sales growth acceleration into the second half of the year in the upper half of our full year core sales growth guidance range with sequential acceleration in our growth rate from Q3 to Q4***."

161. As Defendant Polk explained in responding to an analyst question concerning Defendants' call for a "second half core sales uptick":

> ***So the back half was always going to be the more loaded half of the year for us*** for two reasons. It's natural; so it matches the natural flow of our business, but also in the first half of the year, we've been changing basically everything; the entire organization, new people, new roles, consolidating structures. So this wasn't the period of time to be launching a lot of new items into the market. ***So it's the natural phasing in our business and the natural phasing of our—in connection to the natural phasing of our change program.***

And when given the chance to provide more clarity of Defendants' view for Newell's second half of 2017, Defendant Polk doubled down on his call for core sales growth acceleration and guided analysts and investors to the top half of Newell's core sales growth guidance while dismissing impediments to achieving it, as follows:

> ***So in my guidance, what I said was that in the back half of the year, we'll be in the top half of our range, which top half of the range is 3.25% to 4%.*** So in order to average somewhere in the top half of the range, you have to have pretty good and then I also said sequential improvement from Q3 to Q4. So in order to deliver that outcome, you need to be in one of those quarters. Either of those two quarters

are both pretty strong and balanced or one of those quarters has to be right up against the top of the range.

* * *

***Our outlook for the back half of the year hasn't really changed, so we're always calling acceleration and performance.*** We never got quite as specific to say sequential improvement between Q3 and Q4, but that was always the profile, the plan as you would expect because of the flow of activity. But in the time between the changes we've made in the first half. So I think that would be my answer on core sales growth. And we'll see maybe someday in the future, we have a 5%. But I think that doesn't happen until we get into the thick of our innovation activity on the legacy Jarden businesses. But more to come on 2018 and beyond when we get a little bit closer to that timeframe.

The other thing that I said in the speech – in the script was that ***this presumed no major retail-driven disruptions in the back half of the year. And I think that's a good assumption to make.*** We've experienced many of them. I think other than a surprise bankruptcy; I think we are well aware of where the issues are. And I think we've contemplated particularly given the things we've been able to do in Q2 on Writing, we contemplated the risk profile that could emerge from office superstores in the back half of the year. ***So I think we have well in hand, but again, our guidance would be disrupted by a major bankruptcy. But again, I don't see that. The profile of our retailer base is such that that doesn't look like there's anybody in our top 15 for sure that would ever be in that circumstance.***

162. Speaking on the call about the effects of inventory destocking, Defendant Polk continued to insist that the end of its effect on Newell's bottom line was near, saying Newell would lap the "vast majority" of the inventory destocking coming through the third quarter and that "…once we get…into the fourth quarter, I think the degree of impact lessens." As Defendant Polk stated while recognizing that some amount of inventory destocking may continue, "I don't think it has as profound an impact on the business as the last three quarters and a month or two through Q4 of the last year…."

163. With respect to the integration of Jarden, Defendant Polk discussed cost savings in the Company's synergy programs, telling them, in part, that "…we're right where we expected to be and the disciplined execution of the Transformation Office gives us full confidence in our 2017

delivery." Defendant Polk also referenced what he said was Newell's "advantaged capabilities in innovation and design with the best still yet to come…," telling analysts and investors that product innovation would begin to yield results in the third and fourth quarters of 2017.

164. On the same call, with respect to the continued growth of Newell's Global E-commerce division, Defendant Polk stated that "[w]e're running as fast as we can possibly run." In fact, Defendant Polk revealed that Newell had decided to make a further investment in e-commerce and scale that division beyond what was originally contemplated, stating:

> ***With respect to sustaining our strong e-commerce momentum, our guidance assumes we deliver strong double-digit growth in both the third and fourth quarters.*** Today, e-commerce represents about 10% of our global business or about $1.5 billion of revenue. Through the first half of 2017, our global e-commerce business has grown strong double digits. We've increased our rate of investment in e-commerce beyond what we originally contemplated at the early stages in the combination and are well on our way to reach our near-term design of 500 dedicated e-commerce employees by the end of the year. We've opened e-commerce offices in Seattle and Hoboken in close proximity to our largest e-commerce retail partners and will open a third office in London later this year as we extend our capability to Europe. ***The velocity with which we've scaled this team has been extraordinary, and the team is doing a terrific job of transforming our capability while simultaneously delivering the strong growth we expect. These new resources and our strengthening capability positions us to deliver the strong double digit growth we've assumed in our 2017 guidance.***

