## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE NEWELL BRANDS, INC. SECURITIES LITIGATION | Civil Action No. 18-10878 (JMV) |
| | **OPINION** |

**John Michael Vazquez, U.S.D.J.**

This putative class action concerns allegations of securities fraud on behalf of investors who purchased Newell Brands, Inc. ("Newell") stock between February 6, 2017 and January 24, 2018 (the "Class Period"). D.E. 28. Plaintiff, a pension fund, alleges that Newell and three of its key officers engaged in securities fraud during the Class Period in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. *Id.* Currently pending before the Court is Defendants' motion to dismiss Plaintiff's First Amended Consolidated Complaint ("FAC") for failure to state a claim pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u *et seq.*, and Federal Rule of Civil Procedure 12(b)(6). D.E. 32. The Court reviewed the parties' submissions in support and in opposition[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion to dismiss is granted.

---

[1] Defendants' moving brief will be referred to as "Def. Br.," D.E. 32-1; Plaintiff's opposition will be referred to as "Pl. Opp.," D.E. 36; Defendants' reply will be referred to as "Def. Reply," D.E. 37. The Court also reviewed two notices of supplemental authority submitted by Plaintiff and Defendants' response to each notice. D.E. 38-41.

## I. INTRODUCTION[2]

### A. Background

Defendant Newell is a corporation which manufacturers and markets consumer products. FAC ¶ 36. In April 2016, Newell acquired Jarden Corporation ("Jarden"), another global consumer products company. *Id.* ¶ 3. Newell bought Jarden for approximately $15.3 billion, consisting of $5.4 billion in cash and $9.9 billion in stock. *Id.* ¶ 50. The acquisition more than doubled the size of Newell and created a consumer goods company with a portfolio of over eighty product brands including Sharpie, Paper Mate, Rubbermaid, and Yankee Candle. *Id.* ¶ 51. Newell's customers are primarily large mass merchandisers, including retailers and wholesalers. *Id.* ¶ 7.

Defendant Michael B. Polk was the President and Chief Executive Officer of Newell at all relevant times. *Id.* ¶ 37. Polk oversaw the Jarden acquisition and integration. *Id.* ¶ 52. According to Plaintiff, Polk "built his professional reputation on his ability to transform companies while at the same time reporting strong growth, which he referred to as 'performing while transforming.'" *Id.* ¶ 4. Plaintiff alleges that Polk "had a vested personal interest," that is, his reputation, "in making sure the Jarden acquisition was viewed as a complete success[.]" *Id.* ¶ 53. Defendant Ralph J. Nicoletti was the Executive Vice President and Chief Financial Officer of Newell throughout the Class Period. *Id.* ¶ 38. Defendant James L. Cunningham, III was the Senior Vice

---

[2] The facts are derived from Plaintiff's FAC. D.E. 28. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

President and Chief Accounting Officer of Newell throughout the Class Period. *Id.* ¶ 39. Plaintiff refers to Polk, Nicoletti, and Cunningham collectively as the "Executive Defendants."

When Newell announced the deal with Jarden, Polk ensured investors that there would be "a seamless integration of the new organization" with strategic advantages including scale to grow, a broader portfolio, and elimination of corporate costs. *Id.* ¶ 59. Newell completed its acquisition of Jarden on April 15, 2016, and its accompanying press release again indicated that it expected a "seamless transition." *Id.* ¶ 60. In the wake of the Jarden deal, Newell created a new global e-commerce division ("E-commerce"). *Id.* ¶ 62.

As to its financial results and guidance, Newell used the terms "core sales growth" ("CSG"), a non-GAAP financial measure, and "normalized earnings per share" ("NEPS"). *Id.* ¶ 7. Newell reported positive financial results in its first three quarters of 2016, prior to the start of the Class Period. *Id.* ¶ 61. The first quarter of 2016 yielded a CSG of 5.6%, *id.* ¶ 63, the second quarter of 2016 reflected a CSG of 5.0%, *id.* ¶¶ 65-66, and the third quarter of 2016 resulted in a CSG of 3.0%, *id.* ¶ 68. Plaintiff does not contend that any of the 2016 reports were false or fraudulent. When announcing financial results for the third quarter of 2016, Polk touted Newell's growing E-commerce team and how it would work alongside Newell's brick-and-mortar operations ("B&M").[3] *Id.* ¶ 71. Polk stated that the E-commerce team would sit "one floor below the executive team" because of "the importance of its delivery against our growth agenda." *Id.*

**B. Alleged Fraudulent Conduct**

---

[3] Newell's E-commerce division handled all e-commerce activity while Newell's B&M sales teams worked with the physical "brick-and-mortar" store fronts. *Id.* ¶ 6. Newell created the E-commerce division because of increased online shopping, which Newell referred to as the "migration from 'bricks to clicks.'" *Id.*