165. Defendants' representations in announcing Newell's financial results for the second quarter of 2017 were materially false and misleading because, unbeknownst to Newell investors, Newell's bloated inventory levels and continued inventory destocking by Newell's retailer customers were having an increasingly negative effect on Newell's sales growth and margins. Further, integration costs and communication issues were continuing to plague Newell's integration of Jarden. Specifically, as alleged herein, at the time Defendants were announcing Newell's second quarter 2017 financial results, but unbeknownst to investors, Newell was attempting to reverse course and hire back the legacy Jarden sales force it had terminated by the

first quarter of 2017, which had left the legacy Newell sales force responsible for selling products they were unfamiliar with just prior to a key selling season. Further, Newell's Transformation Office was overstaffed and in the process of itself racking up approximately $247 million in costs for 2017 that were excluded from adjusted operating metrics, while the Company's R&D and brand marketing apparatus was plagued by communication issues and inefficiency. Finally, Defendants' statements concerning Newell's new Global E-commerce division were materially false and misleading because pricing conflicts between Newell's E-commerce division and the Company's brick-and-mortar divisions were continuing to have a negative impact on the Company's sales growth and margins.

166. As such, Defendants knew or should have known that their actions in reaffirming the Company's previously-issued financial guidance for 2017, raising its net sales guidance, and telling analysts and investors to expect Newell to finish in the top half of its 2017 core sales growth guidance when announcing the Company's second quarter 2017 financial results lacked a reasonable basis.

167. On August 9, 2017, Newell filed with the SEC its Form 10-Q for the second quarter of 2017, the period ending June 30, 2017, which was signed by Defendants Nicoletti and Cunningham. The Second Quarter 10-Q substantially reiterated the false information contained in the announcement of Newell's second quarter 2017 financial results on August 4, 2017, as alleged herein, and contained similar false and misleading MD&A, risk factor and disclosure control disclosures to those present in the 2016 Form 10-K. As with Newell's 2016 Form 10-K, the Second Quarter 2017 10-Q was signed and certified under SOX by Defendants Polk and Nicoletti.

168. In September 2017, ***just three weeks from the close of Newell's financial third quarter and after much of the annual back-to-school selling was largely finished***, Defendants

continued to mislead investors by reaffirming the Company's previously-issued 2017 core sales growth and net sales guidance.  In a September 6, 2017 press release discussing disruptions associated with Hurricane Harvey on Newell's United States manufactured resin businesses, the Company affirmed its 2017 core sales growth guidance of 2.5%-4.0% and its 2017 net sales guidance.  And the next day, while speaking at the Barclays Global Consumer Staples Conference, Defendant Polk touted Newell's "[b]road-based growth," the integration of Jarden and prospects for the Company's R&D pipeline while once again reaffirming the Company's 2017 core sales growth guidance.

## VIII.   THE TRUTH ABOUT NEWELL EMERGES

169.    As alleged herein, after closing at $44.23 on February 6, 2017, the first day of the Class Period, Newell's stock reached a Class Period high of $55.08 on June 19, 2017, based, in part, on Defendants' materially false and misleading statements and omissions concerning, among other things, (1) Newell's bloated inventory levels and the increasing effect of retailer inventory destocking; (2) inadequate communications that created and exacerbated severe pricing conflicts between the E-commerce division and the bricks-and-mortar sales division; and (3) Newell's ability to effectively integrate its acquisition of Jarden.  As set forth above, throughout the Class Period, Defendants reaffirmed and even raised Newell's 2017 financial guidance multiple times, and did so once again with only three weeks left in Newell's third quarter of 2017.

170.    On November 2, 2017, however, Defendants shocked investors when Newell issued a press release before the market opened announcing extremely disappointing financial results for the Company's third quarter of 2017.  Newell reported that, for its third quarter, net sales ***declined*** 7% compared to the prior year period to $3.7 billion.  Far from the core sales growth acceleration that Defendants had told the market to expect as recently as two months earlier,

Newell reported that core sales growth had nearly ceased altogether, growing only 0.4%. Newell was also forced to ***slash its projected core sales growth in half***, telling investors to now expect 2017 core sales growth of 1.5%-2.0%.

171. In Newell's press release, rather than disclose the myriad issues alleged herein that were causing the Company's sales growth and margins to deteriorate, Defendant Polk deceptively attributed the Company's disappointing financial results to macroeconomic conditions, stating that the shortfall was due to "weak late-quarter sales related to retailer inventory rebalancing, ***primarily in response to decelerating U.S. market growth through the Back-to-School period***."