Plaintiff alleges that Defendants "issued and reaffirmed false and misleading 2017 financial guidance to investors without a reasonable basis." *Id.* ¶ 117. On February 6, 2017, the first day of the Class Period, Newell issued annual financial guidance for 2017 that set a range of 2.5% to 4.0% for CSG in the second half of 2017. *Id.* ¶ 118. On May 8, 2017, Newell reaffirmed the CSG guidance and raised its NEPS guidance. *Id.* ¶ 119. Newell again reaffirmed its CSG guidance on both August 4, 2017 and September 6, 2017. *Id.* ¶¶ 121-22. On November 2, 2017, Newell announced decreased financial results for the third quarter of 2017. *Id.* ¶ 123. Missing the financial guidance figures that it had previously issued in September, Newell reported a CSG of only .04% and stated that "net sales declined 7% compared to the prior year period to $3.7 billion." *Id.* ¶ 170. That day, Newell revised its CSG range to 1.5% to 2.0%. *Id.* ¶ 123. On January 25, 2018, Newell issued preliminary financial results for 2017 and again downgraded its anticipated CSG to .08%. *Id.* ¶ 125. The crux of Plaintiff's case is that from February 2017 through early September 2017, Newell predicted CSG and NEPS growth that it was ultimately unable to achieve, with the first negative news coming in November 2017.

Plaintiff relies extensively on a May 2018 presentation by Starboard Value LP ("Starboard Presentation"). *Id.* ¶ 29. Starboard Value LP, an investor activist, issued a 172-page presentation after the close of the Class Period entitled "Transforming Newell Brands" based, in part, on interviews with former Newell employees, customers, and suppliers. *Id.* In the FAC, Plaintiff provides numerous slides from the Starboard Presentation. *Id.* ¶¶ 75, 89, 101-05, 109, 127. Plaintiff's FAC includes slides from the Starboard Presentation to show that "Defendants' claim that macroeconomic factors were the cause of Newell's declining sales margin growth in the third and fourth quarters of 2017 was false and misleading, as Newell's peers fared much better in all areas in the same macroeconomic environment." *Id.* ¶ 127. Plaintiff maintains that Defendants'

misstatements and omissions throughout the Class Period were the actual cause of Newell's decline. *Id.*

Plaintiff alleges three categories of alleged material misstatements and omissions. *Id.* ¶ 48. The first category concerns Newell's inventory. Plaintiff claims that Defendants misled investors regarding high levels of inventory in Newell's retail channel and an increasing trend of inventory "destocking" by customers that was hurting Newell's sales growth and margins. *Id.* The second area concerns internal price conflicts. Plaintiff states that Defendants failed to disclose pricing conflicts between Newell's E-commerce and B&M divisions that was negatively impacting Newell's growth and margins. *Id.* The final category concerns general operation and managerial problems. Plaintiff claims that Defendants misled investors as to operational errors and managerial issues between Newell and Jarden following the acquisition. *Id.*

### 1. Excess Inventory

Plaintiff claims that during the Class Period, Newell's retail channel was "loaded with extremely high levels" of inventory. *Id.* ¶ 75. In late 2016, many of Newell's retail customers began tightening their inventories, which Plaintiff refers to as inventory destocking. *Id.* As a result, Newell was forced to store increasingly higher levels of unsold inventory in-house. *Id.* Citing the Starboard Presentation, Plaintiff claims that Newell's inventory levels were approximately 42% higher than industry averages. *Id.* Plaintiff alleges that the excess inventory problem had a significant negative impact on Newell's sales and margins. *Id.* ¶ 76. Furthermore, Plaintiff states, "even in the sales Newell could make, the Company was forced to make significant promotional concessions." *Id.* Plaintiff does not indicate any specific information as to the alleged concessions nor do they indicate the effect that such concessions had on Newell's financial performance.

Plaintiff adds that Defendants were "well aware" of the negative effect these issues were having on Newell's sales growth. *Id.* ¶ 77. During a November 2, 2017 analyst conference call, Polk said the company had "perfect visibility into our largest retailers' inventory position" which Plaintiff interprets to mean that Defendants monitored both "'sell-in' and 'sell-through' or 'sell-out' on a real-time basis."[4] *Id.* Polk also stated, "we get [Point of Sale] data weekly, which is transaction data from our retailers, including Amazon and we get the ability to split both [E-commerce] from bricks-and-mortar by product family." *Id.* Plaintiff alleges that because Defendants monitored Newell's customers' inventory levels, Defendants made material misstatements or omissions by claiming that the related issues would or had abated. *Id.* ¶¶ 79-81. The FAC also includes a chart tracking Newell's inventory levels and alleged material misstatements and omissions from the second quarter of 2016 through the third quarter of 2017. *Id.* ¶ 83. Plaintiff claims that "Defendants' statements were designed and timed to falsely reassure investors that any concerns about inventory were overblown." *Id.* Plaintiff does not allege that Defendants reported false or fraudulent inventory levels.