172. Later the same day, on the Company's conference call with analysts and investors, Defendant Polk continued to point to macroeconomic conditions as the reason for Newell's disappointing quarter, stating that "[w]e had unrelenting retailer inventory destocking, creating a headwind for revenue ***as our retail partners adjust to slowing market growth and changes in shopping patterns.***" In addition to misleading investors concerning the true source of Newell's deteriorating core sales growth, on the same call Defendant Polk announced for the first time a major risk involving Newell's global supply chain, as follows:

> ***The reality of our business model is it's impossible to adjust in 30-day windows or 60-day windows or 45-day windows because of the fact that we're only 50% self-manufactured, and we have a long value chain of sourced finished goods that are on the water that's tied to kind of a forward-looking forecast***. It's really important for us to accept the retail landscape dynamics for what they are such that we're not setting ambitions in the company that drive behaviors that carry too much risk. So, for example, ***if we put too big a number out there to chase for top line, the divisions will build inventories to support that outcome*** because we won't do that without them having given us some confidence in that. ***And if you miss, then you're hung out with those inventories.***

173. On the same call, in response to analyst questions, Defendant Polk acknowledged that Defendants had "perfect visibility" into Newell's inventory levels in the retail channel, stating:

> We have ***perfect visibility*** into our largest retailers' inventory position. We know what our—through Retail Link, you have that visibility. ***You see exactly how many weeks on hand you've got at retail and how many weeks on hand you have in the warehouse.*** So we know exactly what has gone on there and ***we can see that by SKU, quite frankly, every day.*** So we have ***perfect visibility*** at that customers and they share that with us because it's in their interest for us to know and to work with them to manage those inventories down.
>
> *  *  *
>
> …***we get [Point of Sale] data weekly, which is transaction data from our retailers, including Amazon and we get the ability to split both [E-commerce] from bricks-and-mortar by product family***. We could go lower, but we've got all that data that comes in and gets aggregated. So you're not going to see the [Point of Sale] data that we see. We see that every week and it's the equivalent of retail link from all of our retailers and then of course, we have our invoicing that we compare all that to. We look at it across 75 product families and we do this in the U.S. And so we have a very, very granular view of our business and it's a unique combination of these different data sources that gives us the perspective and that's the number we quote.

174. Analysts were stunned by the news, especially given Defendants' prior recent statements that Newell was on track to meet its 2017 financial guidance, and Defendant Polk's assurances that it would likely meet the top half of its 2017 core sales growth guidance range. In response to this news, Newell stock fell approximately 27%, or $10.99 per share, on heavy trading volume to close at $30.01 per share on November 2, 2017.

175. Then, on January 25, 2018, Newell issued a press release pre-announcing the Company's 2017 financial results, which showed investors the full extent of the problems at Newell and its inability to effectively integrate the Jarden acquisition. Rather than the revised 1.5%-2.0% 2017 core sales growth guidance that Defendants had issued only two months earlier, Newell stated that it now anticipated 2017 core sales growth of only approximately 0.8% (implying negative core sales growth in the fourth quarter), and the Company's normalized EPS for 2017 also fell short of guidance ranges issued and repeatedly reaffirmed by Defendants during the Class Period.

176. As it related to the integration of Jarden, and demonstrating just how complex and unwieldy the bureaucracy at Newell had become as a result of the acquisition, Newell announced that the Company was exploring "strategic options" to divest industrial and commercial assets and smaller consumer businesses with such divestitures resulting in a staggering 50% reduction in both Newell's customer base and global factory and warehouse footprint. Further, Newell announced that three members of its Board had resigned, including Ian G.H. Ashken, the former president of Jarden, and Martin E. Franklin, the former chairman of Jarden.

177. Analysts were troubled by the severity of Newell's sudden downturn, and noted that Newell's substantial planned divestiture was centered on legacy Jarden businesses acquired in that acquisition. Specifically, a January 25, 2018, Wells Fargo report titled "NWL: Pre-Announces Disappointing 2017 Results And 2018 Outlook," observed:

> ***Finally, we note that a number of divestitures/challenged businesses are from the legacy Jarden portfolio and we can't help but ask: <u>what exactly will NWL be left with after spending over $20B for Jarden less than two years ago?</u>*** [underlining in original]

178. On these disclosures, Newell stock fell another 21%, or $6.42 per share, on heavy trading volume to close at $24.81 per share on January 25, 2018.

## IX. ADDITIONAL FACTS RELEVANT TO SCIENTER

179. Each of the Executive Defendants acted with scienter in that, as set forth herein, each knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

180.    As set forth herein, the Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, receipt and/or modification of Newell's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Newell, participated in the fraudulent scheme alleged herein.

181.    Defendant Polk was, at all times during the Class Period and continuing to the present, the CEO of the Company and a member of Newell's Board.  As alleged in greater detail above, Defendant Polk made affirmative statements in press releases and presentations concerning the Company's business plans and operations, its competitive environment, its results and its future prospects, which included the Company's relative lack of adversity stemming from retailer inventory destocking, the growth of the Company's Global E-commerce division, and the integration of the Jarden acquisition.