## 2. Pricing Conflicts between Newell's E-commerce and B&M Divisions

Plaintiff claims that during the Class Period, Newell's E-commerce division set the online pricing for Newell's products without coordinating with Newell's B&M teams. *Id.* ¶ 85. The result, Plaintiff continues, was "inconsistent pricing, strained customer relationships, and ultimately a negative impact on the Company's sales growth and margins." *Id.* ¶ 85. Newell's B&M teams set in-store pricing for Newell customers while the E-commerce division set online pricing, even when both sold to the same customer. *Id.* ¶ 86. For example, Newell's B&M teams

---

[4] "[S]ell-in" refers to Newell's initial sales to its retailers, while "sell-through" or "sell-out" refers to sales from the retailers to the ultimate customers. *Id.* .

set the prices for products sold at Walmart stores while the E-commerce division set the prices for products sold on Walmart.com. *Id.* Plaintiff alleges that due to a lack of communication between these two divisions, pricing conflicts arose and Newell was "essentially competing with itself on prices for its products" and "violating its own Minimum Advertised Price ("MAP") policy for a number of products, triggering concessions to its retailer customers." *Id.* ¶ 87.

Plaintiff alleges that Defendants were aware of the pricing conflicts yet misleadingly touted the E-commerce division's growth and success to investors without mentioning its negative effects on the B&M division. *Id.* ¶¶ 90-96. Yet, Plaintiff does not provide any specific, negative financial impact that the pricing conflicts had on Newell. Plaintiff continues that as a result of the pricing conflicts, Newell had to do "extensive promotional discounting." *Id.* However, Plaintiff does not explain what the financial impact of this promotional discounting was or when it occurred.

### 3. Operational Issues with the Jarden Acquisition

Finally, Plaintiff alleges that "undisclosed operational missteps and differences in managerial style and culture" between Newell and Jarden caused problems for the company throughout Jarden's integration. *Id.* ¶ 97. Plaintiff states that in February and May 2017, Defendants "falsely reassured investors that [Newell] was on track with the integration of Jarden and that any significant issues were behind it." *Id.* ¶¶ 110-13. Plaintiff points to the fact that Newell fired many members of the legacy Jarden sales force by the first quarter of 2017. *Id.* ¶ 98. As a result, Plaintiff continues, Newell's sales force was understaffed and unequipped to sell Jarden products. *Id.* ¶¶ 99-100. Plaintiff also claims that Defendants increased corporate costs by not consolidating Newell's corporate offices and by adding layers of management. *Id.* ¶¶ 102-03. Plaintiff points to Newell's Transformation Office, which had been "tasked with capturing the cost savings and synergies from the Jarden acquisition," as one source of escalating costs. *Id.* ¶ 105.

Plaintiff alleges additional communication issues related to Newell's new organizational structure that Defendants allegedly "concealed" from investors. *Id.* ¶ 106. Plaintiff uses as an example the Yankee Candle franchise, which Newell acquired from the Jarden deal. *Id.* Before the acquisition, Jarden created a value-price candle line so that Yankee Candle products could be sold by major retailers. *Id.* ¶ 107. After the acquisition, Newell scrapped the value-price candle line and began selling Yankee Candle's more expensive products through its major retailers. *Id.* Newell then allowed its retailer customers to discount the more expensive product. *Id.* ¶ 108. While there were close to 600 Yankee Candle stores in the United States selling candles at full price ($27.99), the exact same candles were selling for up to $8.00 less through Newell's retailer customers. *Id.* ¶ 109. Plaintiff claims that this "resulted in a massive negative impact on gross margins[.]" *Id.* Yet, Plaintiff does not allege the specific negative financial effect.

Plaintiff further claims that Newell had a "complex and inefficient" research and development ("R&D") process. *Id.* ¶ 112. Plaintiff states that "while Defendant Polk conceded that many R&D products do not make it into production, he misleadingly failed to disclose any of the inefficiency and communication issues embedded in Newell's R&D and brand marketing apparatus that would increasingly hinder Newell's ability to capitalize on any of its concepts." *Id.* ¶ 114. Again, Plaintiff fails to indicate with any precision the actual impact of the alleged R&D issues.

### C. Alleged Violations of SEC Rules

Plaintiff alleges that Defendants violated various SEC rules. *Id.* ¶¶ 128-34. First, Plaintiff claims that Defendant violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303, titled "Management's discussion and analysis of financial condition and results of operations" ("MD&A disclosures"). *Id.* ¶¶ 128-30. Item 7 of Form 10-K and Item 2 of Form 10-Q required Newell to

disclose material trends, events, or known uncertainties that had or were likely to have a material effect on the company's revenue. *Id.* ¶¶ 128-29. Plaintiff alleges that Defendants' MD&A disclosures "were materially false and misleading because Defendants failed to disclose material uncertainties, trends, and events associated with" Newell's excess inventory issue, pricing conflicts with the E-commerce division, and operational issues with the Jarden acquisition. *Id.* ¶ 130. Plaintiff does not assert that it has a private cause of action for an Item 303 violation.

Second, Plaintiff alleges that Defendants violated Item 503 of Regulation S-K, 17 C.F.R. § 229.503, which concerns "risk factors" according to Plaintiff. *Id.* ¶ 131. Item 503 of Regulation S-K, however, is titled "Prospectus Summary" and does not discuss risk factors. It appears that Plaintiff meant to allege a violation of Item 105 of Regulation S-K, 17 C.F.R. § 229.105, which covers risk factors. Nonetheless, Item 1A of both Form 10-K and Form 10-Q required Defendants to disclose risk factors of investing with Newell. *Id.* ¶ 131. Plaintiff alleges that Defendants made materially false and misleading representations about risks associated with investing in Newell, including a risk associated with the change of product demand in Newell's global supply chain. *Id.* ¶ 132. Plaintiff does not assert that it has a private cause of action for a violation of Item 503 or Item 105.