182.    With respect to the issue of retailer inventory destocking and Newell's own inventory levels, Defendant Polk has admitted that the Executive Defendants were provided with real-time information concerning the Company's inventory levels and the sell-out or sell-through at the Company's retailer customers, and as such were aware that continued destocking by retailer customers would have an increasingly negative effect on Newell's sales growth and margins.  As described above, Defendant Polk represented that Newell had "perfect visibility" into its largest retailers' inventory positions, including weekly Point of Sale data that provided a "very, very granular view of our business."

183.    Similarly, Defendants were well aware of the pricing conflicts that emerged between Newell's Global E-commerce division and the Company's brick-and-mortar divisions/brands that were causing a strain on Newell's relationships with its retailer customers

and contributing to the deterioration of the Company's sales growth and margins. As described in greater detail here, before the Class Period, Defendant Polk told Newell investors that the new E-commerce division ***was going to be located on the floor below the Company's executive team in Newell's corporate offices in Hoboken so that Newell executives could monitor the activities and prevent any pricing conflicts from developing***. On Newell's October 28, 2016 analyst conference call, Defendant Polk stated that Newell management was keenly aware of potential conflicts that could arise between Newell's e-commerce operations and its brick-and-mortar operations, especially around pricing, and as such the "***hub of [Newell's E-commerce] organization will be one floor below the executive team in Hoboken***" so "***that we don't get into pricing dislocating dynamics between the bricks-and-mortar dotcom and the bricks-and-mortar or the pure-play dotcom in the bricks-and-mortar***."

184. Further, with respect to the array of internal problems plaguing the Company that stemmed from integration of the Jarden acquisition, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors, it is apparent that Defendants were well aware of these issues given the sheer magnitude of the transaction and Defendants' prominent placement of the acquisition as a central feature of Newell's purported ability to "perform while it transformed."

185. Defendant Polk also had a powerful personal motive to ensure that the integration of Jarden was not just a success, but that it was the "seamless" integration that he promised to investors. Polk and the other Defendants had sold the market on their ability to effectively integrate the Jarden acquisition by referencing their prior ability to effectuate a turnaround of Newell's business fortunes from 2011 to 2015, often calling their strategy a "proven" model for integrating Jarden's business into Newell's. As set forth more fully herein, Defendant Polk had

staked his entire professional reputation on his ability to "transform" companies, and Defendants chose to make "transformation" and "performing while transforming" central themes of Newell after its acquisition of Jarden.

186.    Despite this knowledge, the Executive Defendants continued to issue what they knew or should have known to be unreasonable 2017 financial guidance, including guidance related to Newell's core sales growth, to Newell analysts and investors.  Defendants issued this unreasonable guidance without also disclosing key trends and facts, thereby rendering the guidance materially false and misleading.   Indeed, in total contradiction of known facts and trends, Defendants told analysts and investors that the Company's financial prospects, including its core sales growth, would actually accelerate in the second half of 2017.

187.    Newell consistently reaffirmed its 2017 financial guidance over the course of 2017, even raising it on a couple of occasions, before reaffirming this guidance for the final time only weeks before the end of Newell's financial third quarter of 2017.  It was not until November 2, 2017, when Newell reported its third quarter 2017 financial results, that investors began to understand that Defendants' prior representations were false and lacked a reasonable basis.  The Company's culpability, and the culpability of each Defendant, is further evidenced by the fact that these significant misstatements were not corrected by Defendant Polk or by any other member of Newell's management either when they were made or for the majority of the Class Period before the partial corrective disclosure on November 2, 2017.

188.    The Executive Defendants' knowledge concerning the alleged misrepresentations is also indicated by the signature of each of the Company's 2016 Form 10-K and/or Forms 10-Q during the Class Period, and in particular the certifications attesting to the truth and veracity of those filings made by Defendants Polk and Nicoletti.

## X.   LOSS CAUSATION

189.    As alleged herein, Defendants engaged in a scheme during the Class Period to deceive the market and in a course of conduct that artificially inflated the value of Newell's securities and operated as a fraud on Class Period purchasers of Newell stock by misrepresenting or failing to disclose, *inter alia*, that (1) Newell's retail channel was loaded with extremely high levels of Newell product, and inventory destocking by the Company's retailer customers was having, and increasingly would continue to have, a material adverse effect on Newell's sales growth and margins; (2) undisclosed pricing conflicts between Newell's new Global E-commerce division and its brick-and-mortar sales teams were straining the Company's relationships with its retailer customers and were also having a material adverse effect on the Company's sales growth and margins; and (3) undisclosed operational missteps and differences in managerial style and culture between the legacy Newell and Jarden businesses were causing significant problems within the Company, resulting in the Company's inability to capture the benefits that Defendants had promised to Newell investors as a result of the Jarden acquisition.