Third, Plaintiff alleges that Defendants violated Item 307 of Regulation S-K, 17 C.F.R. § 229.307, entitled "Disclosure controls and procedures." Item 9A of Form 10-K and Item 4 of Form 10-Q required Defendants to divulge information about the effectiveness of Newell's disclosure controls, which are "the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized, and reported." *Id.* ¶ 133. Plaintiff alleges that Defendants "falsely and misleadingly"

represented that "its disclosure controls were operating effectively when they were not." *Id.* ¶ 134.

Plaintiff does not assert that it has a private cause of action for a violation Item 307.

### D. Alleged Materially False and Misleading Statements and Omissions During the Class Period

Plaintiff alleges that throughout the Class Period, the Defendants made numerous materially false and misleading statements and omissions. *Id.* ¶¶ 135-68. On February 6, 2017, the first day of the Class Period, Newell issued its financial guidance for 2017, predicting a range of 2.5% to 4.0% for CSG and $2.95 to $3.15 for NEPS. *Id.* ¶ 137. During a conference call with investors later that day, Polk predicted a stronger second half of 2017 and indicated that he believed the issue of inventory destocking "will be behind us." *Id.* ¶ 140. He also stated that with respect to the Jarden integration in the U.S. market, the changes were "largely behind us." *Id.* Plaintiff alleges that these statements were "materially false and misleading because, unbeknownst to Newell investors, Newell had loaded its retail channel with large amounts of the Company's products" and was facing issues with the Jarden integration. *Id.* ¶ 141.

On March 1, 2017, Newell filed its Form 10-K for 2016 with the SEC, which the Executive Defendants signed. *Id.* ¶ 143. Plaintiff alleges that the filing included false and misleading disclosures and omissions because it referred only to "*potential risks*" regarding the Jarden integration and inventory pressures "when, as alleged herein, those risks had materialized and were then existing." *Id.* ¶ 144 (emphasis in original). Yet, the 2016 Form 10-K included warnings that "the Company's customer base is relatively fragmented" and that "the Company does not have any long-term supply or binding contracts or guarantees of minimum purchases with its largest customers." *Id.* ¶ 144. The filing warned that "cancellations, reductions, delays in purchases or changes in business practices or by customers could have a material adverse effect" on Newell's business and financial condition. *Id.* The 2016 Form 10-K added that "[t]he Company's plans to

continue to improve productivity and reduce complexity and costs may not be successful, which would materially adversely affect its ability to compete." *Id.* Furthermore, the filing indicates that "the Company's cost savings plans associated with the Jarden integration may not be completed substantially as planned, may be more costly to implement than expected, or may not result in, in full or in part, the positive effects anticipated." *Id.*

Plaintiff additionally alleges that the 2016 Form 10-K was false and misleading because Item 9A stated that Newell's "disclosure controls and procedures were effective as of December 31, 2016." *Id.* ¶ 145. In particular, Plaintiff claims that Polk and Nicoletti "falsely and misleadingly certified" that representation about the disclosure controls. *Id.* ¶ 146.

On May 8, 2017, Newell filed a Form 8-K and issued a press release to announce Newell's financial results for the first quarter of 2017. *Id.* ¶ 147. Newell reported a CSG of 2.5% and increased its guidance for its 2017 NEPS range to $3.00 to $3.20. *Id.* ¶¶ 147-48. Plaintiff does not allege that the reported CSG of 2.5% was inaccurate or fraudulent.

During a conference call later that day in response to a question about the Jarden integration, Polk stated that "the vast majority of change in our biggest market [the United States] is behind us." *Id.* ¶ 149. Plaintiff does not provide evidence that this was a false statement when made, but claims it was misleading given the then-existing internal communication problems, R&D process inefficiencies, and the fact that Newell had already fired much of Jarden's sales team. *Id.* ¶ 153. On the same call, Polk also claimed that the effects of inventory destocking were "now behind us." *Id.* ¶ 150. Plaintiff states that at the time of this statement, "Defendants knew that its bloated inventory levels would have an increasingly negative effect on Newell's sales growth and margins." *Id.* ¶ 152. Plaintiff also cites to the Starboard presentation slide that Newell's inventory levels were 42% higher than other industry averages. *Id.* Additionally, Polk

stated that Newell's E-commerce division "grew strong double digits," which Plaintiff alleges was materially false and misleading because "pricing conflicts had already developed." *Id.* ¶¶ 151, 154. However, Plaintiff does not allege that the actual reported growth was false or fraudulent. Plaintiff adds that Defendants made similar, misleading comments to investors on June 15, 2017 regarding the same issues. *Id.* ¶ 157.

On August 4, 2017, Newell filed a Form 8-K in which it announced its financial results for the second quarter of 2017. *Id.* ¶ 158. Newell reported a CSG of 2.5% and a net sales growth of 5.1%. *Id.* Plaintiff does not allege that either number is false. In an accompanying press release, Polk reaffirmed Newell's previously issued financial guidance for 2017, increased its guidance for net sales, and stated "[w]e expect core sales growth to strengthen in the second half of the year." *Id.* ¶¶ 158-59.