190.    As a result of their purchases of Newell securities during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss and damages under the federal securities laws, when subsequent disclosures removed the inflation from such securities.

191.    The false and misleading statements and material omissions caused Newell's common stock to trade at artificially inflated levels throughout the Class Period.  After closing at $44.23 on February 6, 2017, the first day of the Class Period, Newell's stock reached a Class Period high of $55.08 on June 19, 2017.  However, as the direct and proximate result of the two corrective disclosures set forth herein, which revealed the truth about the false and misleading

statements and disclosed facts that had been previously concealed by Defendants' wrongful conduct, by the end of the Class Period, Newell stock plummeted to a January 25, 2018, close of $24.81 per share.

192. In late-2017 and early 2018, as the two corrective disclosures were made to the market, the price of Newell stock declined with relevant news. Conversely, when Defendants made statements during the Class Period that portrayed the Company's financial condition and prospects in a false light, the market reacted positively, which allowed the Company's stock either to remain at its then-current trading levels or even increase in price.

193. For example, on May 8, 2017, before the market opened, Newell announced its first quarter 2017 financial results, reporting net sales growth of 148.4% and core sales growth of 2.5%. Newell also raised guidance for full-year 2017 normalized earnings per share, reaffirmed its previously issued net sales guidance that reflected 9.5% to 11% growth, and reaffirmed its 2017 core sales growth guidance range of 2.5% to 4%. Analysts expected the Company's core sales growth to continue to accelerate based on Defendants' representations that the worst of retailer inventory destocking was over and noted that expense reductions and synergies from the Jarden acquisition were ahead of schedule. Specifically, in a May 8, 2017, research report titled "Newell Brands Inc, Momentum Likely to Linger Post Beat, as Most Challenging Quarter Is Behind, Reiterate OW," J.P. Morgan observed, in part:

> ***We are raising our FY17 EPS estimate for Newell Brands to $3.09, from $3.02 previously, following the company's 1Q EPS beat and FY17 guidance raise (to $3.00-$3.20 from $2.95-$3.15 before)***. Heading into the print, investors were focused on core sales growth, with bears calling for ~1% growth in the quarters given sluggish trends industry-wide. ***Now that organic sales growth fears have been alleviated with NWL posting +2.5% core sales growth on the company's most difficult compare of the year (~310bps more difficult than the remainder of FY17), we believe NWL shares can continue to grind higher as management executes on expense reductions that serve as marketing ammunition to foster top line growth***.

* * *

> **Core Sales Should Continue to Accelerate through FY17**. NWL's +2.5% core sales growth in 1Q17 was better than feared with some bears calling for ~1% sales growth in the quarter given sluggish trends across the CPG space, particularly in January and February. To this point, NWL's sales contraction in January and February was likely less sharp than other CPG companies as NWL's core product offerings are less impacted by pantry stocking/destocking as these products are more discretionary in nature. Instead, the company's sales were more impacted by retailer destocking, while POS trends were described as "healthy." ***Looking ahead, management guided to a sequential improvement in sales growth in 2Q vs. 1Q driven by less pressure from destocking***, investments in advertising, and ~60bps easier compares sequentially from 1Q.

194. As alleged herein, Newell concealed from investors that its retail channel was loaded with extremely high levels of Newell product which, when combined with increasing retailer inventory destocking, would have a material adverse effect on Newell's operating performance and prospects for growth in future periods, and that Newell's business was being negatively impacted by a host of undisclosed internal issues, including pricing conflicts between its Global E-commerce division and brick-and-mortar divisions/brands, and an inability to effectively integrate the Jarden acquisition. Based on the Company's positive earnings report, the price of Newell's common stock increased on May 8, 2017, by $5.54, or almost 12%, to close at $51.93. Newell's stock price continued to increase in the weeks following this earnings announcement.