In a conference call with investors and analysts later that day, Polk reiterated his expectation that Newell would perform even better in the second half of the year. *Id.* ¶ 160. Polk added that this expectation "presumed no major retail-driven disruptions in the back half of the year. And I think that's a good assumption to make." *Id.* ¶ 161. Polk stated that as to the effects of inventory destocking, "once we get ... into the fourth quarter, I think the degree of impact lessens." *Id.* ¶ 162. Regarding the Jarden integration, Polk claimed "we're right where we expected to be and the disciplined execution of the Transformation Office gives us full confidence in our 2017 delivery." *Id.* ¶ 163. Lastly, Polk stated that Newell had increased its rate of investment in its E-commerce division and expected that it would "deliver strong double-digit growth" moving forward. *Id.* ¶ 164.

Plaintiff alleges that Defendants' statements and filings on August 4, 2017 were materially false and misleading because Newell's inventory was still bloated, communication issues and costs

continued to plague the Jarden integration, Newell was in the process of hiring back some of the Jarden sales force that it had fired, pricing conflicts continued to negatively affect Newell's B&M divisions, and Newell's Transformation Office was overstaffed and overspending. *Id.* ¶ 165. Therefore, Plaintiff claims Defendants knew there was no reasonable basis for Newell's positive statements and financial guidance. *Id.* ¶ 166.

On August 9, 2017, Newell filed a Form 10-Q for the second quarter of 2017, which Polk and Nicoletti signed. *Id.* ¶ 167. Plaintiff alleges the filing contained false and misleading information. *Id.* ¶ 167. On September 6, 2017, Newell reaffirmed its previously issued 2017 financial guidance in a press release. *Id.* ¶ 168.

However, on November 2, 2017, Newell issued a press release announcing its financial results for the third quarter of 2017. *Id.* ¶ 170. Newell reported a net sales decline of 7% and reduced its 2017 CSG projections downward to 1.5% to 2.0% from its previous guidance of 2.5% to 4.0%. *Id.* Plaintiff alleges that in the press release, "rather than disclose the myriad issues alleged herein that were causing the Company's sales growth and margins to deteriorate, Defendant Polk deceptively attributed the Company's disappointing financial results to macroeconomic conditions." *Id.* ¶ 171. Polk indicated that the underperformance was due to "weak late-quarter sales related to retailer inventory rebalancing, primarily in response to decelerating U.S. market growth through the Back-to-School period." *Id.* ¶ 171. Later that day on a conference call with investors and analysts, Polk announced what Plaintiff describes as a "major risk" involving Newell's global supply chain. *Id.* ¶ 172. As Polk explained, since Newell manufactures only 50% of its products, it must order the other 50%, which can be difficult to balance and can cause Newell to hold excess inventory. *Id.* On that same call, Polk reiterated that Newell had "perfect visibility into our largest retailers' inventory position." *Id.* ¶ 173. In response

to this November 2, 2017 information, Newell's stock fell approximately 27%, or $10.99 per share. *Id.* ¶ 174.

On January 25, 2018, Newell issued a press release announcing Newell's 2017 financial results. *Id.* ¶ 175. Newell decreased its anticipated 2017 CSG to .08% and decreased its expected NEPS range. *Id.* Newell also announced that three of its board members had resigned and that the company was exploring "strategic options" to divest assets. *Id.* ¶ 176. Newell's stock fell approximately 21%, or $6.42 per share. *Id.* ¶ 178.

**E. Scienter**

Plaintiff alleges that each of the Executive Defendants acted with scienter in that each knew or recklessly disregarded that their public statements were materially false and misleading; knew that they would be disseminated publicly; and knowingly participated or acquiesced in the issuance of such statements in violation of federal securities laws. *Id.* ¶ 179. Plaintiff notes that due to their roles, each Executive Defendant was privy to confidential information about Newell. *Id.* ¶ 180.

Plaintiff contends that Defendants knew of internal problems related to the Jarden acquisition "given the sheer magnitude of the transaction and Defendants' prominent placement of the acquisition as a central feature of Newell's purported ability to 'perform while it transformed.'" *Id.* ¶ 184. Plaintiff further claims that Defendants were aware that pricing conflicts between the E-commerce and B&M divisions were causing harm to the company. *Id.* ¶ 183. Plaintiff notes that Polk told investors that the E-commerce division would be physically located one floor below the executive team so "that we don't get into pricing dislocating dynamics" between the two divisions. *Id.*

Plaintiff alleges that Polk, in particular, made many statements in conference calls and press releases regarding Newell's business, results, and future prospects that were knowingly

materially false and misleading. For example, Plaintiff claims that Polk's statements that inventory destocking issues were "behind" Newell were false because Polk and Newell had "perfect visibility" into its largest retailers' positions. *Id.* ¶ 182. Plaintiff contends Polk had a "powerful personal motive" as to the Jarden transaction, that is, Polk's "entire professional reputation" as he had staked his name on ensuring that Newell could perform while it transformed. *Id.* ¶ 185.