195. On June 15, 2017, Defendant Polk made a presentation at the Deutsche Bank dbAccess Global Consumer Conference, and made positive statements concerning Newell's growth during this period of change after acquiring Jarden while simultaneously downplaying any resulting execution issues, stating:

> ***We're acutely aware as we look to play for the long-term outcome that we've got to deliver while we transform. So, we've used this phrase. We must perform while we transform.*** And last year was a good example of doing that. Terrific outcomes

> in the context of significant change. Here is the data point on Q1 relative to our peer group of companies, ***so good progress despite the change, broad-based across geographies as well.***
>
> So, we've come through Q4 2016, changed agenda, Q1; and ***if I were worried about, in an integration as big as the one we're driving, issues emerging in execution, it would have been in those two quarters because that's where the biggest change occurred and that's where the startup phase for the new organization was. So, I'm resting a lot easier than I was going through that six-month window, and we are now forward facing and forward leaning with respect to unlocking the opportunity.***

Further, Defendant Polk noted that the Company had reaffirmed its financial guidance for 2017, and said that growth should only accelerate in the second half of the year:

> Our full year guidance has been reaffirmed despite the turbulence that's out there, particularly in the U.S. markets regarding the retail landscape, and ***we've got high confidence in our ability to be able to deliver in these ranges. So, we're well on our way to doing this***.
>
> We've said, just to be clear, that Q2 was going to look like Q1, a little bit better, that we would see perhaps – ***we will see acceleration in the second half of the year. And so we're on track to delivering this outcome range and are confident in our ability to do so.***

196. Only two trading days after Defendant Polk's appearance at the Deutsche Bank conference, on June 19, 2017, Newell stock reached its Class Period high of $55.08.

197. On November 2, 2017, before the market opened, the first of two corrective disclosures was made that began to remove the inflation from Newell's stock price, as the Company issued a press release announcing its financial results for the third quarter of 2017. As described in more detail above, these results were below analysts' expectations, with net sales declining 7% compared to the prior year period and core sales growth of only 0.4%. Newell was forced to revise its 2017 net sales outlook to $14.7-$14.8 billion, and core sales growth to 1.5%-2.0%.

198. The November 2, 2017 disclosure was partially corrective of Defendants' prior false and misleading statements because it began to reveal the effect of increased retailer inventory destocking on Newell's business and results and that Defendants' recent assurances that Newell's sales growth would accelerate in the second half of 2017 lacked a reasonable basis. In response to this news on November 2, 2017, Newell stock fell approximately 27%, or $10.99 per share, on heavy trading volume to close at $30.01 per share. The stock price decline resulted in a loss of more than $5.3 billion in the Company's market capitalization.

199. Analysts also reacted sharply to the November 2, 2017 disclosures. For instance, a Jefferies update of November 2, 2017 on Newell Brands noted, as a "Key Takeaway," that Newell had reported "***very disappointing 3Q results, incl. lower than expected core sales (+0.4% vs. +1.5-2.5% / 2.9% mkt / Street), margins, EPS ($0.86, or $0.81 ex-tax rate vs. our model w/ Street $0.92), and CFFO. FY17 guidance revised lower for core sales (1.5-2% vs. 2.5-4% prior) and EPS ($2.80-$2.85 vs. $2.95-$3.05 prior)***." [Emphasis in original.] Jefferies also noted that the Company's performance was hurt by "share losses and inventory reductions in Appliances and Cookware." The next day, in a follow-on report, Jefferies dropped its price target from $47.00 to $32.00 per share.

200. Although the stock price fell by more than 25% – a huge amount – in reaction to the disclosures made on November 2, 2017, the price decline was limited because, as detailed above, the Company failed to disclose the full truth concerning the accelerating effect of retailer inventory destocking on Newell's own inventory levels, the pricing conflicts that had developed between Newell's new Global E-commerce division and its brick-and-mortar sales teams that were straining customer relationships, and the internal problems occurring due to the Jarden integration.

Investors were thus still unaware of the material adverse effect of these undisclosed issues on the Company's sales growth and margins moving forward.

201. Finally, on January 25, 2018, the impact of the Company's false portrayal of its financial condition was more fully revealed when Newell issued a press release pre-announcing the Company's 2017 financial results. Rather than the revised 1.5%-2.0% 2017 core sales growth guidance Defendants had issued only two months earlier, Newell stated that it now anticipated 2017 core sales growth of only approximately 0.8%. Further, far from touting the positive impact of its integration of Jarden, Newell announced that the Company was exploring "strategic options" to divest industrial and commercial assets and that such divestiture would result in a staggering 50% reduction in both Newell's customer base and global factory and warehouse footprint. And Newell also announced that three members of its Board had resigned, including Ian G.H. Ashken, the former president of Jarden, and Martin E. Franklin, the former chairman of Jarden.

202. Once again, the market was shocked by Newell's disclosure. Newell stock fell another 21%, or $6.42 per share, on heavy trading volume to close at $24.81 per share on January 25, 2018. This stock price decline resulted in a further loss of over $3.1 billion in the Company's market capitalization.