### F. Loss Causation; Presumption of Reliance – Fraud on the Market

Plaintiff asserts that Defendants' deceptive scheme "artificially inflated the value of Newell's securities and operated as a fraud on Class Period purchasers of Newell stock." *Id.* ¶ 189. As a result of purchasing securities at artificially inflated prices, class members "suffered economic loss and damages under the federal securities laws, when subsequent disclosures removed the inflation from such securities." *Id.* ¶ 190. Plaintiff asserts that its damages were a direct and proximate result of the Defendants' wrongful conduct. *Id.* ¶ 226.

To support its claim, Plaintiff notes that on the first day of the Class Period, Newell's stock closed at $44.23 per share. *Id.* ¶ 191. Newell's stock rose to $55.09, its high point, on June 19, 2017. *Id.* Subsequently, after the November 2017 and January 2018 financial disclosures, Newell's stock dropped to $24.81. *Id.* Plaintiff claims that the November 2017 and January 2018 disclosures "corrected the false and misleading information previously provided to the market for which the Lead Plaintiff, on behalf of itself and the Class, seeks to be compensated." *Id.* ¶ 204.

Plaintiff states two bases for a presumption of reliance in this case: (1) "the material omissions are presumed to have inflated the market prices of Newell common stock" and (2) "the market for Newell common stock was an efficient market that promptly digested current information with respect to the Company from publicly-available sources and reflected such information in the prices of the Company's securities." *Id.* ¶ 205. Plaintiff adds that Newell stock

was listed on the NYSE, Newell filed public reports with the SEC, Newell communicated officially with public investors and analysts, and Newell's market price reacted quickly to the disclosure of new, material information. *Id.* Plaintiff claims that under these circumstances, "the presumptions of reliance available under the 'fraud-on-the-market' and *Affiliated Ute* theories apply." *Id.* ¶ 206. Plaintiff asserts that Class Members "would not have purchased Newell stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements." *Id.* ¶ 225.

### G. No Safe Harbor – Inapplicability of Bespeaks Caution

Plaintiff indicates that the PSLRA safe harbor for forward-looking statements does not apply to any of Defendants' material misrepresentations and omissions because the statements were not identified as forward-looking or couched in meaningful cautionary statements when made and because the speakers knew the statements to be false or misleading when made. *Id.* ¶¶ 209-11.

### H. Procedural History

Plaintiff filed its Complaint on June 21, 2018. D.E. 1. Plaintiff then filed its FAC on November 28, 2018. D.E. 28. The FAC alleges two Counts: (I) violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (II) violations of Section 20(a) of the Exchange Act by the Executive Defendants. *Id.* ¶¶ 212-33. Defendants moved to dismiss, D.E. 32, which Plaintiff opposed, D.E. 36, and to which Defendants replied, D.E. 37. Plaintiff filed a notice of supplemental authority on August 12, 2019, D.E. 38, to which Defendants replied on August 22, 2019, D.E. 39. Plaintiff filed a second notice of supplemental authority on November 7, 2019, D.E. 40, to which Defendants replied on November 22, 2019, D.E. 41.

## II. LEGAL STANDARD

Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements. "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

PSLRA

The PSLRA imposes further pleading requirements. "The PSLRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). The PSLRA "requires that a complaint state with particularity both the facts constituting

the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* at 241-42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal quotations omitted). In other words, plaintiffs bringing a claim involving an allegedly false or misleading statement must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Id.* at 242 (quoting *Tellabs*, 551 U.S. at 321).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing the requirement set forth in Rule 9(b). *Id.* at 241 n. 3. Although the "PSLRA replaced Fed. R. Civ. P. 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA. *Id.* This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Section 78u-4(b)(1) also adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information or belief," plaintiffs must "state with particularity all facts on which that belief is formed"; that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1).

As to the second element, the PSLRA's approach for pleading scienter sharply deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally. *Avaya*, 564 F.3d at 253. Under the PSLRA, the court must evaluate whether all the facts in the complaint as alleged,

taken collectively, give rise to a "strong inference of scienter" – not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely is one conclusion as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

These pleading requirements apply whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. *Avaya*, 564 F.3d at 253-54. However, when an allegation involves a prediction, the safe harbor provision of the PSLRA immunizes any forward-looking statement from liability, provided that "the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Id.* at 254; *see* 15 U.S.C. § 78u-5(c).

## III.  ANALYSIS

In the Court's view, Plaintiff fails to sufficiently plead a Section 10(b) violation. As a result, the Section 20(a) claim also fails. The Court permits Plaintiff an additional opportunity to replead consistent with the following analysis. Plaintiff first alleges violations of Section 10(b) and Rule 10b-5. The Third Circuit has described such a claim in the following terms:

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The Supreme Court has implied a private cause of action from the text and purpose of [S]ection 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36-37, 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011). To state a claim for securities fraud, plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Id.* at 1317-18; *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

## A. Count I – Section 10(b) and Rule 10b-5

Count I of the FAC suffers from several pleading shortcomings which fall generally into the following areas: (1) material misrepresentations or omissions allegations, (2) PSLRA safe harbor allegations, and (3) Items 303, 503, and 307 allegations. The Court reviews each in turn.