203. And analysts, once again, reacted sharply to the Company's disclosures. Barclays issued a report on January 25, 2018, that began: "**<u>We are downgrading our rating on Newell Brands to Equal Weight</u> on the heels of the company's press releases this morning pre-announcing 4Q17 results and announcing a strategic overhaul and departure of certain key board members. Our new PT of $26 reflects – 15% downside from yesterday's close**." [Emphasis in original.] The report continued:

> Put simply, we've lost confidence. Recall, back in November, we decided not to downgrade NWL because as much as we believed that integration and internal

> issues were equally to blame as the external environment for revenue disappointments, we felt the company's deeper focus on cash flow and attempts to recalibrate sales expectations to better suit the current operating environment were sound. To be sure, we acknowledged the uncertainties with the company's future revenue trajectory but when we thought back to legacy JAH's success in protecting cash flow during difficult and unpredictable times (2007-2009), we took comfort in the legacy JAH management team still being attached to the business.
>
> Against this backdrop, it's clear why today's news changes our thinking. To be sure, we appreciate Newell's willingness (if not necessity) at this point to rethink the company's thesis around bringing Newell and Jarden together and find this reminiscent of management's thought process around the Tools business. That said, today, uncertainty dominates our thought process. So too does our memory of management discussions throughout 2015 (and well before the Jarden deal came into the picture), around the need for a scaling event to unlock further productivity and efficiency opportunities within the Newell story.
>
> From here, given the scale of transformation expected in 2018, we are concerned about the mechanics of alleviating stranded overhead from divestitures, incremental restructuring and the resultant lack of visibility around cash flow. Further, with all aspects of the integration so far proving more challenging than initially anticipated, we also worry about the near-term pipeline for innovation and the ability of the selling and marketing organization to protect market share even in the core businesses.

204. The price declines directly and proximately resulting from the aforementioned disclosures were not caused by market conditions, industry news, randomness, or by Newell-specific information unrelated to the alleged fraud. Each of the above referenced disclosures corrected the false and misleading information previously provided to the market for which the Lead Plaintiff, on behalf of itself and the Class, seeks to be compensated.

## XI. APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND MATERIAL OMISSIONS

205. Lead Plaintiff asserts two bases for a presumption of reliance in this action. *First*, the material omissions are presumed to have inflated the market prices of Newell common stock under the presumption stated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). *Second*, at all relevant times, the market for Newell common stock was an efficient market

that promptly digested current information with respect to the Company from publicly-available sources and reflected such information in the prices of the Company's securities.  Among other factors, throughout the Class Period:

(a)     Newell's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Newell filed periodic public reports with the SEC;

(c)     Newell regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.  Securities analysts and the business press followed and published reports regarding Newell that were publicly available to investors; and

(d)     the market price of Newell common stock reacted promptly to the dissemination of new, material information regarding the Company.

206.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for Newell securities was artificially inflated.  Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" and *Affiliated Ute* theories apply.

207.    Lead Plaintiff and the other Class members relied on the integrity of the market price for the Company's stock and were substantially damaged as a direct and proximate result of their purchases of Newell common stock at artificially inflated prices and the subsequent decline in the price of that common stock when the truth was fully disclosed.

208.     Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased Newell common stock at the artificially inflated prices in the market.

## XII.   NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

209.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

210.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

211.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Newell who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII. CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

212. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

213. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

214. These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Newell common stock during the Class Period.

215. These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of

securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Newell's excess inventory problems and the problems emanating from the integration of the Company's Jarden acquisition; (ii) artificially inflate and maintain the market price of Newell stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Newell stock at artificially inflated prices.

216.    Defendant Newell is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

    i.        Newell's press release of February 6, 2017;

    ii.        Newell's Form 10-K, filed with the SEC on March 1, 2017;

    iii.        Newell's press release of May 8, 2017;

    iv.        Newell's Form 10-Q, filed with the SEC on May 10, 2017;

    v.        Newell's press release of August 4, 2017;

    vi.        Newell's Form 10-Q, filed with the SEC on August 9, 2017;

    vii.        Newell's press release of November 2, 2017; and

    viii.        Newell's Form 10-Q, filed with the SEC on November 8, 2017.

217.    Newell is further liable for the materially false and misleading statements and omissions made by Defendants Polk, Nicoletti and Cunningham in press releases and during presentations with investors and analysts as well as in connection with Newell's annual and quarterly reports, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

218.    Defendants Polk, Nicoletti and Cunningham are liable for the false and misleading statements they made and/or signed, as follows:

i.  Throughout the Class Period, as alleged above, Defendant Polk signed the Form 10-K, Forms 10-Q, and certifications in Form 10-K and Forms 10-Q, made statements in and was directly responsible for other statements made in press releases, Forms 8-K and during meetings and presentations with investors and analysts, and signed letters addressed to Newell's shareholders that were attached to Newell's annual reports.

ii.  Throughout the Class Period, as alleged above, Defendant Nicoletti signed the Form 10-K, Forms 10-Q, and certifications in Forms 10-K and Forms 10-Q, and made statements in and was directly responsible for other statements made in press releases, Forms 8-K and during meetings and presentations with investors and analysts.

iii.  Throughout the Class Period, as alleged above, Defendant Cunningham signed the Form 10-K and Forms 10-Q and was directly responsible for other statements made in press releases, Forms 8-K and during meetings and presentations with investors and analysts.