### 1. Material Misrepresentations or Omissions

Defendants argue that Plaintiff fails to sufficiently plead any actionable material misrepresentation or omission. Def. Br. at 21-29. In a securities fraud claim, plaintiffs must "identify a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 (3d Cir. 1997)). "However, a fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to

the investor." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988)). In other words, courts must "examine statements in the full context of the documents which they are a part" and not engage in a "selective reading" of the statements. *City of Edinburgh Council*, 754 F.3d at 168-69 (citing *Burlington Coat Factory*, 114 F.3d at 1426; *Tellabs*, 551 U.S. at 322). Moreover, under the PSLRA, a complaint is to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Court agrees that it is suspicious that Defendants reported in September 2017 that their financial guidance was on target, but then failed to meet that target in November of 2017, less than two months later. FAC ¶¶ 168-70. Even so, the FAC falls short. It appears that Plaintiff has, in large part, incorporated the Starboard Presentation as the basis of its case. While the Starboard Presentation can certainly support an *ex post facto* analysis as to why Newell failed to meet its prior projections at the end of 2017 and the beginning of 2018, the presentation does not necessarily indicate fraud. To the contrary, the Starboard Presentation appears to explain why certain business decisions, such the firing of Jarden sales representatives, ended up hurting Newell. However, business decisions made in good faith that do not play out as hoped do not give rise to securities fraud. In addition, Plaintiff never contends that any of the historical financial information provided by Defendants is false or fraudulent. If such information was in fact accurate, particularly the CSG numbers, they would seem to support optimism by the Executive Defendants.

As noted, Plaintiff's claim is that Defendants deceived investors by misrepresenting or failing to disclose (1) Newell's excess inventory levels, (2) pricing conflicts between the E-

commerce and B&M divisions, and (3) operational issues relating to the Jarden integration. As to the inventory levels, Plaintiff does not plausibly allege the material impact of excess inventory levels on Newell's finances. While it is true that in May 2017, Polk stated that the inventory reduction impacts are "now behind us," *id.* ¶ 81, the FAC does not provide sufficient evidence showing that the statement was false when made or, for that matter, that Polk believed that it was false. For example, Plaintiff does not allege that the Executive Defendants were given internal warnings about the precise inventory issues that caused Newell to miss its predicted guidance figures. Additionally, while Plaintiff relies on the Starboard Presentation to show that Newell's inventory levels were approximately 42% higher than industry averages, *id.* ¶ 75, Plaintiff does not explain why such a comparison is indicative of fraud. For example, Plaintiff does not claim that Defendants indicated that that their inventory levels were commensurate with, or below, industry averages.

As to the pricing conflicts between the E-commerce and B&M divisions, Plaintiff again fails to sufficiently allege the material impact of the conflicts. Plaintiff does not allege any particular monetary loss attributable to such conflicts. Instead, Plaintiff alleges that the conflicts resulted in "extensive promotional discounting that led to significantly impaired sales margins[.]" *Id.* ¶ 87. However, Plaintiff fails to offer any necessary, supporting information, such as when such discounts occurred, the amount of such discounts, the adverse financial impact of such discounts, or when the adverse impact was felt by Newell. Moreover, Plaintiff does not adequately indicate how such discounts are suggestive of fraud.

As to the operational and managerial issues with the Jarden integration, it appears most of Plaintiff's allegations in this category simply reflect bad business decisions (or reasonable decisions that did not pan out) by Newell and are protected by the business judgment rule. "The

business judgment rule originated as a means of limiting the liability of corporate directors and officers for mistakes made while performing their duties. Absent bad faith or some other corrupt motive, directors are normally not liable to the corporation for mistakes of judgment[.]" *Cramer v. Gen. Tel. & Elecs. Corp.*, 582 F.2d 259, 274 (3d Cir. 1978) (citation omitted). Newell's decisions to fire most of the Jarden sales force or to not consolidate its corporate offices as well as its decisions as to funding of the Transformation Office and the growth of the E-commerce division appear to be soundly within the business judgment rule absent requisite allegations demonstrating fraud. The same is true of the allegations concerning Newell's R&D process. Plaintiff fails to sufficiently allege any false or misleading statements concerning these areas. For example, Plaintiff does not allege that Defendants indicated that they were drastically cutting costs in the Transformation Office while, in reality, they were dramatically increasing costs. Similarly, Plaintiff does not allege that Defendants stated that the R&D process resulted in a high success rate while, in fact, only a very low percentage of products made it through the process. Critically, Plaintiff does not plausibly allege the material impact that the operational and managerial issues had on Newell.