219.  As a result, Defendants Polk, Nicoletti and Cunningham are liable for the above-identified false and misleading statements they made and/or signed during the Class Period.  As more fully stated in the description of the fraud (Section V), pursuant to the aforesaid plan and course of conduct, these Defendants participated, directly and indirectly, in the preparation and/or issuance of the statements and documents referred to above, including in Newell's filings with the SEC, press releases, and other materials.  These statements and documents were materially false and misleading and/or omitted material information.

220.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Lead Plaintiff and the Class.

221.    These Defendants engaged in a scheme to misrepresent the financial condition and results of Newell, and to maintain and/or inflate the prices of Newell securities in order to, among other things, mask the severe undisclosed internal problems that Newell was experiencing integrating its acquisition of Jarden.  These Defendants also knew or should have known that (1) Newell's retail channel was loaded by Defendants with extremely high levels of unsold Newell product to artificially boost the Company's core growth metric; (2) pricing conflicts between Newell's Global E-commerce division and its brick-and-mortar divisions/brands were having a significant adverse impact on the Company's relationship with its brick-and-mortar retailer customers; (3) these issues would ultimately have a material adverse effect on the Company's overall financial results; and (4) Newell's poor financial performance in the second half of 2017 was attributable to these internal Company problems rather than the macroeconomic factors cited by Defendants to analysts and investors.

222.    The 2016 Form 10-K and Forms 10-Q issued in 2017, as well as all earnings releases issued during the Class Period, were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made in those SEC filings, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those SEC filings were intended to, and did, mask the severe undisclosed internal problems that Newell was experiencing that would later have a material adverse effect on the Company's financial and operating results.

223. As described above at Sections V and IX and elsewhere, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

224. The above allegations, as well as the allegations pertaining to Defendants' own admissions concerning their contemporaneous knowledge of detailed inventory levels at Newell's retailer customers, establish a strong inference that Defendants Newell, Polk, Nicoletti, and Cunningham acted with scienter in misrepresenting the Company's financial condition during the Class Period. Defendants Newell, Polk, Nicoletti and Cunningham caused Newell's business to appear more appealing and less risky than it actually was.

225. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Newell common stock. Lead Plaintiff and the Class would not have purchased Newell stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

226. As a direct and proximate result of these Defendants' wrongful conduct, which Lead Plaintiff has asserted within the statute of repose and statute of limitations set forth in the Exchange Act, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Newell common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violations of Section 20(a) of the Exchange Act (Against the Executive Defendants)**

227. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

228. This Count is asserted against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

229. During their tenures as officers and/or directors of Newell, each of these Defendants was a controlling person of Newell within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Newell, these Defendants had the power and authority to cause Newell to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Newell during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

230. In their capacities as senior corporate officers of the Company, and as more fully described above, each of the Executive Defendants had direct involvement in the day-to-day operations of the Company and in Newell's financial reporting and accounting functions. Each of the Executive Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Newell during the Class Period. As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Newell within the meaning of Section 20(a) of the Exchange Act.

231. By reason of their positions as officers and/or directors of Newell as described above, each of the Executive Defendants is a "controlling person" within the meaning of Section

20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their executive, officer and/or director positions within Newell, these Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

232. As set forth above, Newell violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Newell and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Newell securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Newell, each of these Defendants is culpable for the material misstatements and omissions made by Newell, including such misstatements in Company press releases, Form 10-K, Forms 10-Q, and Forms 8-K.

233. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Newell stock.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment individually and on behalf of the Class, as follows:

A. declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      awarding damages, including interest, to Lead Plaintiff and to the Class members;

C.      awarding Lead Plaintiff reasonable costs, including attorneys' and expert's fees; and

D.      awarding such equitable/injunctive or other relief for the benefit of the Class as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury for all issues so triable.

Dated:  November 28, 2018

*/s/ Robert A. Hoffman*
Robert A. Hoffman
Jeffrey B. Gittleman
Chad A. Carder
**BARRACK, RODOS & BACINE**
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 297-1484
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com

Jeffrey W. Golan, Esquire
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
jgolan@barrack.com

*Lead Counsel and Attorneys for Lead Plaintiff*