Based on the foregoing reasons, the Court finds that Plaintiff has failed to adequately allege "a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC*, 306 F.3d at 1330 (citing *Burlington Coat Factory*, 114 F.3d at 1419). Given that Plaintiff has failed to plausibly plead the first element of Count I, the Court does not reach the remaining requirements of a Section 10(b) claim.[5]

---

[5] While the Court is not addressing the remaining elements, it does have concerns, particularly regarding scienter. Plaintiff alleges that Polk's "powerful personal motive" to ensure the success of the Jarden integration, which stemmed from his reputation as a transformer, is a basis for scienter. FAC ¶ 185. "[M]otive can be a relevant consideration ... the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. Yet, general motives to help a company are

24

## 2. PSLRA Safe Harbor

The Court need not address the PSLRA safe harbor issues given that Plaintiff has not

successfully pleaded its securities fraud claim, but the Court briefly discusses the safe harbor

because the Court is granting leave to amend. The safe harbor provision of the PSLRA immunizes

any forward-looking statement from liability, provided that "the statement is identified as such and

accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show

the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254; *see* 15

U.S.C. § 78u-5(c).

Many of the alleged statements in the FAC involve forward-looking statements. Plaintiff

claims that the statutory safe harbor does not apply to any of Defendants' material

misrepresentations and omissions. FAC ¶¶ 209-11. Specifically, Plaintiff claims the statements

"were not identified as 'forward-looking statements' when made and there were no meaningful

cautionary statements." *Id.* ¶ 210. In contrast, Defendants contend that most of the challenged

statements fall squarely within the protection of the statutory safe harbor. Def. Br. at 11.

In opposition, Defendants prepared a chart that sufficiently indicates how each challenged

forward-looking statement was identified as forward-looking and the cautionary language

accompanying each statement. Def. Br. Ex. 26. Defendants' cautionary language appears both

"extensive and specific," as required by *GSC Partners CDO Fund v. Washington*, 368 F.3d 228,

243 n.3 (3d Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).

For example, the risks set forth in Newell's 2016 Form 10-K filed on March 1, 2017, which

---

insufficient to establish scienter, absent unusual circumstances. *Avaya*, 564 F.3d at 278-79. Instead, plaintiffs must plead a concrete, personal benefit to the individual defendants. *Id.* The Court has found no case law that supports an inference of motive based on an individual defendant's reputation, as alleged here. It would appear that every individual defendant would have an interest in protecting his or her reputation.

Plaintiff included in the FAC, appear tailored to specific risks and uncertainties Newell was facing. *Id.* ¶ 144. The warnings explained that the following factors, among others, could have material adverse affects on Newell's profits: Newell's reliance on purchases from large customers, the fact that Newell's customer base is "relatively fragmented," and the fact that Newell generally does not have long-term contracts with its customers. *Id.* The warnings specifically mention that Newell's "cost saving plans associated with the Jarden integration may not be completed substantially as planned, may be more costly to implement than expected, or may not result in, in full or part, the positive effects anticipated." *Id.* The warnings pointed to a "significant amount of organizational change," which could have a variety of negative impacts on Newell. *Id.*

The cautionary language appears to fit within the parameters of the statutory safe harbor. The Court, however, does not make a definitive finding in this regard because it is granting leave to amend.

### 3. Items 303, 503, and 307 Allegations

Plaintiff asserts claims based on violations of Items 303, 503, and 307 of Regulation S-K. However, Plaintiff does not provide any legal justification that these Items[6] provide private causes of action.

As to Item 303, the Third Circuit held in *Oran v. Stafford* that violations of Item 303 do not create an independent cause of action for private plaintiffs. 226 F.3d 275, 287 (3d Cir. 2000) ("In *Burlington*, this Court noted that '[i]t is an open issue whether violations of Item 303 create an independent cause of action for private plaintiffs.' *Burlington*, 114 F.3d at 1419 n.7. Today, we hold that they do not."). More recently, citing *Oran* and *In re NVIDIA Corp. Sec. Litig.*, 768

---

[6] Plaintiff also does not provide legal justification that Item 105, which the Court believes Plaintiff meant to plead in place of Item 503, provides a private cause of action.

F.3d 1046 (9th Cir. 2014), Judge McNulty stated that "an omission in the context of Item 303 can give rise to a Rule 10b-5 claim *if the Item 303 omission renders other statements materially misleading*." *In re Galena Biopharma, Inc. Sec. Litig.*, 337 F. Supp. 3d 378, 392 (D.N.J. 2018) (emphasis in original).

If Plaintiff chooses to re-assert these claims in an amended complaint, it must provide legal justification as to why each Item it asserts provides a private cause of action or otherwise properly supports a claim.

### B. Count II – Section 20(a) – Control Person Liability[7]

Plaintiff also asserts claims for control person liability against the Executive Defendants under Section 20(a). FAC ¶¶ 227-33. "Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a 'controlled person' who violates Section 10(b)." *Carmack*, 258 F. Supp. 3d at 466 (citing 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005)). The three elements to this claim are "(1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Id.* (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 (3d Cir. 2006)). Thus, "liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.* Because the Section 10(b) claim is dismissed for the reasons state above, Plaintiff's Section 20(a) claim – Count II – is also dismissed.

---

[7] The Court notes that "[a] difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 485 (3d Cir. 2013)).

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss Plaintiff's First Amended Consolidated Complaint, D.E. 32.  The dismissal is without prejudice.  Plaintiff shall have thirty (30) days to file an amended complaint, which cures the deficiencies noted herein.  If Plaintiff does not do so, this matter will be dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Dated: December 10th, 2019

John Michael Vazquez, U.S.D.J.